## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

Debtors.

**Case No. 3:16-bk-02230-PMG**

**Chapter 11**
**(Jointly Administered)**

> **THIS DOES NOT CONSTITUTE A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THE COURT HAS APPROVED THE DISCLOSURE STATEMENT.  THE COURT HAS NOT APPROVED THIS DRAFT DISCLOSURE STATEMENT.**

**DISCLOSURE STATEMENT TO ACCOMPANY THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC**

**STORCH AMINI PC**
Jeffrey Chubak (admitted pro hac vice)
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
(212) 490-4208 (Facsimile)
jchubak@storchamini.com

**THAMES MARKEY & HEEKIN, P.A.**
Richard R. Thames
Robert Heekin
Florida Bar No. 0718459
Florida Bar No. 652083
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
rah@tmhlaw.net

*Attorneys for the Official Committee of*
*Unsecured Creditors*

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

**DAVIS POLK & WARDWELL LLP**
Timothy Graulich (admitted pro hac vice)
James I. McClammy (admitted pro hac vice)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com

**STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON,
P.A.**
Patricia Ann Redmond
Florida Bar No. 303739
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
predmond@stearnsweaver.com

*Attorneys for the Trustees of the
National Maritime Museum*

Dated: August 28, 2018

THE PLAN PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO ACCOMPANY THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC (THE "**DISCLOSURE STATEMENT**") TO HOLDERS OF CLAIMS FOR PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION (THE "**PLAN**") PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC (COLLECTIVELY, THE "**PLAN PROPONENTS**").  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII.

THE PLAN PROPONENTS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED BY THE PLAN. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE PLAN PROPONENTS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN, ATTACHED HERETO, OR INCORPORATED HEREIN BY REFERENCE IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS RELIED ON FINANCIAL DATA PROVIDED BY THE DEBTORS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  AS A RESULT, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  THE PLAN PROPONENTS CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE RECOVERY ANALYSIS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE PLAN PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE PLAN PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, INCLUDING THE RECOVERY ANALYSIS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE PLAN PROPONENTS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

IF THE COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).

# TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY ...................................................................................1
    A.  Overview of this Disclosure Statement and the Plan.................................2
    B.  Purpose and Effect of the Plan..................................................................3
    C.  Treatment of Claims and Interests under the Plan ....................................4
    D.  Deadlines for Voting and Objecting to the Plan; Confirmation Hearing
        Date ...........................................................................................................6
    E.  Additional Information ..............................................................................6
    F.  Recommendation .......................................................................................6
II.  VOTING ON THE PLAN ..................................................................................7
III.  DESCRIPTION OF THE DEBTORS AND THE HISTORY OF THE R.M.S.
    TITANIC ARTIFACTS......................................................................................9
    A.  The Debtors' Businesses...........................................................................9
    B.  Corporate Structure...................................................................................9
    C.  The Titanic Artifacts and the Covenants and Conditions .........................9
IV.  THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS............12
    A.  The Debtors' Motion to Sell the French Artifacts ...................................12
    B.  Plan Discussions and Proposals ..............................................................13
    C.  Plan Mediation ........................................................................................15
    D.  Trustee Motion ........................................................................................15
    E.  D&O Litigation........................................................................................15
    F.  Equity Committee Plan ............................................................................16
    G.  The Plan Sponsors' Bid Letter ................................................................16
    H.  Debtors' Third Sale Motion .....................................................................16
    I.  The Plan Support Agreement and the Sale to the Plan Sponsors .............17
    J.  Bankruptcy Court Status Conference.......................................................23
    K.  Use of Cash Collateral and Debtor-in-Possession Financing ..................24
    L.  Debtor-in-Possession Administration ......................................................24
V.  SUMMARY OF THE PLAN OF LIQUIDATION .............................................25
    A.  Classification and Treatment of Claims and Interests ..............................26
    B.  Limited Consolidation for Voting, Confirmation, and Distribution
        Purposes ...................................................................................................27
    C.  Bar Dates and Claims Filed .....................................................................27
    D.  Implementation of the Plan......................................................................27
    E.  Summary of Certain Other Provisions of the Plan...................................30
    F.  Executory Contracts and Unexpired Leases .............................................31
    G.  Claims Allowance Process.......................................................................32
    H.  Distributions............................................................................................33
    I.  Effectiveness of Plan...............................................................................35
    J.  Retention of Jurisdiction .........................................................................36
    K.  Limitation of Liability, Releases and Injunction .....................................37
    L.  Revocation or Withdrawal of the Plan.....................................................39
    M.  Modification of the Plan ..........................................................................39
    N.  Payment of Statutory Fees .......................................................................40

#91100595v13

O.      Governing Law ..........................................................................................40
P.      Withholding, Reporting, and Payment of Taxes.......................................40
Q.      Comparison of Estimated Recoveries for Unsecured Creditors under the
        Third Sale Motion and the Plan ...............................................................40
VI.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .....42
A.      Voting; Acceptance...................................................................................42
B.      Confirmation Hearing ...............................................................................43
C.      Feasibility..................................................................................................44
D.      Best Interests Test.....................................................................................45
E.      Fair and Equitable Requirement ...............................................................46
VII.    CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING.................47
A.      Certain Bankruptcy Considerations ..........................................................47
B.      Certain Considerations Associated with the Sale .....................................49
VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES................................50
A.      Introduction...............................................................................................50
B.      Consequences to the Debtor......................................................................51
C.      Consequences to Holders of Allowed Class 3 Claims..............................51
IX.     SUMMARY OF ADDITIONAL SOURCES OF INFORMATION...................56
X.      RECOMMENDATION AND CONCLUSION...................................................57

#91100595v13

## I.    EXECUTIVE SUMMARY

RMS Titanic, Inc. ("**RMST**") and certain of its affiliates, as debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**"), including its parent corporation Premier Exhibitions, Inc. ("**PRXI**"), each filed with the United States Bankruptcy Court for the Middle District of Florida (the "**Court**") a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") on June 14, 2016 (the "**Petition Date**").  The Chapter 11 Cases are jointly administered for procedural purposes only under lead case number 16-02230 (PMG).

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of the Debtors, the Trustees of the National Maritime Museum ("**NMM**"), the Board of Trustees of National Museums and Galleries of Northern Ireland ("**NMNI**" and, together with NMM, the "**Museum Plan Sponsors**"), and Running Subway Productions, LLC ("**Running Subway**" and, together with the Museum Plan Sponsors, the "**Plan Sponsors**"; the Plan Sponsors, together with the Creditors' Committee, the "**Plan Proponents**") submit this disclosure statement (this "**Disclosure Statement**") in accordance with section 1125 of the Bankruptcy Code to provide information regarding the *First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC* (as amended, supplemented, or modified from time to time, the "**Plan**").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  All capitalized terms used but not defined herein shall bear the same meaning as ascribed to them in the Plan.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Plan and this Disclosure Statement are the culmination of months of discussions among the Plan Proponents, Titanic Belfast Ltd. ("**Titanic Belfast**"), and certain other parties in interest, as described in more detail herein.  On June 27, 2018, the Plan Proponents and certain holders of Claims against the Debtors entered into that certain Plan Support Agreement attached hereto as **Exhibit B** (together with all exhibits thereto, and as may be amended or modified from time to time, the "**PSA**"), which contemplates (a) the sale of substantially all of the Debtors' assets to the Plan Sponsors for a purchase price of $19.2 million and (b) the establishment of a Liquidation Trust for the purpose of, among other things, pursuing certain Causes of Action on behalf of the Debtors' estates, monetizing the Property of the Debtors not sold to the Plan Sponsors, and making distributions to the Debtors' stakeholders.

A hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") is scheduled to be held on [●], 2018, at [●], prevailing Eastern Time, before the Honorable Judge Paul M. Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Florida, 300 North Hogan Street, Courtroom 4A (4th Floor), Jacksonville, Florida 32202.    Additional information with respect to confirmation of the Plan ("**Confirmation**") is provided in Article V of this Disclosure Statement.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and transactions contemplated by, the Plan.  Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing

negotiations among the Plan Proponents, the Debtors and various parties, have not been finally agreed upon, and may be modified.

The Plan Proponents believe that the compromises and transactions contemplated by the Plan are fair and equitable, maximize the value of the Debtors' chapter 11 estates (collectively, the "**Estates**"), and provide the best recovery to claimholders.   This Disclosure Statement contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of that chapter 11 plan, as it includes information about:

- the Debtors' corporate structure and business (Article III hereof);

- material events in the Chapter 11 Cases (Article IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article V.A hereof);

- releases contemplated by the Plan (Article V.K hereof);

- the implementation of the Liquidation Trust, which will undertake the liquidation of the Estates and administer the distribution of the Debtors' remaining assets and Sale Proceeds (Article IV.D hereof);

- the statutory requirements for confirming the Plan (Article VI hereof);

- certain risk factors holders of Claims should consider before voting to accept or reject the Plan (Article VII hereof); and

- certain United States federal income tax consequences of the Plan (Article IX hereof).

The Plan Proponents believe that the Plan is in the best interest of the Estates and, accordingly, recommend that you vote to accept the Plan.

**THIS EXECUTIVE SUMMARY ONLY PROVIDES A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN.   THE EXECUTIVE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.   THE PLAN PROPONENTS STRONGLY RECOMMEND READING THE EXECUTIVE SUMMARY IN CONJUNCTION WITH THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN.**

A.    **Overview of this Disclosure Statement and the Plan**

In the pleadings filed by the Debtors on the Petition Date, PRXI stated that its reason for filing the Chapter 11 Cases was to sell certain artifacts salvaged from the wreck of the R.M.S.

#91100595v13

*Titanic*, which artifacts are the Debtors' most valuable assets, pay off its creditors, and emerge from chapter 11 expeditiously.  Any sale of the artifacts salvaged from the R.M.S. *Titanic* wreck must be approved by the United States District Court for the Eastern District of Virginia (the "**Admiralty Court**") pursuant to the covenants and conditions that apply to the Debtors' ownership of the artifacts.  In the two years since the Debtors commenced these Chapter 11 Cases, the Debtors have been unable to successfully sell any assets or to successfully propose a chapter 11 plan.  The statutory period of plan exclusivity expired on February 8, 2018.

The Plan Proponents propose the Plan, which provides for a sale of substantially all of the Debtors' assets to the Plan Sponsors for a purchase price of $19.2 million, free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements that will be included with the Plan Supplement (such sale transaction, the "**Sale**").  The Plan contemplates that (i) the Museum Plan Sponsors will acquire the R.M.S. *Titanic* artifacts (each, an "**Artifact**" and, collectively, the "**Artifacts**" or the "**Artifact Collection**"), the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, the Debtors' rights in the RMS Titanic Trust, and certain intellectual property and other assets related to the Artifact Collection and the R.M.S. *Titanic* wreck, and (ii) Running Subway will acquire substantially all of the remaining assets of the Debtors, save claims and causes of action that vest in the Liquidation Trust, as described in more detail below.  The transfer of the Artifact Collection and the Debtors' rights as salvor-in-possession to the Museum Plan Sponsors shall be subject to approval of the Admiralty Court and shall be made only on notice to NOAA and all other parties entitled to notice in the Admiralty Court Proceeding.  As of the date of this Disclosure Statement, the Plan Proponents believe that their Plan (i) represents the proposal with the highest value to the Debtors' Estates and the highest likelihood of approval in the Admiralty Court and, thus, (ii) is in the best interest of the Debtors, the Debtors' Estates, and the public's beneficial interest in the historical, archeological, scientific, and cultural aspects of the artifacts salvaged from the R.M.S. *Titanic* wreck.

The Plan also provides for the establishment of a Liquidation Trust that will be vested, as of the Effective Date, with all Property comprising the Estates of the Debtors not conveyed to the Plan Sponsors under the Acquisition Agreements (the "**Liquidation Trust Assets**"), including all claims and Causes of Action (including Avoidance Actions under chapter 5 of the Bankruptcy Code) of the Debtors' Estates, to be administered and prosecuted by a Liquidation Trustee for the benefit of the Debtors' Estates.  The Liquidation Trust will make an initial distribution from the Liquidation Trust to holders of Allowed Claims from the proceeds of the Sale and thereafter will make one or more interim distributions of the proceeds of the Liquidation Trustee's administration of the Liquidation Trust Assets, culminating in a final distribution to be made upon the completion of the Liquidation Trustee's administration of the Liquidation Trust Assets.

### B.    Purpose and Effect of the Plan

The Plan is predicated on, among other things, the proposed sale of substantially all of the assets of the Debtors to the Plan Sponsors.

The Plan Proponents are seeking to implement the Plan under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy

3

Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business or sell and liquidate its assets for the benefit of its stakeholders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all legal and equitable interests of the debtors as of the commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  The consummation of a plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth how a debtor will treat claims and equity interests, and a bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.  A chapter 11 plan divides claims and equity interests into "classes" according to their relative priority and other criteria.

### C.      Treatment of Claims and Interests under the Plan

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes (a) the underlying Claim or Interest, (b) whether the Class is "Impaired" under the Plan, meaning that each holder of a Claim will receive less than full value on account of its Claim or Interest or that the rights of holders of Claims under law will be altered in some way (such as receiving stock instead of holding a Claim), (c) the form of consideration (e.g., cash, equity interests, new debt, or a combination thereof), if any, that such holders will receive on account of their respective Claims or Interests, and (d) whether the Class is entitled to vote on the Plan.

The table below provides a summary of the classification, treatment, and estimated recoveries of Claims and Interests under the Plan and the voting status of each Class of Claims and Interests.  **THE TABLE PROVIDES THIS INFORMATION FOR ILLUSTRATIVE PURPOSES ONLY, IS SUBJECT TO MATERIAL CHANGE BASED ON CONTINGENCIES RELATED TO THE CLAIMS-RECONCILIATION PROCESS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.   THE PLAN PROPONENTS MAKE NO REPRESENTATIONS OR GUARANTEES AS TO THE ACCURACY OF THIS INFORMATION.**

| Class | Designation | Treatment | Voting Status | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Class 1 Claim shall receive Cash in the full amount of such Allowed Class 1 Claim. | Unimpaired; Presumed to Accept | 100% |
| 2 | Secured Creditors | Each holder of an Allowed Class 2 Claim shall receive (i) Cash in an amount equal | Unimpaired; Presumed to | 100% |

| Class | Designation | Treatment | Voting Status | Estimated Recovery |
|---|---|---|---|---|
| | | to such Allowed Class 2 Claim, including any non-default interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (ii) the Collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iii) treatment in any other manner such that its Allowed Class 2 Claim shall not be Impaired.  To the extent any security interest relating to an Secured Claim is avoided or any portion of the Secured Claim is determined to be unsecured, including due to any deficiency (the "**Secured Lenders' Unsecured Claim**"), the Secured Lenders' Unsecured Claim shall be classified in Class 3 as General Unsecured Claims and receive the same treatment as other Class 3 Claims; provided, however, that any Secured Lenders' Unsecured Claim in respect of the Secured Loans, the Secured Notes, or any other Claim held by an Insider shall be separately classified as a General Unsecured Claim and shall receive its Pro Rata share of Available Cash contemporaneous with the other General Unsecured Claims as if such Secured Lenders' Unsecured Claim been classified in Class 3 until such Secured Lenders' Unsecured Claim is paid in full with interest at the Federal Judgment Rate. | Accept | |
| 3 | General Unsecured Claims | Each holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Initial Distribution and each subsequent Distribution until paid in full with interest at the Federal Judgment Rate. | Impaired; Entitled to Vote | 59-71%[2] |
| 4 | Intercompany Claims | All Class 4 Claims shall be cancelled in full, and holders of Class 4 Claims shall | Impaired; Deemed to | 0% |

[2] See Section V.Q for a discussion of risks and considerations relating to the recoveries projected herein.

#91100595v13

| Class | Designation | Treatment | Voting Status | Estimated Recovery |
|-------|-------------|-----------|---------------|--------------------|
|       |             | receive no distribution and retain no Property on account of such Claims. | Reject |  |
| 5 | PRXI Interests | Class 5 Interests shall be discharged, cancelled, released, and extinguished and holders of Class 5 Interests shall neither receive any Distributions nor any of the Debtors' Property. | Impaired; Deemed to Reject | 0% |

**D.      Deadlines for Voting and Objecting to the Plan; Confirmation Hearing Date**

In accordance with section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Court has scheduled the Confirmation Hearing for [●], 2018, at [●], prevailing Eastern Time, before the Honorable Judge Paul M. Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Florida, 300 North Hogan Street, Courtroom 4A (4th Floor), Jacksonville, Florida 32202.  The Court may adjourn the Confirmation Hearing from time to time.

In accordance with the Disclosure Statement Order, any objection to Confirmation must be filed with the Court and served so as to be actually received on or before [●] p.m., prevailing Eastern Time, on [●], 2018.

**E.      Additional Information**

Attached as Exhibits to this Disclosure Statement are copies of the following:

Exhibit A:      Plan of Liquidation

Exhibit B:      Plan Support Agreement

Exhibit C:      Recovery Analysis

Exhibit D:      PRXI Corporate Organizational Chart

Exhibit E:      Covenants and Conditions

**F.      Recommendation**

In the opinion of the Plan Proponents, and the Creditors' Committee in particular, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  ACCORDINGLY, THE PLAN PROPONENTS, AND THE CREDITORS' COMMITTEE IN PARTICULAR, RECOMMEND THAT HOLDERS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION.

#91100595v13

## II.    VOTING ON THE PLAN

This Disclosure Statement is being transmitted to certain holders of Claims for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable holders of Claims that are entitled to vote on the Plan to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

By the order of the Court approving this Disclosure Statement (the "**Disclosure Statement Order**"), the Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims that are entitled to vote on the Plan to make informed judgments with respect to acceptance or rejection of the Plan.  The Court's approval of this Disclosure Statement does not constitute either a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the Plan by the Court.

All holders of Claims are encouraged to read this Disclosure Statement, its exhibits, and the Plan Supplement filed prior to the Voting Deadline carefully and in their entirety before, if applicable, deciding to vote either to accept or to reject the Plan.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions, and projections that may be materially different from actual and future results.  Other events may occur subsequent to the date hereof that may have a material impact on the information contained in this Disclosure Statement.  Except as expressly stated, the Plan Proponents do not intend to update the Disclosure Statement, including, without limitation, the Recovery Analysis attached hereto as **Exhibit C**.  Thus, neither the Disclosure Statement nor the Recovery Analysis will reflect the impact of any subsequent events, including any not already accounted for in the assumptions underlying the Recovery Analysis.  Further, the Plan Proponents do not anticipate that any updates, amendments, or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

In general, a holder of a claim or equity interest may vote to accept or reject a chapter 11 plan if (i) no party in interest has objected to such claim or interest (or the claim or interest has been allowed subsequent to any objection or estimated for voting purposes), (ii) the claim or interest is impaired by the plan, **and** (iii) the holder of such claim or interest will receive or retain property under the plan on account of such claim or interest. Class 3 is the only Class entitled to vote on the Plan.

In general, if a claim is unimpaired under a chapter 11 plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim to have accepted the plan and, thus, the holders of claims in such unimpaired classes are not entitled to vote on the plan. Because Classes 1 and 2 are Unimpaired under the Plan, the holders of Claims in those Classes are conclusively deemed to have accepted the Plan and, therefore, are not entitled to vote.

In general, if the holder of an impaired claim or impaired interest will not receive any distribution or retain any property under a chapter 11 plan in respect of such claim or interest, section 1126(g) of the Bankruptcy Code deems the holder of such claim or interest to have rejected the plan and, thus, the holders of Claims and Interests in such classes are not entitled to vote on the plan. Since Classes 4 and 5 are impaired and not receiving any distribution or retaining any property under the Plan, the holders of Interests in those Classes are conclusively deemed to have rejected the Plan and, therefore, are not entitled to vote.

If you are entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies with non-original signatures will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in disqualification of your vote on such Ballot. Holders of Claims that fail to vote are not counted as either accepting or rejecting the Plan.

If you have any questions concerning the procedure for voting your Claim, the packet of materials that you have received or the amount of your Claim, or if you did not receive a Ballot, received a damaged Ballot, lost your Ballot, or wish to obtain (at no charge) a printed copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact the Plan Proponents' Ballot Tabulator, Jeffrey Chubak, at jchubak@storchamini.com or (212) 490-4100.

**IN THE CASE OF EACH VOTER, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND THE BALLOT TABULATOR MUST ACTUALLY RECEIVE THE BALLOT ON OR BEFORE [●], 2018, AT [4:00 P.M.], (PREVAILING EASTERN TIME), (THE "VOTING DEADLINE") BY U.S. MAIL OR OTHER HAND-DELIVERY SYSTEM AT THE ADDRESS INDICATED ON THE BALLOT.**

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED. ANY BALLOTS RECEIVED THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH OTHERWISE DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS, WILL NOT BE COUNTED. BALLOTS THAT INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL BE TREATED AS A VOTE TO ACCEPT THE PLAN.**

#91100595v13

### III.   DESCRIPTION OF THE DEBTORS AND THE HISTORY OF THE R.M.S. TITANIC ARTIFACTS

#### A.   The Debtors' Businesses

PRXI is the parent corporation of the Debtors and certain non-debtor subsidiaries. *See Chapter 11 Case Management Summary* (Docket No. 8) ("**Case Management Summary**") at ¶ 1.  PRXI and its subsidiaries present permanent and touring exhibitions to the public in exhibition centers, museums, and other venues around the world. *Id.* at ¶ 5.  The exhibitions include: "Saturday Night Live: The Experience," "Titanic: The Artifact Exhibition," "Bodies … The Exhibition," "Bodies Revealed," and "The Discovery of King Tut." *Id.*

The Debtors have represented that PRXI first became known for its Titanic exhibitions, which make use of certain artifacts recovered from the R.M.S. *Titanic* wreck site and held in trust by RMST, subject to certain covenants and conditions described in more detail below. *See* Case Management Summary at ¶ 6.  The Debtors also state that they have obtained and are in possession of the largest collection of data, information, images and cultural materials associated with the R.M.S. *Titanic* shipwreck. *Id.* at ¶ 7.  Moreover, in 1994, the Admiralty Court declared RMST "salvor-in-possession" of the R.M.S. *Titanic* wreck and wreck site. *Id.*  The Debtors subsequently diversified their exhibition content to include additional exhibitions, including those named above. *Id.* at ¶ 8.

#### B.   Corporate Structure

As noted above, all of the Debtors are direct or indirect subsidiaries of PRXI.  PRXI is also the direct or indirect parent of additional entities that did not seek relief under the Bankruptcy Code, specifically: 1032403 B.C. Ltd., a British Columbia company, DinoKing Tech Inc., a British Columbia corporation, DinoKing International, Inc., a British Columbia corporation, Premier Hollywood Pictures LLC, a Nevada limited liability corporation, RMS Titanic Trust, PRXI International Holdings CV, a Netherlands corporation, and RMS Titanic (United Kingdom) Ltd., all of which collectively, together with the Debtors, are referred in this Disclosure Statement as the "**Company**."  An organizational chart of the Company is attached hereto as **Exhibit D**.

#### C.   The Titanic Artifacts and the Covenants and Conditions

On April 15, 1912, the R.M.S. *Titanic*, the luxury liner said to be unsinkable, struck an iceberg and sank on her maiden voyage from Southampton, England to New York, resulting in the loss of more than 1,500 lives.  The *Titanic* remained undiscovered for 73 years until a team of American and French researchers, led by Dr. Robert Ballard and financed in part by the National Geographic Society, discovered the wreck site in September 1985. *See* William J. Broad, *WRECKAGE OF TITANIC REPORTED DISCOVERED 12,000 FEET DOWN*, THE NEW YORK TIMES (Sept. 3, 1985), https://www.nytimes.com/1985/09/03/science/wreckage-of-titanic-reported-discovered-12000-feet-down.html.  And the *Titanic* remained undisturbed for 75 years until a predecessor of RMST conducted its first salvage expedition in 1987.

RMST and its predecessors in interest conducted several research, recovery, and salvage expeditions to the wreck of the R.M.S. *Titanic* in 1987, 1993, 1994, 1998, 2000, and 2004,

recovering approximately 5,500 artifacts. *See id.* at ¶ 4, 7; *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests* (Docket No. 28) ("**Debtors' First Sale Motion**") at ¶ 9. The first several of these expeditions were performed in 1987 with the assistance of the L'Institut Français de Recherche pour l'Exploitation de la Mer, the French government's oceanographic institute. *See* Debtors' First Sale Motion at ¶ 7. Over the course of 32 dives during that expedition, more than 2,100 artifacts were recovered from the R.M.S. *Titanic* wreck site (collectively, the "**French Artifacts**" or the "**French Collection**"). *See id.* In 1993, an Administrator in the French Office of Maritime Affairs (Ministry of Equipment, Transportation and Tourism) awarded RMST title to the French Artifacts. *See R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel etc.*, 435 F.3d 521, 524 (4th Cir. 2006). The Administrator's decision relied upon assurances made by RMST that it "agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition." *Id*. at 528.

On August 26, 1993, RMST commenced an *in rem* action in the Admiralty Court against the artifacts recovered in the 1993 expedition, and the wreck itself. *Id.* A few months later, the Admiralty Court entered an order that assumed *in rem* jurisdiction over the artifacts recovered by RMST in 1993, as well as the wreck itself, and declared RMST to be the salvor-in-possession of the wreck and wreck site. *Id.* RMST recovered more than 3,000 additional artifacts starting in 1993 (collectively, the "**American Artifacts**" or the "**American Collection**"), all of which are subject to the Admiralty Court's *in rem* jurisdiction as well.

In August 2010, the Admiralty Court granted RMST a salvage award for its efforts in recovering and restoring the American Artifacts, and determined the award to be 100% of the fair market value of the American Artifacts. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 742 F. Supp. 2d 784, 809 (E.D. Va. 2010) (the "**2010 Order**"). In the 2010 Order, the Admiralty Court reserved the right to determine the manner in which to pay the award (i.e., by judicial sale of the artifacts or by an *in specie* award of title). *Id*. In keeping with prior orders of the Admiralty Court, RMST and the United States Government, through the United States Attorney, negotiated and drafted *Revised Covenants and Conditions for the Future Disposition of Objects Recovered from the R.M.S. Titanic by R.M.S. Titanic, Inc. pursuant to an in specie salvage award granted by the United States District Court for the Eastern District of Virginia* (the "**Covenants and Conditions**"). The Covenants and Conditions are attached hereto as **Exhibit E**. The Covenants and Conditions are perpetual in duration and are intended to govern the disposition, care, conservation, and management of the American Collection. Covenants and Conditions § I(F). In August 2011, the Admiralty Court granted RMST an *in specie* salvage award in the form of title to the American Artifacts, "fully subject to" the Covenants and Conditions. *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 804 F. Supp. 2d 508, 509 (E.D. Va. 2011).

Not limited to the American Artifacts, the Covenants and Conditions require RMST and any successors to hold the entire Artifact Collection in trust for the benefit of the public and subject RMST and any successors to oversight by the Admiralty Court. The Covenants and Conditions are intended to ensure that the Artifact Collection is "for the benefit of the public

interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." Covenants and Conditions § I(G). The Admiralty Court has "continuing jurisdiction over the [American] Collection as part of the pending admiralty action." *Id*. § V(F). While not purporting to grant the Admiralty Court *in rem* jurisdiction over the French Artifacts, the Covenants and Conditions require that the American Collection shall "to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the [French Collection] as an integral whole." *Id.* § III(A).

Moreover, the Covenants and Conditions expressly require the Admiralty Court's approval for any sale, transfer, or assignment of the American Collection and set forth detailed requirements and procedures for such approval, including that the Admiralty Court must determine that the transferee is a "qualified institution." *See id*. § VI(A)-(F). The Covenants and Conditions define a "qualified institution" as an entity demonstrating, in part, the willingness and capacity to ensure that the American Collection "is available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes." *Id*. § II(I). Annex A to the Covenants and Conditions provides criteria for evaluating whether an entity meets this definition, and the Covenants and Conditions set forth detailed procedures for how the Admiralty Court may conduct its review. The Admiralty Court may engage experts to conduct a due diligence investigation of potential subsequent trustees and their operations. *See id*. § VI(E)(2). In addition, the National Oceanic and Atmospheric Administration ("**NOAA**") may submit a report and recommendation as to the qualifications of subsequent trustees. *Id*. § VI(E)(4).

The Covenants and Conditions also provide procedures in the event of RMST's bankruptcy. In any bankruptcy proceeding, the beneficial interests of the American Collection, "including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate" and all measures taken by RMST "shall be subject to review by the . . . [Admiralty Court] to protect the unity and integrity of the [American Collection]." *Id*. § VII(B). Under these circumstances, "the [Admiralty] Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions." *Id*. § VII(D)(1).

The Debtors admit that the Covenants and Conditions place substantial requirements on the Artifact Collection that make a traditional sale or auction of the Artifact Collection, including the French Artifacts (individually or collectively), difficult. *See* Third Sale Motion (as defined below) at ¶ 12. The Covenants and Conditions require that the Artifact Collection be made available for public display and exhibition, historical review, and research. Covenants and Conditions § III(B). The Covenants and Conditions also place strict conservation, curation, and management requirements on the Artifact Collection. *Id*. § IV. The Covenants and Conditions appoint NOAA in an oversight role to ensure adherence to the Covenants and Conditions. *Id*. § V. The Covenants and Conditions also place a number of substantive and procedural requirements for the care and transfer of the American Artifacts to any subsequent trustee. *Id*.

11

## IV.      THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS

On June 14, 2016, each Debtor filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 22, 2016, the Court entered an order that the Chapter 11 Cases be jointly administered for procedural purposes only under lead case number 16-02230 (PMG).  The Debtors have continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

On August 24, 2016, the Acting United States Trustee for Region 21 (the "**U.S. Trustee**"), acting pursuant to Bankruptcy Code section 1102(a) of the Bankruptcy Code, appointed the Creditors' Committee and an Official Committee of Equity Security Holders (the "**Equity Committee**" and, together with the Creditors' Committee, the "**Committees**") to serve in the Debtors' consolidated Chapter 11 Cases.

The following comprises a general summary of the Chapter 11 Cases including, without limitation, a discussion of the Debtors' restructuring and sale efforts since the Petition Date.

### A.      The Debtors' Motion to Sell the French Artifacts

On June 20, 2016, the Debtors filed the *Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105 And 363 And Bankruptcy Rules 6003, 6004, And 9014 Authorizing The Debtors To Market And Sell Certain Titanic Artifacts Free And Clear Of Liens, Claims, And Interests* (Docket No. 28) (the "**French Artifacts Sale Motion**").  The French Artifact Sale Motion did not (i) identify specific property to be sold, (ii) state the time and place for the sale, (iii) state any procedures for potential purchasers to bid for the artifacts, (iv) state the price for which the assets would be sold, and (v) identify any buyers for the assets.  Instead, the Debtors' "sale motion" was, in effect, a request for an advisory opinion that the Debtors had the authority to sell French artifacts—effectively a quiet title action for declaratory relief.

The United States Department of Justice on behalf of NOAA and the U.S. Trustee both objected to the French Artifact Sale Motion.  *See United States Trustee's Objection to Debtors' Motion for Order Authorizing Sale of Titanic Artifacts Free and Clear of All Liens, Claims and Encumbrances Pursuant to 11 U.S.C. §§ 363 and 105* (Docket No. 67); *United States' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests* (Docket No. 73).  In their objections, each noted, among other things, that the Debtors had failed to provide France with notice of the sale motion under which the French Artifacts were to be sold in Court.  NOAA and the U.S. Trustee also argued that the relief requested by the Debtors was actually declaratory relief, which could only be granted in an adversary proceeding in which France would have an opportunity to defend any interest it might have in the French artifacts.

The Court agreed and, by order entered July 22, 2016, denied the French Artifacts Sale Motion with leave to re-file if and when the Debtors obtained a judgment in an adversary proceeding that France had no interest in the French artifacts.  *See Order on Motion for Order Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens,*

*Claims, and Interests* (Docket No. 102).  On August 17, 2016, the Debtors filed the adversary proceeding that was required in order to quiet title to the French Artifacts, *RMS Titanic, Inc. v. The French Republic*, Case No. 3:16-ap-00183-PMG (the "**French Artifacts Proceeding**").  On September 29, 2017, because France did not appear in the proceeding, the Court granted a default judgment in favor of the Debtors, holding that France did not have any interest in the French Artifacts.  *See* French Artifacts Proceeding, *Final Default Judgment* (Docket No. 67).

Following the entry of the Final Default Judgment in the French Artifacts Proceeding, NOAA maintained that the Covenants and Conditions do not allow a sale of the French Artifacts separately from the American Artifacts, and has repeatedly indicated that it would vigorously challenge any effort to auction any French Artifacts individually or separately from the American Artifact collection.[3]  The Debtors have conceded that the Covenants and Conditions result in significant risks and uncertainty attendant to any sale or disposition of the Artifact Collection, and particularly any sale of individual or small groups of artifacts.  *See* Third Sale Motion at ¶ 13.  Accordingly, the Debtors did not pursue its plan to sell only the French Artifacts pursuant to the French Artifact Sale Motion.

### B.    Plan Discussions and Proposals

In February 2017, the Debtors met with the Committees to discuss a consensual reorganization plan.  At that time, the Debtors' preference remained to sell certain assets and emerge from the Chapter 11 Cases as an on-going business.  The Debtors drafted and distributed to potential purchasers of the Debtors or their assets solicitation materials in which the Debtors stated their intention to obtain exit financing in the amount of $22.5 million that would be used to pay approximately $12 million in general unsecured claims and about $3.5 million in prepetition secured claims.    Another $3 million to $5 million would be used to pay administrative expenses in the Chapter 11 Cases.  After payment of loan fees and interest, including establishment of an interest reserve, approximately $475,000 would have been available for working capital.

The Creditors' Committee supported the repayment of unsecured claims from the proceeds of the exit financing; however, the Equity Committee opposed that proposal. GlassRatner Advisory & Capital Group LLC ("**GlassRatner**"), which is employed as financial advisor to Debtors, also projected that the Debtors would not be able to repay the exit facility out of cash flow from operations but would have required a post-confirmation liquidity event to repay the loan.  Faced with opposition from the Equity Committee, the Debtors ultimately abandoned their plans for an exit facility. *See Disclosure Statement to Accompany Chapter 11*

---

[3] NOAA reiterated its position in response to the motion of Euclid Claims Recovery LLC to appoint a chapter 11 trustee.  *See Response of United States of America to Motion of Euclid Claims Recovery LLC for Appointment of a Chapter 11 Trustee* (Docket No. 1041) at 2 ("Under the [Covenants and Conditions], RMST has committed, among other things, to conserving and curating, 'to the maximum extent possible and consistent with reasonable collection management practices,' the American Collection of Titanic artifacts together with the French Collection of Titanic artifacts 'as an integral whole' . . . In light of this provision in the [Covenants and Conditions] and the movant's obvious preference for a sale of the French artifacts if the Court appoints a trustee, NOAA expressly reserves its right to object or otherwise respond to any motion filed in this Court seeking authority to sell any of the artifacts recovered from the Titanic.")

*Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* (Docket No. 1044) at Art. II.C.

The Debtors and the Committees began negotiating a consensual plan after the Debtors abandoned their plan for the exit financing facility. These negotiations resulted in the Committees and the Debtors entering into a Plan Support Agreement (the "**Debtors' PSA**") that was approved by order of the Court entered on July 6, 2017. A copy of the PSA is attached as Exhibit 1 to the *Order Authorizing The Debtors, The Official Committee Of Unsecured Creditors And The Official Committee Of Equity Security Holders To Enter Into And Perform Their Obligations Under A Plan Support Agreement* (Docket No. 642). Under the Debtors' PSA, the Debtors and the Committees agreed that the Debtors would conduct a sale process under which they would pursue a sale of (i) the entire Company, (ii) RMST and/or the Artifact Collection, or (iii) the other operating companies among the Company. The Debtors' PSA did not contemplate the piecemeal sale of the Artifacts.

GlassRatner conducted the sale for the Debtors. GlassRatner reported that they contacted 126 parties, of which 26 parties entered into non-disclosure agreements with the Debtors (each, an "**NDA**") and received a solicitation package from GlassRatner. Ten of those parties who executed NDAs conducted due diligence in a data room maintained by GlassRatner. By the deadline for submission of proposals, July 31, 2017, only five of these submitted letters of intent. These finalists were invited to bid for position as stalking horse bidder in a second round of solicitation with bids due in October 2017. Around this time, NMM began formal discussions with GlassRatner expressing its interest in putting forward a bid for the Artifact Collection. In the end, the Debtors did not select NMM or any finalist to be the stalking horse bid.

Instead, on November 14, 2017, the Debtors filed a second sale motion, *Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Bid Protections; and (VI) Granting Related Relief* (Docket No. 811) (the "**Second Sale Motion**"), without a stalking horse, under which the Debtors proposed a bulk sale of their assets at a "naked" auction. At the same time, the Debtors filed the *Debtors Joint Plan under Chapter 11 of the Bankruptcy Code* (the "**Debtors' Plan**") (Docket No. 859), which contemplated completion of the sale proposed by the Second Sale Motion and the establishment of a liquidation trust tasked with, among other things, pursuing certain causes of action, monetizing the assets of the Debtors remaining after the sale contemplated by the Second Sale Motion, and making distributions.

On December 12, 2017, an ad hoc group of equity holders (the "**Ad Hoc Group**") comprised of funds managed by affiliates of Apollo Global Management, LLC and Alta Fundamental Advisers LLC filed an objection to the proposed naked auction, requesting that they be given time to conduct diligence with respect to the Debtors to formulate a restructuring alternative to the naked auction. *See Objection of the Ad Hoc Group of Equityholders to the Motion of the Debtors for Entry of an Order (I) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (II) Scheduling a Related Auction; (III) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Bid Protections;*

*and (VI) Granting Related Relief* (Docket No. 850). On December 14, 2017, NMM filed a motion to withdraw the reference with respect to the proposed naked auction motion and transfer it to the Admiralty Court in accordance with the Covenants and Conditions. *See Motion to Withdraw the Reference and Transfer Venue* (Docket No. 850).

Because of these objections and other considerations, on December 15, 2017, with the support of the Committees, the Debtors withdrew both the Second Sale Motion (Docket No. 863) and the Debtors' Plan (Docket No. 944). As of the date of the filing of this Disclosure Statement, the Debtors have not filed a new chapter 11 plan.

### C.    Plan Mediation

In January 2018, the Debtors and the Committees met and agreed to pursue mediation to resolve the Chapter 11 Cases (the "**Plan Mediation**"). On February 26 and 27, 2018, Plan Mediation was held in Atlanta, Georgia, with Edward Dobbs as mediator. Over two days, the parties to the Plan Mediation met but were unable to reach agreement on a consensual chapter 11 plan or other exit strategy. *See Report of Mediator* (Docket No. 970). The Plan Mediation closed without resolution and the Debtors re-embarked upon a process to sell the Debtors or their assets. *Id.*

### D.    Trustee Motion

On May 1, 2018, Euclid Claims Recovery LLC ("**Euclid**"), a creditor in the Chapter 11 Cases, filed a *Motion of Euclid Claims Recovery LLC for Appointment of Chapter 11 Trustee* (Docket No. 1013) (the "**Trustee Motion**"), in which Euclid sought appointment of a chapter 11 trustee. In support of the Trustee Motion, Euclid cited, among other things, (i) multiple failed attempts at selling the assets of the Debtors without ultimately finalizing any sale process, (ii) incurring aggregate fees and expenses of chapter 11 professionals approaching $5 million, and (iii) substantial and continuing loss to and diminution of the Estates due to postpetition administrative losses. A hearing on the Trustee Motion was held on June 7, 2018. On June 29, 2018, the Court denied the Trustee Motion. *See Order on Motion of Euclid Claims Recovery LLC for Appointment of Chapter 11 Trustee* (Docket No. 1082).

### E.    D&O Litigation

In May 2018, the Equity Committee moved for derivative standing to prosecute and settle certain claims on behalf of the Debtors' estates (Docket No. 1015) and sought to, among other things, employ Robert Charbonneau and Agentis PLLC as special litigation counsel to prosecute such claims on a contingency basis (Docket No. 1017). The Court granted derivative standing to prosecute certain claims and approved the proposed engagement (Docket No. 1038) over the objections of the Debtors and Creditors' Committee (Docket Nos. 1029, 1036). On June 4, 2018, the Equity Committee commenced an adversary proceeding asserting breach of fiduciary duty and gross negligence claims against certain current and former directors and officers (Adv. Pro. No. 18-64). The recovery analysis annexed to the Equity Committee's disclosure statement projects net recoveries of $2 to $4 million from the litigation. The Creditors' Committee believes that the Equity Committee overvalues the causes of action. Significantly, even under the Equity Committee's high estimated net recovery ($4 million), the proceeds from the

15

litigation, together with proceeds from the Sale (assuming no qualified bids are submitted), would be insufficient to pay creditors in full.

### F.      Equity Committee Plan

On June 1, 2018, the Equity Committee filed a chapter 11 plan (the "**Equity Committee Plan**") and an accompanying Disclosure Statement.  The Equity Committee Plan contemplates marketing and selling the American Artifacts to a "qualified institution" and separately marketing and auctioning the French Artifacts at Guernsey's auction house (Docket Nos. 1044, 1045).  The Equity Committee Plan does not describe the funding source with which to (i) fund the litigation that would ensue over the proposed liquidation of the French Artifacts[4] or (ii) repay the DIP Loan at maturity, but prior to the sale of any French Artifacts.  At the status conference held by the Bankruptcy Court on July 25, 2018 (the "**Status Conference**"), counsel to the Equity Committee stated that it had sent to the Debtors a term sheet for exit financing.  *See* Transcript of Proceedings (the "**Status Conference Transcript**") (Docket No. 1143) at 46.  At the Status Conference, the Debtors described the commitment as a "non-binding, not firm commitment" for up to $7 million, which is not sufficient to refinance the current DIP Loan, the administrative claims, the priority claims, and the claims of the Lenders.  *See id.* at 67.

### G.      The Plan Sponsors' Bid Letter

On June 7, 2018, the Museum Plan Sponsors and Running Subway sent GlassRatner a letter indicating their interest in purchasing substantially all of the Debtors' assets for $19.2 million in cash, which would be raised by the Museum Plan Sponsors and Titanic Belfast through a global fundraising campaign.  A description of the Museum Plan Sponsors and Running Subway is included in Article IV.I.4.

As described below, eight days later, on June 15, 2018, the Debtors filed a sale motion to pursue a sale to a stalking horse purchaser for $17.5 million.

### H.      Debtors' Third Sale Motion

On June 15, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (a) Approving Competitive Bidding Procedures and Sale Procedures; (b) Approving Form and Manner of Notices; (c) Approving Form of Asset Purchase Agreement; (d) Approving Break Up-Fee and Expense Reimbursement; (e) Scheduling Auction and Hearing to Consider Final Approval of Sale, Including Rejection or Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (f) Authorizing Sale of the Transferred Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (g) Approving Settlement with the PacBridge Parties; and (h) Granting Related Relief* (Docket No. 1055) (the "**Third Sale Motion**").  The Third Sale Motion contemplates the sale of substantially all of the assets of the

---

[4] In NOAA's objection to the Equity Committee's disclosure statement, NOAA stated that the separate sale of the French Artifacts "could constitute a Material Default under the Covenants if it does not result in the entire Titanic collection being conserved and curated as an integral whole available for public display and exhibition."  *See Objection of United States of America to Disclosure Statement to Accompany Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* (Docket No. 1120) at ¶ 12.  NOAA describes this as a "material and substantial litigation risk."  *Id.* at ¶ 15.

16

Debtors to Premier Acquisition Holdings LLC, a Delaware limited liability company (the "**Stalking Horse Purchaser**"), an entity formed by (1) affiliates of members of the Ad Hoc Group, (2) Haiping Zou, Lange Feng, and Jihe Zhang (collectively, the "**Lenders**"), each of which extended a $1 million loan to the Debtors prior to the commencement of their chapter 11 cases, and (3) PacBridge Capital Partners (HK) Ltd. ("**PacBridge**"), for $17.5 million, subject to higher and better offers if any qualified bids are submitted by the contemplated bid deadline set forth in the Third Sale Motion.  The Museum Plan Sponsors have advised the Debtors and the Creditors' Committee that, due to institutional limitations, they cannot submit a qualified bid under the bid procedures annexed as Exhibit A to the Debtors' Third Sale Motion.  The Creditors' Committee does not believe that any other potential purchasers will submit a timely qualified bid under the bid procedures.

The Third Sale Motion also contemplates providing bid protections of up to $1 million to the Stalking Horse Purchaser if any qualified bids are timely submitted, and seeks approval of a "PacBridge Parties Settlement" under which a potential estate cause of action to avoid the Lenders' security interests under their respective promissory notes would be resolved on the following terms: (a) the Lenders would receive $1 million in cash at the closing of the Sale and $2 million in allowed general unsecured claims, and (b) a $1,195,350.39 claim filed by PacBridge, which the Debtors previously objected to on the ground that it was for services rendered to a non-debtor affiliate of the Debtors (Docket No. 520), shall be allowed in full.

Pursuant to section 7.4 of the Asset Purchase Agreement filed as Exhibit B to the Debtors' Third Sale Motion (the "**Stalking Horse APA**"), the Stalking Horse Purchaser may terminate the Stalking Horse APA if certain milestones are not achieved or if the Bankruptcy Court approves a disclosure statement with respect to a chapter 11 plan filed by any person other than the Debtors, including this Disclosure Statement.  *See* Stalking Horse APA §§ 7.4(b), (d).  As of the date hereof, two milestones were not achieved: (i) the Bankruptcy Court did not enter an order approving the bidding procedures associated with the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on July 20, 2018, and (ii) the Bankruptcy Court did not approve the sale substantially all of the Debtors' assets pursuant to the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on August 15, 2018.  As of the date hereof, neither the Creditors' Committee nor the Museum Plan Proponents are aware of a notice of termination having been served by the Stalking Horse Purchaser upon the Debtors.

On June 22, 2018, the Equity Committee filed their own objection to the PacBridge Claim (Docket No. 1070).  The hearing on that objection has been continued.  On July 11, 2018, Euclid objected to the Debtors' Third Sale Motion (Docket No. 1109).

I.     **The Plan Support Agreement and the Sale to the Plan Sponsors**

Since initially reaching out to GlassRatner in September 2017, NMM, together with Titanic Foundation Ltd., Titanic Belfast, and NMNI, engaged in months of good faith, substantive discussions with GlassRatner and the Creditors' Committee with respect to its interest in purchasing the Artifact Collection.  More recently, to address creditor concerns that the Museum Plan Sponsors' bid for the Artifact Collection would leave uncertainty with respect to the disposition of the Debtors' remaining assets and the swift and inexpensive resolution of

17

the Chapter 11 Cases, NMM began negotiations with Running Subway to put forward a joint bid for substantially all of the assets of the Debtors.

These months of discussions culminated in the signing of the PSA on June 27, 2018 by the Plan Proponents and certain holders of Claims against the Debtors.  Under the PSA, the Plan Sponsors, the Creditors' Committee, and each of the three members of the Creditors' Committee in their capacity as creditors agreed to, among other things, support and take all steps reasonably necessary to support the Sale and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Sale.  Significantly, James Sanna, the CEO of both Running Subway and of TSX Operating Co., LLC (a creditor in the Chapter 11 Cases and a member of the Creditors' Committee), recused himself from, and did not participate in, the Creditors' Committee's deliberations concerning, or vote on the decision to support, the Plan.  Rather, that decision was made by the Creditors' Committee's two other remaining members—B.E. Capital Management Fund LP and Dallian Hoffen Biotechnique Co., Ltd.  In fact, if the Creditors' Committee were presented with a proposal superior to the Sale and Plan, section 6(b) of the PSA authorizes the two other members of the Creditors' Committee to terminate the Creditors' Committee's support for the Plan without Mr. Sanna's involvement.

Following the signing of the PSA and concurrently with the filing of this Disclosure Statement, the Plan Proponents filed the Plan.  The Plan contemplates, among other things, the sale of substantially all of the assets of the Debtors to the Plan Sponsors in accordance with the PSA and the term sheet attached thereto.  The Sale contemplated by the PSA and the Plan further the Plan Proponents' common goals of (i) maximizing the value of the Debtors' Estates for the benefit of all having an interest therein, (ii) providing for the Debtors' prompt emergence from these expensive and protracted Chapter 11 Cases, (iii) providing the least expensive and most certain route for approval of the sale of the Artifacts Collection by the Admiralty Court, and (iv) returning the Artifact Collection home to the United Kingdom to be (A) held in perpetual public ownership for the benefit of the public interest and (B) kept together, intact and available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes.

Against this backdrop, the Plan Proponents negotiated the Sale.  The central elements of the sale are set forth below.

1.    *Purchased Assets*

The Debtors will sell substantially all of their assets to the Plan Sponsors pursuant to the Acquisition Agreements, which will be filed with a Plan Supplement and are substantially similar to Stalking Horse APA.  The Museum Plan Sponsors will acquire (a) the Debtors' rights as salvor-in-possession of the R.M.S. *Titanic* wreck, (b) all of the Debtors' legal and beneficial interests in the Artifacts, (c) the Debtors' interests in RMS Titanic Trust, (d) all of the Debtors' right, title, and interest in and to photographs, video footage, recreations of the ship, maps, and data related to the R.M.S. *Titanic* vessel, wreck site and debris field and the Artifact Collection, and (e) all intellectual property and certain other assets related to the foregoing (collectively, the "**Museum Purchased Assets**").  If consummated, the Plan will assure the perpetual public ownership of the Artifact Collection as an integral whole.

Running Subway will acquire substantially all of the assets of the Debtors that are not Museum Purchased Assets (collectively, the "**Running Subway Purchased Assets**" and, together with the Museum Purchased Assets, the "**Purchased Assets**") including, but not limited to, all exhibitry from the Debtors' currently operating *Titanic* exhibitions that do not constitute Museum Purchased Assets, the complete Bodies exhibitions, the Dino/Bugs attractions, and the Saturday Night Live exhibition.

<div align="center">

2.       *Purchase Price and Source of Funds*

</div>

The purchase price for the Purchased Assets is $19,200,000 (the "**Purchase Price**"). NMM, NMNI, and Titanic Belfast intend to raise the full amount of the Purchase Price from and with the support and assistance of government sources from the United States, United Kingdom, and Northern Ireland, high net worth individual and corporate donors, and a public campaign backed by certain high profile endorsements.

Over the past year, NMM and Titanic Belfast have conducted a campaign to build support among government officials, certain key individuals connected to the R.M.S. *Titanic*, and high net worth individual and corporate donors for the acquisition of the Artifact Collection. The support is led by the National Geographic Society, and by Dr. Ballard, who led the 1985 expedition that located the Titanic.  Together, NMM and Titanic Belfast have developed a comprehensive fundraising campaign that launched with a media event on July 24, 2018, in Belfast, Northern Ireland, at which Dr. Ballard was the keynote speaker and at which James Cameron, director of the 1997 *Titanic* film, provided a video address.  Titanic Belfast has secured the support of the National Geographic Society to act as a publicity platform from which to promote the fundraising efforts, as well as the support and assistance of the Ireland Funds, a global philanthropic network that has raised over $600 million to promote and support peace, culture, education and community development throughout Ireland.

In addition to the fundraising efforts, RMG is in advanced discussions with the United Kingdom Department for Digital, Culture, Media and Sport for support of up to £7.5 million (approximately $9.7 million) in the form of an unsecured loan, repayable by RMG over an extended period.[5]

NMM and Titanic Belfast remain confident that by the Confirmation Hearing, they will have received the remaining contributions to reach the full amount of the Purchase Price.

<div align="center">

3.       *Terms of the Proposed Acquisition Agreements*

</div>

The Plan Sponsors anticipate that the terms of their Asset Purchase Agreement (the "**Plan Sponsors' APA**") will be substantially similar to the terms of the Stalking Horse APA, including an identical outside date of 70 days from the Admiralty Court Order Entry Date (as defined in the Stalking Horse APA).  Certain terms of the Plan Sponsors' APA are expected to differ from the Stalking Horse APA, however, including in the following respects:

---

[5] Due to institutional limitations, NMM is unable to obtain loans from banks and other traditional financing sources.

- *Absence of Certain Purchaser Protective Provisions*. Unlike the Stalking Horse APA, the Plan Sponsors' APA will not include (i) any termination fee payable to the Purchasers (as defined in the Stalking Horse APA) or (ii) the reimbursement by Sellers (as defined in the Stalking Horse APA) of the Purchasers' expenses incurred in connection with its due diligence investigation of Sellers and RMST and the negotiation of the Plan Sponsors' APA. In fact, the attorneys representing NMM are doing so on a pro bono basis.

- *Fully-Refundable Good Faith Deposit*. To accommodate the Plan Sponsors' institutional limitations, the Plan Sponsors' APA will require the Good Faith Deposit (as defined in the Stalking Horse APA) to be refunded in the event the closing of the acquisition does not occur.

- *Materiality Qualification of Representations and Warranties*. The Stalking Horse APA requires the representations and warranties of Sellers and RMST contained therein to be true and correct in *all respects* as a condition to Purchasers' obligation to close the acquisition—a standard that substantially detracts from the Debtors' certainty that closing will occur. In particular, such a condition to closing would mean the Stalking Horse Purchaser would not be required to close the acquisition if any aspect of any of the Debtors' representations or warranties was incorrect. By contrast, the Plan Sponsors' APA will provide that the Purchasers will not be permitted to invoke a breach of, or inaccuracy in, the Sellers' representations or warranties to avoid closing the acquisition unless, (i) for fundamental representations, such representations and warranties are not true other than in *de minimis* respects and (ii) for non-fundamental representations, such representations and warranties are untrue such that it would cause a Seller Material Adverse Effect (as defined in the Plan Sponsors' APA)*, which is an extremely high standard.

- *Fundraising Condition*. The Plan Sponsors' APA will contain a representation from the relevant Plan Sponsors that they have a fundraising plan designed to raise the full purchase price. In addition, the relevant Plan Sponsors will covenant to use their reasonable best efforts to complete the fundraising plan prior to the closing date. Due to the nature of the Museum Plan Sponsors' business, the successful completion of the fundraising plan will be a condition to the closing, however, the Museum Plan Sponsors are very confident of their ability to raise the necessary funds.

    4.    *Museum Plan Sponsors*

The strength of the Plan Proponents' sale proposal is highlighted by the joint bid of NMM and NMNI for the Artifact Collection. NMM and NMNI are uniquely qualified to care for the Artifact Collection, ensure its preservation as a whole, and provide public access to, and interpretation of, this important part of the United Kingdom's heritage. The Plan Proponents believe that NMM and NMNI are undoubtedly "qualified institutions" as defined in the Covenants and Conditions and that the sale of the Artifact Collection to NMM and NMNI will be approved by the Admiralty Court.

#91100595v13

(a)    The National Maritime Museum

NMM's commitment to protecting and exhibiting the United Kingdom's underwater heritage spans more than 80 years.  The National Maritime Museum was created by the Parliament of the United Kingdom's National Maritime Act of 1934.  It is the largest and preeminent maritime museum in the world and it includes, among other things, the Queen's House, the Royal Observatory, Greenwich, and the clipper ship *Cutty Sark*.  The collective brand name for the four sites, one of which is NMM, is Royal Museums Greenwich.  NMM is a statutory corporation and a charity.  It is one of a select group of national museums and galleries that receives direct government funding from Parliament.

Based in Greenwich, London, NMM is the leading custodian of the United Kingdom's maritime heritage.  NMM's in-house professional conservation experts have significant experience in the preservation and conservation of maritime artifacts for the benefit of the public, now and in the future, and NMM's standards and procedures are externally audited and accredited as such every three years.

NMM exists to advance the public's access to maritime heritage through its exhibitions, displays, and its educational and research programs.  In 1994, NMM staged the first major exhibition displaying the Artifacts, which explored the significant historic and cultural legacy of the ship.  In February 1995, NMM convened an international conference in Greenwich, London to find ways to protect underwater cultural heritage within the existing framework of international law.  In January 1996, the National Maritime Museum convened a follow-up conference to debate and gain support for the International Law Association's draft convention to protect underwater cultural heritage.  This convention was subsequently adopted by the United Nations Educational, Scientific and Cultural Organization ("**UNESCO**") and, in 2001, became the UNESCO Convention on Underwater Cultural Heritage.  The R.M.S. *Titanic* came within the scope of that convention in 2012.

NMM has a strong fundraising record, having fundraised for a wide range of projects and acquisitions.  Over the past decade, Royal Museums Greenwich ("**RMG**"), the museum complex of which NMM is a part, has raised £75 million to support capital works projects and major acquisitions to the National Maritime Museum's collections, from individuals, foundations, and the Heritage Lottery Fund, which distributes shares of the United Kingdom's National Lottery funding to support heritage projects across the United Kingdom.  In 2008, Mr. Sammy Ofer gave a gift of £20 million to support the construction of a new wing at NMM.  Additionally, after a fire ravaged the *Cutty Sark* in May 2008 in the midst of a restoration project, the Heritage Lottery Fund contributed £23 million and Mr. Ofer contributed the final £3.3 million to the conservation effort.  The Heritage Lottery Fund has been a generous supporter of major capital projects, new gallery construction and nationally important acquisitions, totaling nearly £22 million.

RMG also has recent experience raising funds for specific acquisitions. In 2016, RMG raised £10.3 million to acquire the Armada Portrait of Elizabeth I and simultaneously ran a £26 million capital masterplan project that secured numerous individual donations of greater than £1 million from supporters such as the Sackler Foundation, the Kristian Gerhard Jebsen Foundation, Mr. Mark Pigott, and LIBOR funds administered through the United Kingdom Treasury.

#91100595v13

Finally, in 2018, NMM acquired a painting by U.S. contemporary artist Kehinde Wiley with approximately £70,000 of support from the RMG American Friends group, which enjoys 501(c)(3) tax status in the United States, and the Art Fund, an independent membership-based British charity which raises funds to aid the acquisition of artwork for the United Kingdom.

(b)    NMM's Partnership with Titanic Belfast and NMNI

In February 2017, Titanic Foundation Ltd. and Titanic Belfast were contacted by NMM to inform both parties that RMST was in bankruptcy and was looking to sell its assets, including the entire Artifact Collection.  Since then, Titanic Belfast and NMM have been working together to pursue a joint bid for the Artifact Collection.  It is the intention of Titanic Belfast and NMM that the Artifact Collection will be jointly owned by NMM and NMNI, which will ensure the Artifact Collection's care, state-of-the-art curation and conservation, and public display in perpetuity.  Joint ownership by NMM and NMNI would move the Artifact Collection into perpetual public ownership and preserve and provide public access to, and interpretation of, this important part of the world's history.

Titanic Belfast is an £87 million project which was funded by £37 million of private donations and £50 million of government contributions.  It was opened in 2012, 100 years after R.M.S. *Titanic*'s fateful maiden voyage.  Titanic Belfast is the world's preeminent R.M.S. *Titanic* exhibition.  It is owned by Titanic Foundation Ltd., a charity set up to educate the public on Belfast's industrial and maritime heritage, and was developed in collaboration with Dr. Robert Ballard, who discovered the R.M.S. *Titanic* wreck in 1985, to present the public with a comprehensive and interactive education about Edwardian Belfast, the Harland and Wolff shipyard, the R.M.S. *Titanic*, its passengers and the scientists who discovered her.  It is NMM's and NMNI's intention that a substantial portion of the Artifact Collection will be displayed at Titanic Belfast, adjacent to the slipway where R.M.S. *Titanic* was built.

Sponsored by the Northern Irish government, NMNI's three museums are home to 20,000 works of art, over a million plant, animal, and geological specimens, and tens of thousands of precious objects, including a small number of Artifacts, that tell the story of the human settlement in Ireland.

(c)    Museum Plan Sponsors' Agreement with Running Subway

In May 2018, NMM and Titanic Belfast began discussions with Running Subway, which sought to acquire certain property from the Debtors that would be difficult to monetize should the Museum Plan Sponsors acquire the Artifact Collection.  Running Subway is a New York-based entertainment production company that specializes in the procurement, development, and production of iconic and innovative live entertainment properties.  Running Subway was founded in 2004 and since then has presented over 20 unique exhibitions, including King Tut, Dead Sea Scrolls, and Harry Potter, to over five million people.  Running Subway has opened four distinct venues in New York City, including Bodies at the South Street Seaport and the groundbreaking exhibition center, Discovery Times Square, which premiered with the Titanic exhibit in 2009.  The company currently has a roster of global touring exhibitions and senior management team has decades of experience in the entertainment industry and exhibition presenting and touring realm.

#91100595v13

On June 7, 2018, NMM and Running Subway agreed to a term sheet for a bid to acquire substantially all of the assets of the Debtors. Pursuant to that term sheet, the Museum Purchasers will enter into one or more agreements with Running Subway to enable Running Subway to continue to display certain Artifacts in North America in the exhibition spaces that are subject to the Debtors' leases, including the lease at the Luxor Hotel in Las Vegas, and to use certain intellectual property related to the R.M.S. *Titanic* necessary to effectively display such Artifacts. The Loan and License Agreement will have a duration of five years and will allow for the exhibition of approximately 550 artifacts. Running Subway intends to hire substantially all of the employees of the Debtors.

### J.    Bankruptcy Court Status Conference

By orders and notices of hearing dated June 20, 2018, June 21, 2018, and July 9, 2018, the Bankruptcy Court scheduled a joint hearing on July 25, 2018 to consider (i) the bidding procedures associated with the Debtors' Third Sale Motion, (ii) the adequacy of disclosure statement for the Equity Committee Plan and (iii) the adequacy of the disclosure statement for the Museum Plan (Docket Nos. 1058, 1060, 1100).

On July 6, 2018, the Museum Plan Proponents filed a motion with the Bankruptcy Court to abate the hearing scheduled for June 20 and to instead convene a status conference for the purpose of establishing (i) a coordinated process for the concurrent consideration of the Debtors' Third Sale Motion, the Equity Committee Plan, and the Museum Plan by the Bankruptcy Court and by the Debtors' various stakeholders and (ii) a protocol for the concurrent consideration by the Bankruptcy Court and the Admiralty Court of the propriety of the sales of the Artifact Collection contemplated by the Third Sale Motion, the Equity Committee Plan, and the Museum Plan in light of the Covenants and Conditions (Docket No. 1099). The request for a status conference was joined by the Equity Committee (Docket No. 1103).

On July 13, 2018, the Bankruptcy Court entered an order abating the scheduled hearing and convening the requested status conference (Docket No. 1112). The Debtors subsequently moved for reconsideration of the order scheduling the Status Conference and sought to restore the substantive hearing on the bidding procedures for its proposed sale (Docket No. 1114), but the Debtors' requested relief was not granted by the Bankruptcy Court.

At the Status Conference, the various parties presented arguments as to how best to proceed in light of, among other things, the Covenants and Conditions and the jurisdiction of the Admiralty Court over the Artifact Collection. Thereafter, the Bankruptcy Court issued a written order in connection with the Status Conference (the "**Status Conference Order**") (Docket No. 1151). In the order, the Bankruptcy Court set a joint hearing to consider the adequacy of the disclosure statements for the Museum Plan and the Equity Committee Plan and the bidding procedures associated with the Debtors' Third Sale Motion for August 30, 2018. In addition, the Bankruptcy Court instructed the Debtors, the Equity Committee, and the Museum Plan Proponents to "take the steps that they believe are necessary for approval of the proposed sales by the [Admiralty] Court." Status Conference Order at 4.

#91100595v13

### K.      Use of Cash Collateral and Debtor-in-Possession Financing

The Lenders asserted liens on the assets, including cash collateral, of Debtors Premier, Premier Exhibitions Management, Premier Merchandising, and RMST in connection with prepetition loans in the principal amount aggregating $3,000,000 (the "**Lenders' Loans**"). The Equity Committee disputed whether the Lenders' Loans are secured and asserted that any security interest that may secure the same may be avoidable under chapter 5 of the Bankruptcy Code. However, despite such dispute, Lenders consented to the Debtors' use of their cash collateral by order of the Court (Docket No. 532) (the "**Cash Collateral Order**"). Under the terms of the Cash Collateral Order, the Lenders were granted a replacement lien on all alleged cash collateral of the Lenders to the same extent, validity, and priority as the security interests asserted by the Lenders as of the Petition Date.

On May 18, 2017, the Debtors filed their *Motion for Entry of Final Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors* (Docket No. 588) (the "**DIP Financing Motion**"). The DIP Financing Motion sought authority of the Court for the Debtors to enter into a post-petition loan agreement with Bay Point Capital Partners LP (the "**DIP Lender**") to obtain debtor-in-possession financing in an amount of up to $5,000,000 in principal amount (the "**DIP Loan**") upon terms set forth in the DIP Loan agreements. On July 12, 2017, the Court entered its order granting the DIP Financing Motion. *See Order (I) Authorizing Debtors to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364; and (II) Granting Adequate Protection to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, and 364* (Docket No. 650).

The DIP Loan, *inter alia,* bears an interest rate of 13% per annum and a default interest rate of 18% per annum. It is secured by first priority liens on all assets of the Debtors' Estates, except for avoidance actions under chapter 5 of the Bankruptcy Code. As of the date of this Disclosure Statement, the Debtors have advised that the DIP Loan has been fully drawn. *See* Status Conference Transcript at 12. The maturity of the DIP Loan has been extended to May 2019.

### L.      Debtor-in-Possession Administration

1.      *Retention of Professionals*.

During the course of the Chapter 11 Cases, the Debtors and the Committees sought and obtained orders of the Court authorizing the employment of various professionals. The identities of such professionals, when each was employed and for what purpose, and the order of the Court authorizing such employment are as follows::

(a)      *Debtors' Professionals*

- Nelson Mullins Reilly & Scarborough LLP – general bankruptcy counsel. Order entered August 11, 2016 (Docket No. 128).

#91100595v13

- Kaleo Legal – special litigation counsel.  Order entered August 15, 2016 (Docket No. 132).

- McGuireWoods LLP – special litigation counsel.  Order entered on August 15, 2016 (Docket No. 133).

- GlassRatner – financial advisor.  Order entered on December 8, 2016 (Docket No. 372).

- Troutman Sanders LLP – co-counsel for the Debtors.  Order entered on December 16, 2016 (Docket No. 378).

- Carr, Riggs & Ingram – tax advisor.  Order entered on June 26, 2017 (Docket No. 604).

      (b)    *Creditors' Committee's Professionals*

- Storch Amini PC – general bankruptcy counsel.  Order entered on October 3, 2016 (Docket No. 249).

- Thames Markey & Heekin, P.A. – local counsel.  Order entered on October 3, 2016 (Docket No. 248).

      (c)    *Equity Committee's Professionals*

- Akerman LLP – general bankruptcy counsel.  Order entered on October 13, 2016 (Docket No. 274).

- Landau Gottfried & Berger LLP – general bankruptcy counsel.  Order entered on October 14, 2016 (Docket No. 277).

- Teneo Securities LLC – financial advisor.  Order entered on December 8, 2016 (Docket No. 371).

- Lincoln Partners Advisors LLC– financial advisor.   Order entered on July 13, 2017 (Docket No. 652).

- Agentis PLLC—special litigation counsel.  Order entered on May 29, 2018 (Docket No. 1038).

## V.    SUMMARY OF THE PLAN OF LIQUIDATION

The Plan Proponents believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of holders of Allowed Claims.

#91100595v13

The Plan is attached to this Disclosure Statement as **Exhibit A** and is incorporated herein by reference.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan, and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, INCLUDING ANY SUPPLEMENTS AND SCHEDULES THERETO AND DEFINITIONS THEREIN.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.   Classification and Treatment of Claims and Interests

Except for the Claims addressed in Article III of the Plan, all Claims and Interests are classified in the Classes set forth in Article IV of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is

classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The chart in Section I.C summarizes the proposed classification and treatment of the holders of Allowed Claims under the Plan.

### B.    Limited Consolidation for Voting, Confirmation, and Distribution Purposes

The Plan is predicated on the Court providing in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for the purposes of the Plan, its confirmation and Distributions made pursuant to it.  *See* Plan, Article V.

### C.    Bar Dates and Claims Filed

On July 15, 2016, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "**Schedules and SOFAs**").  Among other things, the Schedules and SOFAs set forth the Claims of known creditors against the Debtors as of the Petition Date based upon the Debtors' books and records.

On July 12, 2016, the Bankruptcy Court entered an order (the "**Bar Date Order**") setting deadlines for filing proofs of claim against the Debtors.  Pursuant to the Bar Date Order, the last date for certain persons and entities to file proofs of claim in the Chapter 11 Cases was October 24, 2016, and the last date for governmental units to file proofs of claim in the Chapter 11 Cases was 180 days after the Petition Date.

As described in detail below, the Plan contemplates the establishment of an Administrative Claims Bar Date.  The projected recoveries set forth in Exhibit C to the Disclosure Statement are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.

### D.    Implementation of the Plan

#### 1.    *Sale to the Plan Sponsors*

Subject to the terms of the Acquisition Agreements, on the Effective Date, the Debtors shall be authorized and directed to consummate the Sale and, among other things, the Purchased Assets shall be transferred to and vest in the Plan Sponsors free and clear of all claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order, and the Acquisition Agreements.  On the Effective Date, the Debtors shall consummate the transactions contemplated by the Acquisition Agreements pursuant to the terms thereof so long as the conditions precedent set forth in the Acquisition Agreements have been satisfied or waived in accordance with the terms thereof.  Upon entry of the Confirmation Order by the Court, all

#91100595v13

matters provided for under the Acquisition Agreements will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors.  The Debtors will be authorized and directed to execute and deliver, and to consummate the transactions contemplated by, the Acquisition Agreements, as well as to execute, deliver, file, record and issue any notes, documents, or agreements in connection therewith, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

Without limiting the generality of the foregoing, except as otherwise expressly provided in the Acquisition Agreements, neither the Plan Sponsors nor any of their Affiliates shall be liable for any claims against the Debtors or any of their predecessors or affiliates, and neither the Plan Sponsors nor any of their affiliates shall have successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor, employment or benefits law, de facto merger or substantial continuity, whether known or unknown as of the closing, then existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates arising prior to the closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing.

The transactions contemplated by the Acquisition Agreements are undertaken without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the sale contemplated thereunder shall not affect the validity of such sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such sale are duly stayed pending such appeal. The Plan Sponsors are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

2. *Administration and Sale of Liquidation Trust Assets and the Estate Causes of Action*

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Documents for the purpose of, among other things, (i) prosecuting those Causes of Action for which the Equity Committee was granted derivative standing to pursue, and additional causes of action belonging to the Debtors' Estates, as appropriate, (ii) administering, monetizing and/or liquidating the Property of the Debtors other than the Purchased Assets, (iii) resolving all Disputed Claims, (iv) making all Distributions from the Liquidation Trust, and (v) prosecuting and defending appeals of the Confirmation Order as provided for in the Plan, this Disclosure Statement, and the Liquidation Trust Documents.  The Liquidation Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidation Trust and the Plan.

3. *Vesting of Assets*

#91100595v13

On the Effective Date, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust, free and clear of all claims, liens, encumbrances, charges and other interests. On and after the Effective Date, the transfer of the Liquidation Trust Assets from the Debtors' Estates (as the case may be) to the Liquidation Trust will be deemed final and irrevocable and distributions may be made from the Liquidation Trust. *See* Plan, Art. VII.F.

4.    *Establishment of the Liquidation Trust*

On the Effective Date, the Liquidation Trust Agreement will become effective, and, if not previously signed, the Creditors' Committee, as a Plan Proponent, on behalf of the Estate, and the Liquidation Trustee will execute the Liquidation Trust Agreement.

The Liquidation Trust shall qualify as a liquidation trust within the meaning of Treasury Regulation Section 301.7701-4(d) and shall be treated as a grantor trust for United States federal income tax purposes. In accordance with Treasury Regulation Section 301.7701- 4(d), the beneficiaries of the Liquidation Trust will be the holders of all Allowed Class 3 Claims. The holders of such Allowed Class 3 Claims will receive an allocation of the Liquidation Trust's property as provided for in the Plan and the Liquidation Trust Agreement. The beneficiaries of the Liquidation Trust shall be treated as the grantors and owners of such beneficiaries' respective portion of the Liquidation Trust.

5.    *General Powers of the Liquidation Trustee*

The entry of the Confirmation Order shall ratify the selection of the Liquidation Trustee. The rights and powers of the Liquidation Trustee are specified in the Liquidation Trust Documents. Except as expressly set forth in the Plan and the Liquidation Trust Agreement, the Liquidation Trustee shall administer the Liquidation Trust and its assets in accordance with the Plan, the Liquidation Trust Agreement, and the other Liquidation Trust Documents and shall be responsible for, among other things, making certain distributions required under the Plan. From and after the Effective Date and continuing through the date of entry of a Final Decree, the Liquidation Trustee shall: (a) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Court; (b) have the authority to act on behalf of the Debtors' Estates in all adversary proceedings and contested matters pending in the Court and in all actions and proceedings pending elsewhere; and (c) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Court.

6.    *Prosecution of Estate Causes of Action by the Liquidation Trustee*

The Liquidation Trustee shall have the power and authority to prosecute, compromise or otherwise resolve any and all Estate Causes of Action assigned to the Liquidation Trust pursuant

#91100595v13

to the Plan in accordance with the terms of the Plan. All recoveries derived therefrom will be included within the Liquidation Trust Assets.

"**Causes of Action**" is defined in the Plan to mean, with respect to each of the Debtors, any and all actions, proceedings, causes of action (including causes of action pursuant to chapter 5 of the Bankruptcy Code, other than those which are released or dismissed as part of and pursuant to the Plan), suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law (whether domestic or foreign), equity, or otherwise, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

For avoidance of doubt, the Liquidation Trustee's right to recover against the former officers and/or directors of the Debtors shall not be limited to the proceeds of any director and officer liability policy.

### E.    Summary of Certain Other Provisions of the Plan

1.    *Court Approval of Professional Fees Required*

By order entered on August 17, 2016 (Docket No. 141), the Court granted the Debtors' *Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals* (Docket No. 89), pursuant to which the Debtors are authorized to pay, monthly and upon an interim basis pursuant to monthly statements timely filed by such professionals, up to 80% of the fees and 100% of the expenses of each professional employed in the Chapter 11 Cases.

These interim payments and any and all other Professional Fee Claims must be approved, on a final basis, by the Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty (20) days following the filing with the Court of any request for compensation or reimbursement of Professional Fee Claims and be served on the Debtors, counsel for the Debtors, counsel to the Creditors' Committee, the Liquidation Trustee, counsel to the Liquidation Trustee, and the holders of Professional Fee Claims requesting payment.

2.    *Deadlines for Filing Claims and Administrative Expenses*

#91100595v13

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications or motions for allowance of Administrative Claims (other than Professional Fee Claims and DIP Financing Claims), which date shall be the Administrative Claims Bar Date. **HOLDERS OF ADMINISTRATIVE CLAIMS NOT PAID PRIOR TO THE CONFIRMATION DATE SHALL FILE WITH THE COURT AND SERVE UPON THE DEBTORS OR LIQUIDATION TRUSTEE, AS APPLICABLE, A MOTION REQUESTING PAYMENT OF SUCH ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR FOREVER BE BARRED FROM DOING SO.** The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date. The Liquidation Trustee shall have sixty (60) days (or such longer period as may be allowed by Final Order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims (other than Professional Fee Claims and DIP Financing Claims).

All applications for compensation or reimbursement of Professional Fee Claims pursuant to sections 328, 330, 331, or 503 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Debtors, counsel to the Debtors, the U.S. Trustee, the Liquidation Trustee, counsel to the Liquidation Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date.

3. *Priority Tax Claims*

The Bankruptcy Code requires that each holder of a Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period ending not later than five years after the date of the bankruptcy filing (in this case, not later than June 14, 2021). Each holder of an Allowed Priority Tax Claim will receive treatment in any manner that is consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

**F. Executory Contracts and Unexpired Leases**

1. *Treatment*

All executory contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Court on or prior to the Confirmation Date or (b) is set forth on a Schedule of Assumed Contracts and Leases filed in connection with the Acquisition Agreements. All or substantially all of the executory contracts and unexpired leases of the Debtors will be assumed and assigned to certain of the Plan Proponents. The Plan Proponents intend to file, as a Plan Supplement prior to the Confirmation Hearing, a schedule listing certain executory contracts and unexpired leases to be assumed by the Debtors.

#91100595v13

The assumption, assumption and assignment, and rejection of executory leases and unexpired contracts under the Plan shall be governed by the terms of the Acquisition Agreements, the Confirmation Order, and other orders of the Court.

2.      *Cure Payments*

The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Acquisition Agreements, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be paid by the assuming party in accordance with the terms and conditions of the Acquisition Agreements, the Confirmation Order, and other orders of the Court.

3.      *General*

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Class 3 Claims under the Plan.

All Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, must be filed with the Court on or before such date as the Court has fixed by its order with respect to Claims arising from the rejection of specified executory contracts and unexpired leases, or, if rejected pursuant to the Plan, on or before the day that is 30 days after the Effective Date or, if such day is not a Business Day, the first Business Day occurring thereafter.  Any such Claims which are not filed within such time will be forever barred from assertion against the Debtors' Estates and their property, or the Liquidation Trust.

G.      **Claims Allowance Process**

1.      *Resolution of Disputed Claims*

As of the Effective Date, the Liquidation Trustee will have sole authority for investigating, administering, monitoring, implementing, litigating, and settling Claims.  From and after the Effective Date, the Liquidation Trustee will have the right to file objections to Claims (except those specifically Allowed by the Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the applicable Claims Objection Deadline.  The Claims Objection Deadline may be extended by order of the Court without notice.

2.      *Reserve for Disputed Claims*

In connection with the Distributions required to be made under the Plan, on the Effective Date or as soon as practicable thereafter (and in accordance with the provisions of the Plan), the Liquidation Trustee shall reserve Cash allocated for distribution on account of each Disputed Claim based on the Face Amount of each such Disputed Claim, plus 10% of the Face Amount on account of interest attributable to any such General Unsecured Claim, or such lesser or greater amount as may be agreed to by the holder of the Claim and the Debtors or Liquidation Trustee

32

(the "**Disputed Claims Reserve**").  All Cash or other property allocable to the relevant Class with respect to the Disputed Claims shall be allocated for records keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve. The Liquidation Trustee shall have no duty to fund, or to set aside any separate account for the Disputed Claims Reserve.

Cash held in the Disputed Claims Reserve shall be held by the Liquidation Trustee in trust for the benefit of holders of Allowed Claims.

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed as soon as practicable after the Claim is Allowed (and consistent with the provisions of the Plan). Distributions shall be made only to the extent of the aggregate distributions that the holder of any Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to the amounts held in the Disputed Claims Reserve).  Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior Distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

The Disputed Claims Reserve shall no longer be necessary at the earlier of (i) when all Disputed Claims have been resolved, or (ii) when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan have been made.

The Liquidation Trustee may, at the Liquidation Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("**DOF**") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor Liquidation Trust.  If the election is made, the Liquidation Trustee will comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

## H.    Distributions

### 1.    *Generally*

Distributions to be made on account of Allowed Claims, other than Allowed Class 3 Claims, shall be made on the Effective Date, unless otherwise provided for in the Plan or ordered by the Court.  The dates for Distributions by the Liquidation Trust on account of Allowed Class 3 Claims after the Initial Distribution shall be the first Business Day after the end of the months of June and December, continuing until the Final Distribution Date.  The Initial Distribution Date shall occur on the Effective Date or as soon as reasonably practicable after the Effective Date.  A Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur, however, if either (i) the aggregate value of the consideration to be distributed on such Distribution Date is less than $250,000, or (ii) the Liquidation Trustee, with consent from the Liquidation Trust Oversight Board as provided in the Liquidation Trust Agreement, determines that it is in the best interest of the Liquidation Trust that no Distribution Date should occur,

#91100595v13

which in either case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date.

### 2. *Manner of Payment*

Any payment of Cash made by the Liquidation Trustee pursuant to the Plan may be made either by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Liquidation Trustee.

### 3. *Distributions of Property Other Than Cash*

Any distribution under the Plan of property other than Cash shall be made by the Liquidation Trustee in accordance with the terms of the Plan.

### 4. *Setoffs*

The Liquidation Trustee may setoff against any Claim any claims of any nature whatsoever that the Liquidation Trust may have against the holder of such Claim. Neither the failure to effect such setoff nor the allowance of any Claim that otherwise would be subject to setoff, shall constitute a waiver or release by the Liquidation Trust of any such claim the Liquidation Trust may have against such holder.

### 5. *Unclaimed Distributions*

All Property distributed on account of Allowed Claims must be claimed prior to the date on which the Court enters the Final Decree, or, in the case of a Distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Article VII.I of the Plan. All Unclaimed Property will be retained by and will vest in the Liquidation Trust to be subsequently distributed in accordance with Articles IV and VII of the Plan. All full or partial payments made by the Liquidation Trustee and received by the holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtors or the Liquidation Trustee pursuant to the Plan. Nothing shall require the Debtors or the Liquidation Trustee to attempt to locate any holder of an Allowed Claim other than by reviewing the records of the Debtors and any Claims filed in the Chapter 11 Cases. All Claims in respect of Unclaimed Property will be deemed Disallowed and the holder of any Claim Disallowed in accordance with Article VII.J of the Plan will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets, the Liquidation Trustee or the Liquidation Trust notwithstanding any federal or state escheat laws to the contrary.

### 6. *Delivery of Distributions, Address of Holder*

For purposes of all notices and Distributions under the Plan, the Liquidation Trustee shall be entitled to rely on (a) the last known addresses of such holders or (b) the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Liquidation Trustee is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.

### I.      Effectiveness of Plan

1.      *Conditions Precedent*

The Plan Proponents intend for the Plan to be effective as soon as reasonably practicable following the entry of the Confirmation Order.  It is a condition to the Effective Date of the Plan that the following provisions, terms and conditions are approved or waived in accordance with the Plan:

(a)      the Confirmation Order, in form and substance acceptable to the Plan Proponents in their sole discretion, which shall include, among other provisions, (i) an authorization and direction for the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan, and (ii) a reservation of jurisdiction over the Sale post-Effective Date, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, enjoined or stayed pending appeal;

(b)      an order of the Admiralty Court approving the Sale to the extent required to be approved pursuant to the Covenants and Conditions, in form and substance acceptable to the Plan Sponsors, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated enjoined or stayed pending appeal;

(c)      all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(d)      all transactions contemplated in the Acquisition Agreements shall have been consummated;

(e)      the Creditors' Committee shall have appointed the Liquidation Trustee, and the Liquidation Trust Agreement and the other Liquidation Trust Documents shall have been executed and delivered; and

(f)      no order of a court shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

2.      *Notice of the Effective Date*

On or before five (5) Business Days after the occurrence of the Effective Date, the Liquidation Trustee shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the applicable Bar Date, and (iv) such other matters as the Liquidation Trustee deems appropriate.

35

### J.    Retention of Jurisdiction

The Plan provides that the Court will retain and have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.    to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom;

2.    to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date;

3.    to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

4.    to resolve disputes as to the ownership of any Claim;

5.    to hear and determine timely objections to Claims;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8.    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

9.    to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code;

10.    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

11.    to hear and determine disputes arising in connection with the interpretation, implementation or consummation of any transaction in connection with an Acquisition Agreements;

12.    to hear and determine any issue for which the Plan requires a Final Order of the Court;

13.    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14. to hear and determine disputes arising in connection with compensation and reimbursement of expenses of Professionals for the Debtors, Creditors' Committee or Equity Committee for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date;

15. to hear and determine any Causes of Action preserved under the Plan including under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3);

16. to hear and determine any matter regarding the existence, nature and scope of any injunction issued hereunder;

17. to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article X of the Plan;

18. to hear and determine any matter regarding the Liquidation Trust and Liquidation Trust Documents;

19. to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection; and

20. to enter a Final Decree closing the Chapter 11 Cases.

**K. Limitation of Liability, Releases and Injunction**

1. *Exculpation*

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting the releases described in Articles X.B and X.C, and notwithstanding anything to the contrary in the Plan, each Released Party will be released and exculpated from any Claim, obligation, Cause of Action, or liability for any action taken or omitted to be taken, whether prepetition or postpetition, in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Plan Support Agreement), the Disclosure Statement, the Sale and the Acquisition Agreements, and/or the DIP Credit Facility, or any contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and**

37

financial advisors with respect to their duties and responsibilities pursuant to the Plan Support Agreement and the Plan.  Each Released Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the transactions contemplated herein, including the Sale, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, this exculpation shall not release any obligation or liability of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

"Released Parties" is defined in the Plan to mean, in each case solely in its capacity as such, (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Plan Sponsors, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

2.    *Injunction Enjoining Holders of Claims and Interests*

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Interests.  To that end, except as otherwise expressly provided in the Plan, the Plan Supplement, documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including all Governmental Units) shall be permanently enjoined from, on account of such Claims or Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, any Released Party, the Liquidation Trust, the Liquidation Trustee, or any of their respective properties or assets: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, executing, collecting, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (v) enjoining or invalidating any foreclosure or other conveyance of any Property of the Liquidation Trust or of the Debtors; and (vi) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of the Plan.  Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  This injunction shall not enjoin or prohibit (i) the holder of a Disputed

38

Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan or (ii) any party in interest from seeking the interpretation or enforcement of any of the obligations of the Debtors, the Liquidation Trustee, or the Liquidation Trust under the Plan.  The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any Claim or Interest or cause of action against any Debtor, any Estate, any Released Party, the Liquidation Trustee, the Liquidation Trust, or any of their respective properties or assets, based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under the Plan have been made or are not yet due.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim, as applicable, by accepting, or being eligible to accept, distributions under such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article X.E of the Plan.

### 3.   *Nondischarge of the Debtors*

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

### L.   **Revocation or Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw the Plan, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of any Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by any Person.

### M.   **Modification of the Plan**

Subject to the limitations contained in the Plan: (1) the Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan

prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Creditors' Committee may, upon order of the Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

### N.   Payment of Statutory Fees

All quarterly fees due and payable to the U.S. Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code.   The Liquidation Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Chapter 11 Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Liquidation Trustee under the Plan. After the Effective Date and until the Chapter 11 Cases are closed, the Liquidation Trustee shall file with the U.S. Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

### O.   Governing Law

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

### P.   Withholding, Reporting, and Payment of Taxes

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidation Trustee shall report and pay taxes on the income of the Liquidation Trust Assets, if any, as required by applicable law.   In addition, to the extent required by applicable law, reported Distributions from such reserves shall include all interest and investment income, if any, attributable to the Cash or property being distributed net of taxes which are, or are estimated to be, due and payable thereon.

### Q.   Comparison of Estimated Recoveries for Unsecured Creditors under the Third Sale Motion and the Plan

As described above, the Debtors' Third Sale Motion and the Plan each contemplate the sale of substantially all of the assets of the Debtors, including the Debtors' rights with respect to the Artifact Collection.   A recovery analysis comparing the expected returns for unsecured creditors under the Debtors' Third Sale Motion (assuming a sale to the Stalking Horse Purchaser for $17.5 million) to the expected returns under the Plan (based on a purchase price of $19.2

million) is included as Exhibit C.  In addition to differences in the purchase price, the following differences between the sale pursuant to the Plan and the sale proposed by the Debtors' Third Sale Motion result in different returns to the unsecured creditors:

- *PacBridge Settlement*.  The Third Sale Motion provides that the $1,195,350.39 PacBridge Claim is an allowed unsecured claim and settles approximately $4 million in alleged secured loans and accrued interest owed to the Lenders for $1 million in cash and allowed unsecured claims against the Debtors in total aggregate amount of $2 million.  The Plan contemplates paying the Lenders $4 million on account of their claims (unless the security interest relating to those claims is avoided or any portion is determined to be unsecured) and does not allow the PacBridge Claim because the PacBridge Claim is an alleged claim on account of services provided to a non-debtor.

- *Bid Protections*.  Any bid at the auction by a third party will trigger the bid protections provided to the Stalking Horse Purchaser of up to $1 million, which will be an administrative expense claim that must be paid in full before unsecured creditors are paid.

The Recovery Analysis does not account for the transfer taxes that the Debtors may be required to pay in connection with a sale to the Stalking Horse Purchasers.  *See* Stalking Horse APA § 5.10(b) ("All transfer, documentary, sales or similar Taxes payable solely as a result of the sale and transfer of the Transferred Assets and the Assumed Liabilities pursuant to this Agreement (the 'Transfer Taxes') shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by the Sellers when due.").[6]  The Plan Proponents expect the Sale pursuant to the Plan to be exempt from transfer taxes under section 1146(a) of the Bankruptcy Code.]

**Based on the Recovery Analysis, the Plan Proponents submit that the Plan provides holders of impaired Claims with more value than would a sale to the Stalking Horse Purchaser for $17.5 million.**

The Plan Proponents note that the Recovery Analysis is speculative and premised on assumptions and estimates of the Debtors as of June 29, 2018.  The determination of estimated recoveries is an uncertain process involving the use of estimates and assumptions that are inherently subject to business and economic uncertainties and contingencies beyond the control of the Plan Proponents, Debtors, the Debtors' management, and the Plan Proponents' and Debtors' advisors. Inevitably, some assumptions in the Recovery Analysis may not materialize and unanticipated events and circumstances could affect the ultimate results. Other parties, including the Debtors, may disagree with certain of the assumptions in the Recovery Analysis and may challenge these assumptions and/or that the Plan satisfies the "best interests" test in connection with confirmation of the Plan.[7]  Delay in confirmation or consummation of the Plan,

---

[6] The Plan Proponents have not assessed the transfer taxes that the Debtors may be required to pay in connection with a sale to the Stalking Horse Purchasers.

[7] The Creditors' Committee sent the Recovery Analysis to the Debtors' advisors on July 10, 2018.  Since that date, neither the Debtors nor their advisors have indicated that they disagree with the Recovery Analysis.

including as a result of litigation related to the Debtors' Third Sale Motion, the Plan, or the Equity Committee Plan, may result in reduced recoveries relative to those projected herein due to the continued accrual of interest on the DIP Loan and potentially additional administrative expenses, including professional fees of the Debtors, the Creditors' Committee, and the Equity Committee.[8]  Additionally, the Recovery Analysis does not account for any costs associated with solicitation, nor does it account for any savings associated with obviating the need for a follow-on liquidation plan process should the Debtors' Third Sale Motion be approved.  No independent appraisals were conducted by the Plan Proponents in preparing the Recovery Analysis. **ACCORDINGLY, NEITHER THE PLAN PROPONENTS NOR THEIR PROFESSIONALS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A SALE OF THE DEBTORS' ASSETS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN; ACTUAL RESULTS COULD VARY, IN SOME CASES MATERIALLY**.

## VI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

For the Plan to be confirmed by the Court, all of the applicable requirements of section 1129 of the Bankruptcy Code must be met.  These include, among others, the requirements that the Plan (a) is accepted by all impaired Classes of Claims and Interests, (b) is feasible, and (c) is in the "best interest" of holders of Claims and Interests in each Class impaired under the Plan.

The Plan and the Disclosure Statement were filed with the Court.  A Confirmation Hearing with respect to the Plan is scheduled to commence on _____ __, 2018, at __:__ _.m.  At the Confirmation Hearing, the Plan Proponents will request the Court to confirm the Plan on the basis that all confirmation requirements have been satisfied.

### A.    Voting; Acceptance

Any holder of a Claim in an impaired Class is entitled to vote if either (i) such holder's Claim has been scheduled by the Debtor in the Schedules filed with the Court (provided that such Claim has not been scheduled as disputed, contingent, unknown, or unliquidated), (ii) such holder has filed a Proof of Claim on or before the deadline previously fixed by the Court and such Claim is deemed allowed pursuant to section 502 of the Bankruptcy Code or has been allowed by the Court or by the Plan, unless such Claim has been disallowed for voting purposes by the Court, or is disallowed under the Plan.   A vote may be disregarded if the Court determines, after notice and a hearing, that an acceptance or rejection was not solicited or procured or made in good faith or in accordance with the provisions of the Bankruptcy Code.

---

[8] Professional fees of the Plan Sponsors are not paid from the Debtors' estates and, as a result, will not result in additional administrative expenses.  As mentioned above, the Plan Sponsors are not requesting reimbursement by the Debtors of any professional fees by means of a breakup fee or otherwise.

#91100595v13

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) days prior to the deadline for casting ballots on the Plan, unless an order of the Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

As stated above, Class 3 is the only Class entitled to vote on the Plan.  Class 3 will have accepted the Plan if (i) the holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in Class 3 have voted to accept the Plan and (ii) more than one-half in number of the holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in Class 3 have voted to accept the Plan.

### B.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of the Plan. The Confirmation Hearing may be postponed from time to time by the Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.   Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector, and otherwise complying with the requirements of the Bankruptcy Rules and Local Bankruptcy Rules. Objections must be filed and served pursuant to the Confirmation Notice in the manner set forth therein, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION NOTICE, IT MAY NOT BE CONSIDERED BY THE COURT.

At the Confirmation Hearing, the Court will determine, among other things, whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.    Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before the confirmation of the Plan is reasonable or, if such payment is to be fixed after the confirmation of

#91100595v13

the Plan, such payment is subject to the approval of the Court as reasonable.

5. Each holder of a Class 3 Claim either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claims, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Estate were liquidated on such date under Chapter 7 of the Bankruptcy Code.

6. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that the DIP Loans, Administrative Claims and such Other Priority Claims as are designated in section 1129(a)(9) of the Bankruptcy Code will be paid in full on the Effective Date and that holders of Priority Tax Claims will receive on account of such Claims payment in full on the Effective Date equal to the allowed amount of such Claims.

7. At least one impaired class of Claims has accepted the Plan (i.e., Class 3), determined without including any acceptance of the Plan by any insider holding a Claim in such class.

8. The Plan contemplates the disposition of all of the assets of the Debtors' Estates and the distribution of the proceeds therefrom to holders of Allowed Claims in order of priority and as provided for in the Plan.

The Plan Proponents believe that the Plan will be accepted by Class 3—the only Class entitled to vote to accept or reject the Plan—and will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Plan Proponents have complied or will have complied with all of the requirements of chapter 11, and that the Plan is being proposed and submitted in good faith.

**C.    Feasibility**

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless liquidation is contemplated by the Plan. Here, the Plan contemplates the sale of substantially all of the assets of the Debtors to the Plan Sponsors and that all of the Debtors' right, title, and interest in the Company (other than the Purchased Assets) will be vested in the Liquidation Trust on the Effective Date. The Plan Sponsors and Titanic Belfast intend to raise the full amount of the Purchase Price from government sources, several key individuals and high net worth donors, and other sources. As such, the Plan essentially provides for a controlled and orderly administration and liquidation of the assets of the Debtors' Estates, and is not likely to result in the need for further financial reorganization of the Debtor.

#91100595v13

### D.      Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.[9]  However, the Plan Proponents believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur, and additional claims due to, among other things, the rejection of executory contracts, as a result of liquidating the Estates in a chapter 7 case. Additionally, the Debtors have proposed a sale to the Stalking Horse Purchaser for a purchase price that is $1.7 million less than the Purchase Price proposed under the Plan and, as evidenced in the Recovery Analysis, the sale to the Stalking Horse Purchaser would result in a lower recovery for unsecured creditors.

Conversion of the Chapter 11 Cases to chapter 7 at this stage would likely result in significantly reduced creditor recoveries, relative to the recoveries that would likely be achieved if the Sale contemplated hereby were consummated.  The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee, and additional accrued interest obligations under the DIP Loan. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the

---

[9] Any effort by the chapter 7 trustee to liquidate the French Collection by auction and to separately sell the American Collection would lead to significant professional fees and expenses (which would be paid from the Debtors' Estates) and delay in distributions to creditors as a result of the litigation that would ensue in the Admiralty Court.  As a result, a chapter 7 trustee would likely seek to sell the Artifact Collection as an integrated whole in a manner similar to the Sale.

affairs of the Debtors.  Appointment of a chapter 7 trustee would result in the abrupt shutdown of the Debtors' exhibition business, as the chapter 7 trustee would be prohibited from operating the same absent Court authorization pursuant to Bankruptcy Code section 721 and would likely lack the experience and expertise to operate said business.  Such a shutdown would likely result in the incurrence of significant additional administrative expenses, such as rent obligations under the Debtors' assumed or postpetition exhibition leases.  A chapter 7 trustee would likely also incur significant costs marshalling the Debtors' assets, from geographically dispersed permanent and traveling exhibition locations, particularly if his or her appointment results in key personnel departures.  In addition, appointment of a chapter 7 trustee would also likely result in the establishment of a new Claims Bar Date pursuant to Bankruptcy Rule 1019 and payment of an otherwise avoidable statutory commission to the chapter 7 trustee under section 326 of the Bankruptcy Code.

As such, the distributions to creditors will likely be larger under the Plan.  Additionally, distributions to creditors contemplated by the terms of the Plan will be made more quickly than any likely distribution that would be made by a chapter 7 trustee because a chapter 7 trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Estates.

Based on the foregoing, the Plan Proponents believe that the Plan satisfies the Best Interest Test and represents a preferred alternative to the costs and delays attendant to a conversion of the Chapter 11 Cases to Chapter 7 case and the appointment of a Chapter 7 trustee.

### E.       Fair and Equitable Requirement

Section 1129(b) of the Bankruptcy Code permits a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the same have not voted to accept it or if an impaired class is deemed to reject it; provided that the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b), notwithstanding an impaired class's rejection (or deemed rejection) of the plan, such plan may be confirmed, so long as it does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

The Plan Proponents do not believe that the Plan discriminates unfairly against any impaired Class.

The fair and equitable test applies to classes of different priority and status.  Section 1129(b)(2)(C) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of interests if (i) it provides that each holder of interests of such class receive or retain on account of such interest property of a value, as of the plan effective date, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interests; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.  The Plan Proponents believe these requirements are satisfied because, among other things, no holder of interests junior to PRXI Interests is receiving any property under the Plan.

46

A corollary to the fair and equitable requirement is that no senior class may receive more than full compensation for its claims.  The Plan Proponents do not believe that holders of allowed general unsecured claims would receive more than full compensation on their claims under the Plan.  GlassRatner has projected that the Debtors' estates would need to receive approximately $24 million in order for creditors to be paid in full, after accounting for repayment of the DIP Loan, additional administrative expenses, and repayment of the Debtors' secured claims.  The principal sources of recovery under the Plan would be proceeds of the Sale and the above-referenced D&O litigation commenced by the Equity Committee.  As noted above, even under the Equity Committee's high estimated net recovery ($4 million) from the litigation, the proceeds from the same, together with proceeds from the Sale, would be insufficient to pay creditors in full under GlassRatner's projections.

## VII.    CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Certain Bankruptcy Considerations

1.    *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Plan Proponents believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

2.    *Failure To Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Plan Proponents intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Plan Proponents may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

3.    *The Plan Proponents May Not Be Able To Secure Confirmation of the Plan*

#91100595v13

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  The Debtors and/or a non-accepting holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Allowed Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Plan Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from chapter 11.

### 4. *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Plan Proponents believe that the Plan satisfies these requirements, and the Plan Proponents may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan.

### 5. *Risk of Non-Occurrence of the Effective Date*

The Plan Proponents can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Article XI.B of the Plan, including, among others, those

48

relating to consummation of the Plan, as well as the successful fundraising of the purchase price by the Museum Plan Sponsors.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

6.     *The Actual Recoveries May Differ From the Estimated Recoveries*

The estimated creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual recoveries may significantly differ from the estimates. In preparing these estimates, the Plan Proponents relied on financial data provided by the Debtors and on various assumptions regarding the Debtors' business.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual recoveries may vary from the estimates contained in this Disclosure Statement.  Moreover, the Plan Proponents cannot determine with certainty the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims under the Plan.

7.     *Release, Injunction, and Exculpation Provisions May Not Be Approved*

Article X of the Plan provides for certain releases, injunctions, and exculpations.  All of the releases,   injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

8.     *The Chapter 11 Cases May Be Converted Into Chapter 7 Cases*

If no plan of reorganization can be confirmed, or if the Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A conversion of these Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims.

**B.     Certain Considerations Associated with the Sale**

1.     *The Museum Plan Sponsors May Not Be Able To Raise the Purchase Price*

The Plan Sponsors have agreed to purchase substantially all of the Debtors' assets and assume certain liabilities for $19.2 million.  NMM, NMNI, and Titanic Belfast intend to raise the full amount of the Purchase Price from and with the support and assistance of government sources from the United States, United Kingdom, and Northern Ireland, high net worth individual and corporate donors, and a public campaign backed by certain high profile endorsements.  Although the Plan Proponents are confident, based on the strong fundraising records of NMM, NMNI, and Titanic Belfast and discussions with certain government sources and high net worth individual and corporate donors, that NMM, NMNI, and Titanic Belfast will successfully raise the Purchase Price, there is no guarantee that NMM, NMNI, and Titanic Belfast will be able to raise the full amount.  If the fundraising campaign fails to raise the full Purchase Price, then the Sale and consummation of the Plan would not occur.

#91100595v13

### 2.    *The Sale May Not Close*

The Plan Sponsors have agreed to purchase substantially all of the Debtors' assets and assume certain liabilities through the Sale provided that certain conditions are met, including that the filing and approval of the Plan and this Disclosure Statement, confirmation of the Plan, and, if applicable, the closing of the Sale occur within the respective time periods specified in the Acquisition Agreements and that no event giving rise to termination of the Acquisition Agreements has occurred. To the extent the terms or conditions of the Sale are not satisfied, or to the extent events giving rise to termination of the Acquisition Agreements occur, the Acquisition Agreements may be terminated prior to confirmation or consummation of the Plan. Such termination would adversely affect the Plan Proponents' ability to consummate the Plan.

### 3.    *The Admiralty Court May Not Approve the Sale*

The Covenants and Conditions require that the Admiralty Court approve Museum Plan Sponsors, as candidate subsequent trustees of the Artifact Collection. The Covenants and Conditions provide that the Admiralty Court may appoint experts to conduct and complete due diligence investigations of the candidate subsequent trustee. In addition, the Admiralty Court may consider any information and/or report and recommendation submitted by NOAA, as the representative of the public interest in the Artifact Collection, as to whether the candidate subsequent trustee is a qualified institution and whether the transaction may proceed. NOAA has indicated that it may take up to three weeks or longer to evaluate a potential successor trustee, and there is no guarantee that NOAA will recommend that the Admiralty Court approve the museum Plan Sponsors as subsequent trustees. *See United States' Response to RMST's June 29, 2018 Motion to Approve Asset Purchase Agreement* at fn. 4 (Admiralty Court Docket No. 545). Any delay in consummating the Acquisition Agreements due to Admiralty Court approval processes, or the failure to obtain such approvals, could prolong the Chapter 11 Cases (or result in a liquidation of the Debtors), and reduce recoveries available to creditors.

## VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the holders of Class 3 Claims who may receive Distributions under the Plan. The following summary does not address the federal income tax consequences to holders of any other Claims and Claims that are not impaired by the Plan. The following summary is based on the Internal Revenue Code of 1986, as amended ("**IRC**"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. Further, any discussion of the Liquidation Trust and the powers, obligations and/or actions of the Litigating Trustee that may be set forth below is subject to the applicable provisions of the Plan and the Liquidation Trust Agreement; if and to the extent that there is any inconsistency between such discussion on one hand and the Plan and the Liquidation Trust Agreement on the other

hand, the terms of the latter documents shall control.  Holders of Claims should read the Plan and the Liquidation Trust Agreement in their entirety.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Plan Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, holders that hold Claims as part of a hedge, straddle or conversion transaction, holders who acquired their Claims as compensation, and holders who do not hold their Claims as capital assets).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR PRXI INTEREST.  ALL HOLDERS OF CLAIMS OR PRXI INTERESTS ARE URGED TO CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### B.    Consequences to the Debtor

The transfer of the Liquidation Trust Assets to the Liquidation Trust may result in the Debtor recognizing gain or income, depending in part on the value of such assets on the Effective Date and the adjusted basis of such assets on the Effective Date.

### C.    Consequences to Holders of Allowed Class 3 Claims

#### 1.    *Recognition of Gain or Loss Generally*

Pursuant to the Plan, on the Effective Date, each holder of an Allowed 3 Claim will receive an interest in the Liquidation Trust, which is a beneficial interest in the Liquidation Trust, entitling the holder thereof to distributions from the Liquidation Trust as provided for in the Plan and in the Liquidation Trust Agreement.  Except to the extent that the holder of an Allowed Claim, or beneficial interest therein, agrees to a different treatment, said Persons may receive on account of their Allowed Claim, in full and complete satisfaction thereof, from the Liquidation Trust, one or more Pro Rata Distributions based upon the amount of the respective holder's Allowed Claim, in accordance with the priorities of the Plan.  In general, each holder of such an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including, as discussed below, its undivided interest in the Liquidation Trust Assets) that such Allowed Claim holder receives in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date Distribution of such consideration upon the resolution of Disputed

Claims), and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest), as applicable.  For a discussion of the U.S. federal income tax consequences of any Claim for accrued interest, *see* Section 2 below.

Where a holder recognizes gain or loss in respect of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder and how long it has been so held, whether, in the case of an Allowed Claim, the holder had acquired the Claim at a market discount, and, in the case of an Allowed Claim, whether and to what extent the holder had previously claimed a bad debt deduction.  A holder that purchased its Allowed Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Allowed Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

The Liquidation Trust has been structured to qualify as a "grantor trust" for U.S. federal income tax purposes.  Accordingly, each holder of an Allowed Claim receiving a beneficial interest in the Liquidation Trust will be treated for U.S. federal income tax purposes as directly receiving and as a direct owner of its allocable percentage of the Liquidation Trust Assets (*see* Section 3 below). As set forth in the Liquidation Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidation Trustee (if reasonably deemed necessary or desirable by the Liquidation Trustee) will make or have caused to be made a good faith valuation of the Liquidation Trust Assets of the Liquidation Trust, and all parties, including the holders of Allowed Claims, must consistently use such valuation for all federal income tax purposes.

Due to the possibility that a holder of an interest in the Liquidation Trust may receive more than one Distribution subsequent to the Effective Date, the imputed interest provisions of the IRC may apply to treat a portion of such later Distributions to such holders as imputed interest.  In addition, it is possible that any loss realized by a holder in satisfaction of an Allowed Claim may be deferred until all subsequent Distributions relating to Disputed Claims are determinable, and that a portion of any gain realized may be deferred under the "installment method" of reporting.  Holders of such Allowed Claims are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

After the Effective Date, any amount that a holder receives on account of an Allowed Claim as a Distribution from the Liquidation Trust in respect of its beneficial interest therein (other than as a result of the subsequent disallowance of Disputed Claims) generally should not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such holder's beneficial (ownership) interest in the Liquidation Trust.

#91100595v13

In general, a holder's tax basis in any beneficial interest received (and undivided interest in the Liquidation Trust Assets deemed owned) will equal the fair market value of its proportionate share of the Liquidation Trust Assets on the Effective Date. The holding period for such assets generally will begin the day following the Effective Date.

2.    *Distributions in Payment of Accrued but Unpaid Interest*

Distributions to any holder of an Allowed Class 1, 2, or 3 Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

To the extent a holder of debt receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such holder generally recognizes taxable interest income in such amount (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

3.    *Tax Treatment of the Liquidation Trust and Holders of Interests Therein*

On the Effective Date, the Liquidation Trust will be established for the benefit of holders of all Allowed Claims. The Liquidation Trust is intended to qualify and be treated as a "grantor trust" (i.e., a pass-through tax entity), rather than as a separate taxable entity. However, merely establishing a trust as a Liquidation Trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994- 2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a Liquidation Trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Liquidation Trustee, and the Beneficiaries of the Liquidation Trust) are required for federal income tax purposes to treat the Liquidation Trust as a grantor trust of which the Persons receiving interests therein are the owners and grantors. The following discussion assumes that the Liquidation Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidation Trust and the Beneficiaries could vary from those discussed herein.

For all U.S. federal income tax purposes, all parties (including the Debtor, the Liquidation Trustee, and the Beneficiaries) must treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan and the Liquidation Trust Agreement, as a transfer of such Liquidation Trust Assets directly to the Beneficiaries, followed by such Beneficiaries' transfer of the Liquidation Trust Assets to the Liquidation Trust.

Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Liquidation Trust Assets for all U.S. federal income tax purposes. Each such Person will have a tax basis in its proportionate share of the Liquidation Trust Assets deemed owned equal to the fair market value thereof on the Effective Date. As set forth in the Liquidation Trust Agreement, as soon as practicable after the Effective Date, and thereafter as may be required, the Liquidation Trustee will (if reasonably deemed necessary or desirable by the Liquidation Trustee) make or have caused to be made a good faith valuation of the Liquidation Trust Assets, and all parties, including the Beneficiaries, must consistently use such valuation for all federal income tax purposes.

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder of a Class 3 Claim receiving a beneficial interest in the Liquidation Trust will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Liquidation Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Liquidation Trust distributing any Cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Liquidation Trust regardless of the fact that the holder has not received any prior or concurrent Distribution. Other than in respect of Cash retained on account of Disputed Claims and subsequently distributed, the Liquidation Trust's Distribution of Cash to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying Liquidation Trust Assets.

The assets set aside or reserved to fund the payment of the Disputed Claims Reserve will be treated and taxed for federal income tax purposes similar to the other assets transferred and held by the Liquidation Trust (i.e., the reserved assets will be treated as transferred to the grantor Liquidation Trust owned by the holders) unless the Liquidation Trustee files a tax election to treat the Disputed Claim Reserve as a Disputed Ownership Fund. Under the Plan, the Liquidating Trustee is allowed, for federal income tax purposes, to treat the Disputed Claims Reserve as either (a) a part of the assets of the grantor Liquidation Trust owned by the Beneficiaries (i.e., the Beneficiaries, rather than the Liquidation Trust, will pay tax on their share of Tax Items, as that term is defined in the Liquidation Trust, attributable to the Disputed Claims) or (b) a DOF, taxable under IRC Section 468B and Treasury Income Tax Regulation Section 1.468B-9 (separate taxable entity). If the Liquidation Trustee fails to file a DOF tax election, the tax consequences with respect to the transfer of assets used to fund the Disputed Claims reserve will be the same as described above for the other assets transferred by the Debtor to the Liquidation Trustee.

If the Liquidation Trustee files a tax election to treat the Disputed Claims reserve accounts as a DOF, then the DOF will be treated as a separate taxable entity for federal income tax purposes (rather than a pass-through tax entity) that is required to file federal income tax returns and pay any federal income tax due with respect to Tax Items that are attributable to the

#91100595v13

Disputed Claims.  All of the federal income tax liability of the DOF will reduce the distributions of all of the holders, including the Disputed Claimants.  The DOF will be taxed for federal income tax purposes as either (a) a C corporation, unless all the assets transferred to the fund by or on behalf of transferors are passive investments assets, or (b) a "qualified settlement fund" within the meaning of IRC Section 468B and the Treasury Income Tax Regulations thereunder (a "**QSF**"), if all the assets transferred to the fund are passive investment assets.  For purposes of determining the DOF's federal income tax liability, a DOF is not required to report as income transfers of assets to the DOF, but is required to include in income all income received or accrued from the assets transferred to the DOF.  The DOF is not allowed a tax deduction for a distribution of disputed assets or the net after tax income earned by the DOF made to a holder.  The initial tax basis of assets transferred to a DOF is the fair market value of the asset determined on the date of transfer to the DOF, and the DOF's holding period begins on the date of the transfer.

4.      *Tax Reporting*

Except to the extent of the Liquidation Trust Assets with respect to which there is a DOF tax election, all parties (including the Debtors, the Liquidation Trustee and the holders) shall, for all federal income tax purposes, treat the transfer of assets to the Liquidation Trust in accordance with the terms of the Plan as a transfer of such assets directly to the holders, followed by the transfer thereof by such holders to the Liquidation Trust.  Consistent therewith, for federal income tax purposes, all parties shall treat the Liquidation Trust as a grantor trust of which such holders are the owners and grantors.  Thus, such holders (and any subsequent holders) shall be treated as the direct owners of an undivided beneficial interest in the assets and liabilities of the Liquidation Trust for all federal income tax purposes.  The Liquidation Trustee will determine the fair market value of the assets, and all parties, including the holders, must consistently use such valuation for all federal income tax purposes.

The Liquidation Trustee will file with the Internal Revenue Service tax returns as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidation Trustee will also send to each holder a separate statement setting forth the holder's share of the Liquidation Trustee's Tax Items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Each of the holders will be required to report on his/her federal income tax return(s) the holder's allocable share of any Tax Items such as income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust and that is set forth on the tax statement provided to the holder.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of the holder.

The federal income tax reporting obligation of the holders is not dependent upon the Liquidation Trustee's distribution of cash or other proceeds.  Therefore, holders may receive Tax Items in a taxable year regardless of the fact that the Liquidation Trustee has not made, or will not make, any concurrent or subsequent distributions to the holders.  If a holder does not receive distributions from the Liquidation Trustee commensurate with the Tax Items allocated to it, the holder may be entitled to a subsequent loss or deduction.

#91100595v13

If the Liquidation Trustee files a DOF tax election with respect to the Disputed Claims Reserve then, for federal income tax purposes, the Liquidation Trustee will file a tax return for the DOF and pay any federal income tax due.

For federal income tax purposes, Disputed Claimants are not treated as transferring assets to the DOF. The taxability of distributions to Disputed Claimants is determined by reference to the Disputed Claim in which the distribution is made.

5.       *Information Reporting and Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain Distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING UPON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## IX.    SUMMARY OF ADDITIONAL SOURCES OF INFORMATION

Additional sources of information regarding the Debtors and documents relating to the Plan are available to holders of Claims and Interests. Copies of the Debtors' securities filings can be viewed at: https://www.sec.gov/cgi-bin/browse-edgar?company=premier+exhibitions&owner=exclude&action=getcompany. All filings with the Court in these Chapter 11 Cases may be viewed at the Committees' website, http://www.jndla.com/cases/premiercommittee, under "Court Docket."

#91100595v13

## X.    RECOMMENDATION AND CONCLUSION

In the opinion of the Plan Proponents, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.    Accordingly, the Plan Proponents recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

In the opinion of the Plan Proponents, and the Creditors' Committee in particular, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.    Additionally, the Plan Proponents believe that the Plan affords holders of Claims the potential for the greatest feasible realization out of the Debtors' Estates, with minimal risk that the contemplated transaction will be rejected by the Admiralty Court, and, therefore, is in the best interest of such holders. ACCORDINGLY, THE PLAN PROPONENTS, AND THE CREDITORS' COMMITTEE IN PARTICULAR, RECOMMEND THAT HOLDERS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION.

#91100595v13

Dated: August __24__ , 2018

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____

Thomas Braziel (Aug 24, 2018)

Name:  Thomas Braziel

Title:   Chairman

Dated: 28 August 2018

**THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM**

By:   _____

Name:  Kevin Fewster

Title:  Director

Dated: August 28, 2018

**THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND**

By: _____

Name: _____

Title: _____

Dated: August 28, 2018                **RUNNING SUBWAY PRODUCTIONS, LLC**

                                      By: _____
                                      Name:  James R. Sanna
                                      Title:   CEO

**Exhibit A**
(Plan)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |
|---|---|
| In re:<br><br>RMS TITANIC, INC., *et al.*,[1]<br><br>      Debtors. | Case No. 3:16-bk-02230-PMG<br><br>**Chapter 11**<br>**(Jointly Administered)** |

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC**

**STORCH AMINI PC**
Jeffrey Chubak (admitted pro hac vice)
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
(212) 490-4208 (Facsimile)
jchubak@storchamini.com

**THAMES MARKEY & HEEKIN, P.A.**
Richard R. Thames
Robert Heekin
Florida Bar No. 0718459
Florida Bar No. 652083
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
rah@tmhlaw.net

*Attorneys for the Official Committee of*
*Unsecured Creditors*

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

**DAVIS POLK & WARDWELL LLP**
Timothy Graulich (admitted pro hac vice)
James I. McClammy (admitted pro hac vice)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Patricia Ann Redmond
Florida Bar No. 303739
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
predmond@stearnsweaver.com

*Attorneys for the Trustees of the*
*National Maritime Museum*

Dated: August 28, 2018

2

# TABLE OF CONTENTS

_____

Page

INTRODUCTION .................................................................................................1
I.     DEFINITIONS AND CONSTRUCTION OF TERMS.............................1
       A.    Definitions..................................................................................1
       B.    Interpretation, Application of Definitions and Rules of
             Construction..............................................................................11
II.    CLASSIFICATION OF CLAIMS AND INTERESTS .........................11
       A.    General Rules of Classification................................................11
       B.    Classification of Claims and Interests.....................................11
III.   TREATMENT OF UNCLASSIFIED CLAIMS....................................12
       A.    Administrative Claims ..............................................................12
       B.    Bar Date for Administrative Claims .........................................12
       C.    Professional Fee Claims...........................................................13
       D.    Priority Tax Claims...................................................................13
       E.    DIP Financing Claims...............................................................13
IV.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS..........13
       A.    Class 1 – Other Priority Claims ...............................................13
       B.    Class 2 – Secured Claims.........................................................14
       C.    Class 3 – General Unsecured Claims........................................14
       D.    Class 4 – Intercompany Claims ...............................................15
       E.    Class 5 – PRXI Interests...........................................................15
V.     LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND
       DISTRIBUTION PURPOSES...............................................................16
VI.    PROVISIONS REGARDING ACCEPTANCE OR REJECTION OF
       PLAN; CRAMDOWN...........................................................................16
       A.    Elimination of Vacant Classes .................................................16
       B.    Cramdown..................................................................................17
VII.   PROVISIONS REGARDING MEANS OF IMPLEMENTATION,
       DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS .................17
       A.    Sale Approval and Consummation ...........................................17
       B.    Timing of Distributions.............................................................17
       C.    Record Date for Distributions...................................................18
       D.    Distributions to Holders of Allowed Claims ...........................18
       E.    Distributions After Allowance ..................................................18
       F.    Liquidation Trust ......................................................................18
       G.    Delivery of Distributions ..........................................................21
       H.    Method of Cash Distributions...................................................21
       I.     Failure to Negotiate Checks.....................................................21
       J.     Unclaimed Property ..................................................................21
       K.    No Distributions on Late-Filed Claims.....................................22
       L.     Limitation on Distribution Rights.............................................22
       M.    Fractional Dollars......................................................................22
       N.    De Minimis Distributions .........................................................22

i

|  | O. | Compliance With Tax Requirements | 22 |
|--|----|----------------------------------|----|
|  | P. | Character of Distributions | 23 |
|  | Q. | No Payment or Distribution Pending Allowance | 23 |
|  | R. | Distributions on Insured Claims | 23 |
|  | S. | Corporate Action | 23 |
|  | T. | Cancellation of Existing Securities and Agreements | 24 |
| VIII. | | PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND CONTEST | 24 |
|  | A. | Preservation of Rights | 24 |
|  | B. | Causes of Action | 24 |
|  | C. | Setoffs | 25 |
|  | D. | Resolution of Disputed Claims | 26 |
| IX. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS | 28 |
|  | A. | Treatment of Executory Contracts and Unexpired Leases | 28 |
|  | B. | Cure of Defaults for Assumed Contracts and Leases | 28 |
|  | C. | Bar Date for Claims for Rejection Damages | 28 |
|  | D. | Treatment of Rejection Claims | 28 |
|  | E. | Employment Agreements and Benefit Programs | 29 |
|  | F. | Survival of Certain Indemnification Obligations | 29 |
| X. | | EFFECT OF CONFIRMATION OF THIS PLAN | 29 |
|  | A. | Continued Corporate Existence | 29 |
|  | B. | Releases by the Debtors of Certain Parties | 30 |
|  | C. | Releases by Non-Debtors | 31 |
|  | D. | Exculpation | 32 |
|  | E. | Injunction | 33 |
|  | F. | Term of Bankruptcy Injunction or Stays | 34 |
|  | G. | Preservation of Insurance | 34 |
|  | H. | Other Documents and Actions | 34 |
|  | I. | Guaranties | 34 |
|  | J. | Subordination Rights | 34 |
|  | K. | No Successor Liability | 35 |
|  | L. | Free and Clear | 35 |
| XI. | | EFFECTIVENESS OF THIS PLAN | 35 |
|  | A. | Conditions Precedent to Confirmation | 35 |
|  | B. | Conditions Precedent to the Effective Date | 36 |
|  | C. | Waiver of Conditions | 36 |
|  | D. | Notice of Confirmation and Effective Date | 37 |
|  | E. | Effect of Failure of Conditions | 37 |
|  | F. | Vacatur of Confirmation Order | 37 |
|  | G. | Revocation, Withdrawal, or Non-Consummation | 37 |
| XII. | | RETENTION OF JURISDICTION | 38 |
| XIII. | | MISCELLANEOUS PROVISIONS | 38 |
|  | A. | Payment of Statutory Fees | 38 |
|  | B. | Modification of this Plan | 39 |
|  | C. | Dissolution of Creditors' Committee and Equity Committee | 39 |

D.      Votes Solicited in Good Faith....................................................................39
E.      Request for Expedited Determination of Taxes........................................39
F.      Governing Law ..........................................................................................40
G.      Filing or Execution of Additional Documents..........................................40
H.      Section 1146 Exemption ...........................................................................40
I.      Section 1145 Exemption ...........................................................................40
J.      Time ...........................................................................................................40
K.      No Admissions or Waivers ........................................................................41
L.      Exhibits/Schedules....................................................................................41
M.      Notices .......................................................................................................41
N.      Further Actions; Implementations ...........................................................43
O.      Severability ...............................................................................................43
P.      Entire Agreement ......................................................................................43
Q.      Binding Effect............................................................................................44
R.      Substantial Consummation .......................................................................44
S.      Conflict ......................................................................................................44
T.      Closing of Chapter 11 Cases.....................................................................44

## INTRODUCTION

The Official Committee of Unsecured Creditors in the above-captioned Chapter 11 Cases, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC propose the following joint plan pursuant to section 1121(a) of the Bankruptcy Code.[2]    The Plan contemplates the sale of substantially all of the assets of the Debtors to the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC, and the resolution of all outstanding Claims against, and Interests in, the Debtors.

Pursuant to section 1125(g) of the Bankruptcy Code, votes to accept or reject a plan of reorganization may be solicited from holders of Claims or Interests entitled to vote on a plan if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the Chapter 11 Cases in a manner complying with applicable nonbankruptcy law.  The Disclosure Statement that accompanies the Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, and operations and a summary and analysis of the Plan and certain related matters.

## I.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings:

"**Acquisition Agreements**" means the agreements to be entered into between the Plan Sponsors and certain Debtors to effectuate the Sale (including all exhibits, schedules (including the Schedule of Assumed Contracts and Leases), supplements, modifications, amendments, appendices, annexes and attachments thereto) which will be filed with the Plan Supplement.

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises.

"**Administrative Claims Bar Date**" means the first Business Day that is thirty (30) days after the Effective Date.

"**Admiralty Court**" means the United States District Court for the Eastern District of Virginia.

---

[2] Capitalized terms have the meanings ascribed to them in Article I.A of the Plan.

"**Allowed**" means, with reference to any Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary Proof of Claim has been filed; (b) any Claim specifically allowed under this Plan; (c) a Claim asserted in a Proof of Claim that was timely filed with the Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable Final Order, or late filed, but with leave of the Court, deemed timely, and in either case, (i) is not objected to within the period fixed by Bankruptcy Code, the Bankruptcy Rules, this Plan (including by the Claims Objection Deadline), the Confirmation Order and/or applicable orders of the Court or (ii) has otherwise been allowed by Final Order; or (d) any Claim the amount or existence of which, if such Claim is a Disputed Claim, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Court, or (ii) has been allowed by Final Order of the Court; *provided*, *however*, that any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder.

"**Assumed Contracts and Leases**" means those certain executory contracts and unexpired leases entered into by the Debtors before the Petition Date which are (i) executory and/or unexpired as of the Closing Date of the Sale and (ii) being assumed by the Debtors and assigned to the Plan Sponsors pursuant to this Plan.

"**Available Cash**" means all Unencumbered Cash held by the Liquidation Trust (less any amounts maintained in any Reserve) after payment in full of all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, DIP Financing Claims, Allowed Secured Claims, and the reasonable fees, costs, and expenses of the Liquidation Trustee.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553 and 724(a) of the Bankruptcy Code.

"**Ballots**" means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim for, among other things, voting on the acceptance or rejection of this Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the date hereof.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and the local rules of the Court, as the context may require.

"**Bar Date**" means October 24, 2016, except (a) in the case of an Administrative Claim, Bar Date shall mean the Administrative Claims Bar Date; and (b) in the case of Claims of a Governmental Unit, Bar Date shall mean the date that is 180 days after the Petition Date.

"**Business Day**" means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a).

"**Cash**" means legal tender of the United States of America.

"**Causes of Action**" means any and all actions, proceedings, causes of action (including Avoidance Actions), suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law (whether domestic or foreign), equity, or otherwise, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"**Chapter 11 Cases**" means the chapter 11 cases commenced by the Debtors.

"**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"**Claims Objection Deadline**" means, as applicable (except for Administrative Claims and Professional Fee Claims): (a) as to timely filed Claims (if not Allowed herein), the day that is the later of (i) the first Business Day that is one hundred eighty (180) days after the Effective Date, or (ii) as to Claims filed after the applicable Bar Date, the first Business Day that is at least thirty (30) days after a Final Order is entered deeming the late filed Claims to be treated as timely filed; or (b) such later date as may be established by the Court upon a motion by the Debtors or Liquidation Trustee, without any further notice to other parties-in-interest.

"**Class**" means a group of Claims or Interests as classified under this Plan.

"**Closing Date**" shall have the meaning set forth in the Acquisition Agreements.

"**Collateral**" means any property or interest in property of the Debtors' Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

"**Consenting Creditors**" has the meaning set forth in the Plan Support Agreement.

"**Confirmation Date**" means the date on which the Confirmation Order is entered by the Court.

"**Confirmation Hearing**" means the hearing conducted by the Court to consider confirmation of this Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

"**Confirmation Order**" means the order entered by the Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"**Convenience Claim**" means a General Unsecured Claim with a Face Amount of less than the Convenience Claim Threshold.

"**Convenience Claim Threshold**" means $5,000.

"**Court**" means (a) the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, having jurisdiction over the Chapter 11 Cases; and (b) with respect to withdrawal of any reference under section 157 of title 28 of the United States Code, with respect to the Chapter 11 Cases, the United States District Court for the Middle District of Florida or the United States District Court to which venue is transferred.

"**Covenants and Conditions**" means the conditions set forth in the *Revised Covenants and Conditions for the Future Disposition of Objects Recovered from the R.M.S. Titanic by R.M.S. Titanic, Inc. pursuant to an in specie salvage award granted by the United States District Court for the Eastern District of Virginia*, attached as Exhibit A to the Admiralty Court's August 12, 2010 Opinion.

"**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Debtors' Chapter 11 Cases, as constituted from time to time.

"**Debtors**" means Premier Exhibitions, Inc., RMS Titanic, Inc., Premier Merchandising, LLC, Premier Exhibition Management LLC, Arts and Exhibitions International, LLC, Premier Exhibitions NYC, Inc., Premier Exhibitions International, LLC, and Dinosaurs Unearthed Corp.

"**DIP Credit Agreement**" means that certain Senior Secured Debtor-In-Possession Loan Agreement dated as of May 18, 2017 by and among the Debtors, as borrowers, and the DIP Lender.

"**DIP Credit Documents**" means the "DIP Loan Documents" under (and as defined in) the DIP Credit Agreement.

"**DIP Credit Facility**" means the multi-draw term loan credit facility established in favor of the Debtors, as borrowers, in an aggregate principal amount of up to $5,000,000 pursuant to the DIP Credit Agreement and the other DIP Credit Documents.

"**DIP Financing Claims**" means all Claims arising under or relating to the DIP Credit Facility, whether pursuant to the DIP Credit Agreement, any other DIP Credit Document, the Final DIP Order, or otherwise.

"**DIP Lender**" means Bay Point Capital Partners LP.

"**Disallowed**" means with reference to any Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Plan, the Bankruptcy Code, applicable law or by a Final Order.

"**Disclosure Statement**" means the written disclosure statement that relates to this Plan, including all exhibits, appendices and schedules thereto, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time.

"**Disputed Claim**" means any Claim as to which the Debtors or any other party in interest have filed an objection or request for estimation on or before such limitation period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court, or that is otherwise disputed by the Debtors, Liquidation Trustee, or any party in interest in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by Final Order.

"**Disputed Claims Reserve**" shall have the meaning ascribed to such term in Article VIII.D.3 of this Plan.

"**Distribution Date**" means on or as soon as reasonably practicable after (i) the Initial Distribution Date, and (ii) the first Business Day after the end of the months of June and December, commencing with the first such date to occur more than ninety (90) days after the Effective Date and continuing until the Final Distribution Date; *provided, however*, that a Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur if either (i) the aggregate value of the consideration to be distributed on such Distribution Date is less than $250,000, or (ii) the Liquidation Trustee, with consent from the Liquidation Trust Oversight Board as provided in the Liquidation Trust Agreement, determines that it is in the best interest of the Liquidation Trust that no Distribution Date should occur, which in either case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date.

"**Distributions**" means the distribution in accordance with this Plan of (a) Cash or (b) other form of consideration, as the case may be.

"**Effective Date**" means the first Business Day selected by the Creditors' Committee and the Plan Sponsors on which (i) all of the conditions specified in Article XI.A and Article XI.B of this Plan have been satisfied or waived in accordance with Article XI.C of this Plan, and (ii) the stay of the Confirmation Order, if any, is no longer in effect and such date shall be set forth in a notice filed with the Court by the Debtors within five (5) Business Days of the occurrence of the Effective Date.

"**Employee Benefit Plan**" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Debtor or any ERISA Affiliate or with respect to which any Debtor or any ERISA Affiliate has any liability.

5

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Committee**" means the Official Committee of Equity Security Holders of PRXI appointed by the United States Trustee in the Debtors' Chapter 11 Cases, as constituted from time to time.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rules issued thereunder.

"**ERISA Affiliate**" means any Person that, at any relevant time, is or was treated as a single employer with any Debtor for purposes of section 414 of the Internal Revenue Code.

"**Estates**" means the Chapter 11 estates of the Debtors, individually or collectively, as is appropriate in the context created by the commencement of and in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

"**Face Amount**" means, at any time, with respect to a particular Claim: (a) if the holder of such Claim has not filed a Proof of Claim by the applicable Bar Date, the amount of such Claim that is listed in the Schedules as noncontingent, undisputed and liquidated; (b) if the holder of such Claim has filed a Proof of Claim by the applicable Bar Date, and such Claim has not become an Allowed Claim or been estimated by Final Order of the Court, the amount stated in such Proof of Claim; or (c) in all other cases, zero ($0) or such amount as shall be fixed or estimated by a Final Order of the Court.

"**Federal Judgment Rate**" means the rate of interest allowed on money judgments in a civil case recovered in a district court as set forth in 28 U.S.C. § 1961.

"**Final Decree**" means the final decree entered by the Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

"**Final DIP Order**" means the order entered on July 12, 2017 by the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, authorizing the Debtors to, among other things, enter into the DIP Credit Agreement and obtain loans under the DIP Credit Facility.

"**Final Distribution Date**" means the date on which the Liquidation Trustee makes the final distribution in accordance with the Plan.

"**Final Order**" means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending.

"**General Unsecured Claim**" means an unsecured Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Professional Fee Claim, DIP Financing Claim, Secured Claim, Intercompany Claim or

Convenience Claim, and shall include (a) pre-Petition Date Claims of vendors or customers of the Debtors that are not priority claims under section 503(b)(9) of the Bankruptcy Code, (b) Claims of employees of the Debtors that are not priority claims under section 507(a) of the Bankruptcy Code, (c) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 and 502(g) of the Bankruptcy Code, (d) Claims arising as a result of pre-Petition Date litigation against any of the Debtors, and (e) Claims arising under section 502(h) of the Bankruptcy Code, if any.

"**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Impaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Initial Distribution Date**" means the Effective Date or as soon as reasonably practicable thereafter.

"**Intercompany Claim**" means any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted or assertable by or on behalf of a Debtor against any other Debtor or Debtors.

"**Interest**" means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest, and any and all Claims that are otherwise determined by the Court to be an Interest, including any Claim or debt that is recharacterized as an Interest.

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Liquidation Trust**" means the trust to be established in accordance with Article VII.F of the Plan.

"**Liquidation Trust Agreement**" means the agreement to be executed between the Liquidation Trustee and the Debtors establishing the Liquidation Trust, which will be filed with the Plan Supplement.

"**Liquidation Trust Documents**" means the Liquidation Trust Agreement and any ancillary documents relating thereto.

"**Liquidation Trust Oversight Board**" means the board established pursuant to the Liquidation Trust Agreement and given certain oversight of the Liquidation Trust, the initial composition of which shall be set forth in the Plan Supplement.

"**Liquidation Trustee**" means the Person designated in the Liquidation Trust Agreement to act as trustee the Liquidation Trust, or any successor of the Liquidation Trustee.

"**Other Priority Claim**" means any Claim against any of the Debtors other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Financing Claim that is entitled to priority in payment as specified in section 507(a) of Bankruptcy Code.

"**Person**" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or Entity.

"**Petition Date**" means June 14, 2016.

"**Plan**" means this *First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC*, as it may be amended or modified from time to time, together with all addenda, exhibits, schedules or other attachments, if any.

"**Plan Proponents**" means the Creditors' Committee and the Plan Sponsors.

"**Plan Sponsors**" means the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, attachments and exhibits to this Plan, to be filed by the Plan Proponents following the filing of this Plan as set forth herein, each of which documents and other materials shall be acceptable in form and substance to the Plan Proponents.

"**Plan Support Agreement**" means that certain Plan Support Agreement dated as of June 27, 2018 by and among the Creditors' Committee, the Plan Sponsors, and the creditors party thereto.

"**Priority Tax Claim**" means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means (i) any professional employed in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code and (ii) any other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b) of the Bankruptcy Code.

"**Professional Fee Claim**" means an Administrative Claim Allowed under section 330(a), 331 or 503 of the Bankruptcy Code for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee or Equity Committee incurred as members of the Creditors' Committee or Equity Committee in discharge of their duties as such).

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

"**Proof of Claim**" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

"**Property**" means all assets or property of the Debtors' respective Estates of any nature whatsoever, real or personal, tangible or intangible, including without limitation Sale Proceeds, contract rights, accounts and Causes of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective Estates, as defined in section 541 of the Bankruptcy Code.

"**PRXI**" means Premier Exhibitions, Inc.

"**PRXI Interest**" means any Interest in PRXI.

"**Record Date**" means, for purposes of making distributions under this Plan on account of Allowed Claims, the Effective Date.

"**Released Parties**" means, in each case solely in its capacity as such, (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Plan Sponsors, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**Releasing Parties**" means, in each case solely in its capacity as such, (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Plan Sponsors, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**Reserve**" means any reserve required or allowed to be established pursuant to this Plan, including the Disputed Claims Reserve, and the Trust Expense Reserve.

"**Retained Actions**" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity,  whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior  to the Effective Date, (ii) claims and Causes of Action against

9

any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (iii) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, arising prior to the Effective Date, (iv) claims and Causes of Action seeking the recovery of any of the Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' businesses, including, without limitation, claim overpayments and tax refunds, and (v) all Avoidance Actions.

"**Running Subway**" means Running Subway Productions, LLC.

"**Sale**" means the sale of substantially all of the Debtors' assets to the Plan Sponsors pursuant to the Acquisition Agreements.

"**Sale Proceeds**" means, collectively, the proceeds arising from or in connection with the Sale and the proceeds arising from or in connection with the sale, transfer, or other disposition of any other Property, whenever arising or occurring, whether before or after the Effective Date.

"**Schedule of Assumed Contracts and Leases**" means the schedule listing certain executory contracts and unexpired leases to be assumed by the Debtors and assigned to any Plan Sponsor pursuant to the Acquisition Agreements.

"**Schedules**" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and related exhibits filed with the Court by each of the Debtors, including any amendments or supplements thereto.

"**Secured Claim**" means any Claim to the extent reflected in the Schedules (but only to the extent it is not listed as contingent, unliquidated, or disputed) or a Proof of Claim (which such Proof of Claim shall supersede the Schedules) filed as a secured Claim, which is (i) secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, (ii) in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"**Trust Expense Reserve**" shall have the meaning ascribed to such term in Article VII.F.5 of this Plan

"**Unclaimed Property**" means any Distribution of Cash or any other Property made to the holder of an Allowed Claim pursuant to the Plan that is returned to the Debtors or the Liquidation Trustee as undeliverable and no appropriate forwarding address is received prior to the date on which the Final Decree is entered in the Chapter 11 Cases, in the case of a distribution made in the form of a check, is not negotiated and no request for reissuance is made as provided for in Article VII.J of the Plan.

"**Unencumbered**" means, any Property not subject to (i) a Lien or (ii) a charge to use such Property for a particular purpose pursuant to the Acquisition Agreements.

"**Unimpaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

### B.    Interpretation, Application of Definitions and Rules of Construction

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in this Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be.  The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section or subsection in this Plan unless expressly provided otherwise.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to Articles, Sections and exhibits to this Plan are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan.  Unless otherwise specified or required by context, references in this Plan to any right or obligation to take any action or not take any action given to the Debtors, the Liquidation Trust, the Liquidation Trustee or any similar references shall be interpreted to give such right or obligation to the Debtors prior to the Effective Date and to the Liquidation Trust or Liquidation Trustee subsequent to the Effective Date.

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## II.    CLASSIFICATION OF CLAIMS AND INTERESTS

### A.    General Rules of Classification

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims have not been classified.  These Claims will be Unimpaired and, therefore, will not be entitled to vote to accept or reject this Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### B.    Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan, and (iii) presumed to accept or deemed to reject this Plan.  A Claim or Interest is designated in a particular Class only to the extent it falls within the

11

description of that Class, and is classified in any other Class to the extent (if any) that a portion of such Claim or Interest falls within the description of such other Class.

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Impaired | Deemed to Reject |
| 6 | PRXI Interests | Impaired | Deemed to Reject |

## III.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    Administrative Claims

Each holder of an Allowed Administrative Claim (other than a Professional Fee Claim and DIP Financing Claim) shall receive from the Debtors (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of (i) the Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon as reasonably practicable thereafter, or (b) such other treatment as (i) the Debtors or the Liquidation Trustee (as applicable) and (ii) such holder shall have agreed upon in writing.

### B.    Bar Date for Administrative Claims

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications or motions for allowance of Administrative Claims (other than Professional Fee Claims and DIP Financing Claims), which date shall be the Administrative Claims Bar Date.  **HOLDERS OF ADMINISTRATIVE CLAIMS NOT PAID PRIOR TO THE CONFIRMATION DATE SHALL FILE WITH THE COURT AND SERVE UPON THE DEBTORS OR LIQUIDATION TRUSTEE, AS APPLICABLE, A MOTION REQUESTING PAYMENT OF SUCH ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR FOREVER BE BARRED FROM DOING SO.**  The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.  The Liquidation Trustee shall have sixty (60) days (or such longer period as may be allowed by Final Order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims (other than Professional Fee Claims and DIP Financing Claims).

Notwithstanding the foregoing, requests for payment of Administrative Claims need not be filed for Administrative Claims that (a) previously have been Allowed by Final Order of the Bankruptcy Court, (b) the Debtors or Liquidation Trustee have otherwise agreed in writing do not require such a filing or (c) arise pursuant to 28 U.S.C. § 1930.

### C.   Professional Fee Claims

All requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 328, 330, 331, or 503 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Debtors, counsel to the Debtors, the Office of the United States Trustee, the Liquidation Trustee, counsel to the Liquidation Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date.  Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claims must be filed and served no later than twenty (20) days following the filing with the Court of any request for compensation or reimbursement of Professional Fee Claims and be served on the Debtors, counsel for the Debtors, counsel to the Creditors' Committee, the Liquidation Trustee, counsel to the Liquidation Trustee, and the holders of Professional Fee Claims requesting payment.  Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

### D.   Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall receive (a) treatment in any manner that is consistent with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing.

### E.   DIP Financing Claims

The DIP Financing Claims shall be Allowed in an amount equal to the sum of all amounts outstanding under the DIP Credit Agreement as of the Effective Date.  On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed DIP Financing Claim shall receive from the Debtors' Cash in an amount equal to the amount of such Allowed DIP Financing Claim.

## IV.   TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### A.   Class 1 – Other Priority Claims

1.   **Classification.**  Class 1 consists of all Other Priority Claims.

2.   **Treatment**.  Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid in full by the Debtors, prior to the Effective Date or (ii) shall have agreed in writing to a less favorable treatment or an alternative Distribution Date, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim, on or as soon as reasonably practicable

after the later of (a) the Effective Date and (b) the date when such Other Priority Claim becomes Allowed.

3. **Impairment and Voting**.  Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

B.  **Class 2 – Secured Claims**

1. **Classification.**  Class 2 consists of all Secured Claims.

2. **Treatment**.  Except to the extent that a holder of an Allowed Secured Claim shall have agreed in writing to a less favorable treatment or an alternative Distribution Date, in full and final satisfaction of such Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the first Distribution Date when such Secured Claim becomes Allowed, such holder of an Allowed Secured Claim shall receive (i) Cash in an amount equal to such Allowed Secured Claim, including any non-default interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (ii) the Collateral securing its Allowed Secured Claim and any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iii) treatment in any other manner such that its Allowed Secured Claim shall not be Impaired.

To the extent any security interest relating to an Secured Claim is avoided or any portion of the Secured Claim is determined to be unsecured, including due to any deficiency (the "**Secured Lenders' Unsecured Claim**"), the Secured Lenders' Unsecured Claim shall be classified in Class 3 as General Unsecured Claims and receive the same treatment as other Class 3 Claims; *provided*, *however*, that any Secured Lenders' Unsecured Claim held by an insider shall be classified as a separate Class and shall receive its Pro Rata share of Available Cash contemporaneous with the other General Unsecured Claims as if such Secured Lenders' Unsecured Claim had been classified in Class 3 until such Secured Lenders' Unsecured Claim is paid in full with interest at the Federal Judgment Rate.

3. **Impairment and Voting**.  Class 2 is Unimpaired under this Plan.  Holders of Allowed Secured Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

C.  **Class 3 – General Unsecured Claims**

1. **Classification.**  Class 3 consists of all General Unsecured Claims.

14

2.      **Treatment**.  Except to the extent a holder of a General Unsecured Claim shall have agreed in writing to a less favorable treatment or an alternative Distribution Date, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the first Distribution Date when such General Unsecured Claim becomes Allowed, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Available Cash.  On each subsequent Distribution Date or as soon as reasonably practicable thereafter, the Liquidation Trustee shall continue to distribute to holders of Allowed General Unsecured Claims their respective Pro Rata shares of any Available Cash until (i) such Claims are paid in full with interest at the Federal Judgment Rate or (ii) the Final Distribution Date.

Each holder of a General Unsecured Claim may elect to be treated as a holder of a Convenience Claim by electing to reduce the amount of its Allowed General Unsecured Claim to the Convenience Claim Threshold in full and final satisfaction of such claim.  Any such election must be made on the Ballot and shall be considered irrevocable.

3.      **Impairment and Voting**.  Class 3 is Impaired under this Plan.  Holders of Allowed General Unsecured Claims in Class 3 are entitled to vote to accept or reject this Plan.

**D.    Class 4 – Intercompany Claims**

1.      **Classification.**  Class 4 consists of all Intercompany Claims.

2.      **Treatment**.  On the Effective Date, all Intercompany Claims shall be cancelled in full, and holders of Intercompany Claims shall receive no distribution and retain no Property on account of such Claims.

3.      **Impairment and Voting**.  Class 4 is Impaired under this Plan.  Holders of Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

**E.    Class 5 – PRXI Interests**

1.      **Classification.**  Class 5 consists of all PRXI Interests.

2.      **Treatment**.  On the Effective Date, the PRXI Interests shall be discharged, cancelled, released, and extinguished and holders of PRXI Interests shall neither receive any Distributions nor any of the Debtors' Property under this Plan.

3.      **Impairment and Voting**.  Class 5 is Impaired under this Plan.  Holders of PRXI Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

## V.   LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND DISTRIBUTION PURPOSES

Solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of this Plan, the confirmation hereof and Distributions hereunder.

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of this Plan, the confirmation hereof and Distributions to be made hereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of this Plan, the confirmation hereof and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors and all Claims filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor hereunder on Allowed Claims and will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors.  Holders of Allowed Claims in each Class shall be entitled to their share of Property available for Distribution to such Class without regard to which Debtor was originally liable for such Claim.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed and assigned pursuant to the Acquisition Agreements, (b) distributions from any insurance policies or proceeds of such policies, or (c) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed and assigned, or (ii) pursuant to the express terms of this Plan. The limited consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6).  Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

## VI.   PROVISIONS REGARDING ACCEPTANCE OR REJECTION OF PLAN; CRAMDOWN

### A.   Elimination of Vacant Classes

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Interest or a Claim or Interest

16

temporarily allowed under Bankruptcy Rule 3018, and as to which no vote is cast, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**B.    Cramdown**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtors may request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the requirements of section 1129(a)(8) thereof, on the bases that the Plan is fair and equitable, and does not discriminate unfairly, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.

**VII.    PROVISIONS REGARDING MEANS OF IMPLEMENTATION, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS**

**A.    Sale Approval and Consummation**

Confirmation of this Plan and the Confirmation Order shall constitute approval of the sale of substantially all of the Debtors' assets to the Plan Sponsors, free and clear of all Claims, Interests, Liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements included with the Plan Supplement. **The terms of this Article VII.A shall be binding on and enforceable against all Persons as a permanent injunction pursuant to Article X.E hereof.**

Upon entry of the Confirmation Order, the Debtors shall be authorized and directed to (a) consummate the Sale without any further order of the Court, subject to applicable law and the terms and conditions of the Acquisition Agreements, and to take any and all actions necessary to consummate the Sale, and (b) execute the Acquisition Agreements.

On the Effective Date the Sale Proceeds to be made available to the Debtors and their Estates shall vest with the Liquidation Trust in accordance with Article VII.F and be used to make Distributions under this Plan.

**B.    Timing of Distributions**

Except as specifically set forth in the Plan and as otherwise provided in this Article VII, Distributions to be made on the Effective Date to holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as soon as reasonably practicable thereafter.  Distributions on account of Claims that become Allowed after the Effective Date will be made pursuant to Article VII.E of the Plan.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### C. Record Date for Distributions

As of the close of business on the Record Date, no party can transfer a Claim. Neither the Debtors nor the Liquidation Trustee shall have any obligation to recognize any transfer of Claims occurring after the Record Date.

### D. Distributions to Holders of Allowed Claims

The Liquidation Trustee shall make all Distributions required under the Plan in a manner consistent with the Plan. Distributions shall only be made to the record holders of Allowed Claims as of the Record Date. On the Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Liquidation Trustee and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan. If a Claim is transferred 20 or fewer calendar days before the Record Date, the Liquidation Trustee shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Liquidation Trustee shall, as appropriate and in lieu of making such Distribution to such holder, delay such Distribution until the disposition thereof shall be determined by Final Order of the Court or by written agreement among the interested parties to such dispute.

### E. Distributions After Allowance

As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Debtors or the Liquidation Trustee, as the case may be, will distribute to the holder thereof all Distributions to which such holder is then entitled under this Plan. All Distributions made under this Article of the Plan will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed holders included in the applicable Class.

### F. Liquidation Trust

1. *Appointment of the Liquidation Trustee*. The entry of the Confirmation Order shall ratify the selection of the Liquidation Trustee. The Liquidation Trust Documents, in the form annexed to the Plan Supplement, are hereby incorporated by reference in their entirety and made an integral part of the Plan.

2. *Creation of the Liquidation Trust*. On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Documents for the purpose of, among other things, (i) prosecuting those Causes of Action for which the Equity Committee was granted derivative standing to pursue, and additional causes of action belonging to the Debtors' estates, as appropriate, (ii) administering, monetizing and/or liquidating the Property of the Debtors, (iii) resolving all Disputed Claims, (iv) making all Distributions from

the Liquidation Trust, and (v) prosecuting and defending appeals of the Confirmation Order as provided for in the Plan, Disclosure Statement, and the Liquidation Trust Documents. The Liquidation Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidation Trust and the Plan. The term of the Liquidation Trust shall not exceed five years from the date of creation of the Liquidation Trust, provided that, if warranted, and subject to the approval of the Court, the term of the Liquidation Trust may be extended for a finite term. Each extension shall be approved by the Court within six months of the extended term.

3.      *Vesting and Transfer of Property to the Liquidation Trust*. The Liquidation Trust shall be established to receive certain Property of the Debtors and to distribute such Property to certain holders of Claims in accordance with the Plan. Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of the Debtors not conveyed to the Plan Sponsors under the Acquisition Agreements shall automatically vest in the Liquidation Trust, free and clear of all Claims, Liens, contractually imposed restrictions, charges, encumbrances and Interests of creditors and holders of Interests on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the rights of holders of Other Priority Claims, Secured Claims, and General Unsecured Claims to obtain Distributions provided for in this Plan. Notwithstanding the foregoing, the Debtors or the Liquidation Trustee may determine to retain certain Property in the Debtors for convenience or in the best interests of the Liquidation Trust, with beneficial ownership, but not legal title, of such assets passing to the Liquidation Trust upon the Effective Date.

4.      *Grantor Trust*. The Liquidation Trust shall qualify as a Liquidation Trust as described in Treasury Regulation section 301.7701-4(d) and shall be treated as a grantor trust for United States federal income tax purposes. The Creditors' Committee (with the consent of the Debtors, which consent shall not be unreasonably withheld) shall appoint the Liquidation Trustee, who shall have the authority to manage the day-to-day operations of the Liquidation Trust, including, without limitation, by disposing of the Property of the Liquidation Trust, appearing as a party in interest, calculating distributions, paying taxes and such other matters as more particularly described in this Article VII of the Plan and the Liquidation Trust Agreement.

5.      *Liquidation Trust Expenses*. Expenses of the Liquidation Trust, including the expenses of the Liquidation Trustee and his representatives and professionals, will be satisfied from the assets of the Liquidation Trust and its proceeds, as set forth in the Liquidation Trust Agreement, in each case in accordance with the Plan. Court approval shall not be required for the payment of any expenses of the Liquidation Trust unless the Liquidation Trust Oversight Board objects to the payment of any such expenses, in which case the Court shall determine any amount to be paid. The Liquidation Trustee shall be authorized to establish a reserve, in an amount determined in the reasonable discretion of the Liquidation Trustee in consultation with the Liquidation Trust Oversight Board, to fund the expected expenses of the Liquidation Trust (the "**Trust Expense Reserve**").

6.    *General Powers of the Liquidation Trustee*.   The rights and powers of the Liquidation Trustee are specified in the Liquidation Trust Documents.  Except as expressly set forth in this Plan or the Disclosure Statement, and in the Liquidation Trust Agreement, the Liquidation Trustee shall administer the Liquidation Trust and its assets in accordance with this Plan, the Liquidation Trust Agreement, and the other Liquidation Trust Documents and shall be responsible for, among other things, making certain distributions required under this Plan. From and after the Effective Date and continuing through the date of entry of a Final Decree, the Liquidation Trustee shall: (a) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Court; (b) have the authority to act on behalf of the Debtors' Estates in all adversary proceedings and contested matters pending in the Court and in all actions and proceedings pending elsewhere; and (c) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Court.

7.    *Substitution of Liquidation Trustee for the Debtors and Equity Committee*.  After the Effective Date, the Liquidation Trustee shall be deemed to be substituted as the party in lieu of the Debtors and Equity Committee (a) in all pending matters including but not limited to (i) motions, contested matters and adversary proceedings pending in the Court, and (ii) all matters pending in any courts, tribunals, forums or administrative proceedings outside of the Court without the need or requirement for the Liquidation Trustee to file motions or substitutions of parties and counsel, and (b) in taking any and all actions necessary to consummate the Sale.

8.    *Liquidation Trust Oversight Board*.

(a)    The Liquidation Trust Oversight Board shall be formed and constituted upon execution of the Liquidation Trust Agreement.  The Liquidation Trust Oversight Board shall have the right, but shall not be required, to fill any vacancy that arises for any reason in accordance with the Liquidation Trust Agreement. The initial members of the Liquidation Trust Oversight Board shall be set forth in the Plan Supplement.

(b)    Liquidation Trust Oversight Board members shall be entitled to reimbursement of their actual and reasonable out of pocket expenses as a Liquidation Trust Oversight Board member. The Liquidation Trust shall pay the actual and reasonable out of pocket expenses of Liquidation Trust Oversight Board members in accordance with the Liquidation Trust Agreement and without approval or order of the Court, unless the Liquidation Trust Oversight Board or Liquidation Trustee objects to all or part of the fees and expenses, in which case the allowance of the disputed portion shall be determined by the Court.

(c)    The Liquidation Trustee shall regularly consult with the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of Estate Causes

of Action and other matters. The Liquidation Trustee shall report to the Liquidation Trust Oversight Board on a regular basis. The Liquidation Trustee shall seek approval from the Liquidation Trust Oversight Board regarding the prosecution and/or settlement of each Estate Cause of Action and other matters as set forth in the Liquidation Trust Agreement.

(d)    A Liquidation Trust Oversight Board Member shall recuse him/herself from participation in decision-making by the Liquidation Trust Oversight Board on matters in which such member has a conflict of interest.

## G.    Delivery of Distributions

Distributions to holders of Allowed Claims shall be made by the Liquidation Trustee (a) at the last known addresses of such holders or (b) at the addresses set forth in any written notices of address changes delivered to the Debtors or the Liquidation Trustee, as appropriate. If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Liquidation Trustee is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.

## H.    Method of Cash Distributions

Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Liquidation Trustee.

## I.    Failure to Negotiate Checks

Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance. Any amounts returned to the Liquidation Trustee in respect of such non-negotiated checks shall be forwarded to (if necessary) and held by the Liquidation Trustee, as the case may be.  Requests for reissuance for any such check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued within such 90-day-period. All amounts represented by any voided check will be held until the earlier of: (a) one (1) month after the date on which the check is voided, or (b) the date on which the Court enters the Final Decree, and all requests for reissuance by the holder of the Allowed Claim in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Article VII.J of the Plan, and all holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtors or their respective assets, the Liquidation Trustee or the Liquidation Trust notwithstanding any federal or state escheat laws to the contrary. In such case, any Cash held for payment on account of such Claims shall revert to the Liquidation Trust, free and clear of any restrictions thereon except as provided elsewhere in the Plan.

## J.    Unclaimed Property

All Property distributed on account of Allowed Claims must be claimed prior to the date on which the Court enters the Final Decree, or, in the case of a Distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Article VII.I

of the Plan. All Unclaimed Property will be retained by and will vest in the Liquidation Trust to be subsequently distributed in accordance with Article IV of this Plan. All full or partial payments made by the Liquidation Trustee and received by the holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtors or the Liquidation Trustee pursuant to the Plan. Nothing contained in the Plan shall require the Debtors or the Liquidation Trustee to attempt to locate any holder of an Allowed Claim other than by reviewing the records of the Debtors and any Claims filed in the Chapter 11 Cases. All Claims in respect of Unclaimed Property shall be deemed Disallowed and the holder of any Claim Disallowed in accordance with this Article VII.J will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets, the Liquidation Trustee or the Liquidation Trust notwithstanding any federal or state escheat laws to the contrary.

### K.  No Distributions on Late-Filed Claims

Except as otherwise provided herein or in a Final Order of the Court, any Claim as to which a Proof of Claim was required to be filed and was first filed after the applicable Bar Date in the chapter 11 Cases, including, without limitation, any Bar Date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is Disallowed in the chapter 11 Cases, without the need for (a) any further action by the Liquidation Trustee or (b) an order of the Court.  Nothing in this paragraph is intended to expand or modify the applicable Bar Dates or any orders of the Court relating thereto.

### L.  Limitation on Distribution Rights

If a claimant holds more than one Claim in any one Class, all Claims of the claimant in that Class will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

### M.  Fractional Dollars

Notwithstanding any other provision of the Plan, Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to Article VII.J of this Plan.

### N.  De Minimis Distributions

The Liquidation Trustee shall not be required to, but may in its discretion, make distributions to any holder of an Allowed Claim of Cash in an amount less than fifty dollars ($50).

### O.  Compliance With Tax Requirements

In connection with each Distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the

Debtors or the Liquidation Trustee shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law. The Debtors or the Liquidation Trustee shall not be required to make a Distribution with respect to any Person until the Debtor or the Liquidation Trustee, as appropriate, receives such Person's tax identification number, certified tax identification number, or other tax information required by law to avoid withholding (including, without limitation, a form W-8 or W-9).

### P.    Character of Distributions

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### Q.    No Payment or Distribution Pending Allowance

All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or the Liquidation Trustee and the holder of such Claim, by operation of law, by Final Order, or by this Plan. Notwithstanding any other provision in the Plan, no payment or Distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

### R.    Distributions on Insured Claims

If any holder has asserted a Claim that is covered as to liability, in whole or in part, by an insurance policy that is assumed or otherwise remains in effect pursuant to the terms of this Plan, such holder will have an Allowed Claim entitled to a Distribution under this Plan only to the extent of any deductible or self-insured retention under the applicable insurance policy that was unpaid or otherwise unexhausted as of the Petition Date. Notwithstanding the foregoing, the holder shall be entitled to pursue recovery of any amount in excess of such unpaid deductible or self-insured retention from the applicable insurance carrier, and, in connection therewith, such holder may continue to pursue the balance of such Claim against the Debtors solely for the purposes of liquidating such Claim and obtaining payment of the balance of such liquidated Claim from any otherwise applicable insurance policy. Except as otherwise provided in the applicable insurance policy, the applicable insurance carrier may, at its expense, employ counsel, direct the defense, and determine whether and on what terms to settle any Claim for the purposes of determining the amount of insurance proceeds that will be paid on account of such Claim. If after liquidation of a Claim pursuant to this Section, it is determined that there are insufficient insurance proceeds available to satisfy the amount of such Claim that is in excess of any unpaid deductible or self-insured retention, then the holder of such Claim shall have an Allowed Claim in the amount of such insufficiency.

### S.    Corporate Action

The entry of the Confirmation Order shall constitute authorization and direction for the Debtors to take or to cause to be taken all corporate and limited liability company actions

necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Court. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors. On the Effective Date, the appropriate officers and managers of the Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Plan Supplement in the name and on behalf of the Debtors.

### T.   **Cancellation of Existing Securities and Agreements**

Except for the purpose of evidencing a right to Distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, (1) the obligations of the Debtors under any membership interest, certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan) shall be released and discharged; *provided*, *however*, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of allowing holders to receive Distributions under this Plan as provided herein.

### VIII.   PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND CONTEST

### A.   **Preservation of Rights**

Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by this Plan, the Acquisition Agreements, or the Confirmation Order, nothing, including, but not limited to, the failure of the Debtors to object to a Claim for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Liquidation Trustee with respect to any Claim, including, but not limited to, all rights of the Debtors or the Liquidation Trustee to contest or defend themselves against such Claims in any lawful manner or forum when and if such Claim is sought to be enforced by the holder thereof.

### B.   **Causes of Action**

Except as otherwise provided in this Plan, the Acquisition Agreements or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, the

Liquidation Trustee (as a representative of the Debtors' Estates) will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Actions, and none of such Retained Actions is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Retained Actions are not identified or described. Absent such express waiver or release by the Debtors, the Liquidation Trustee may pursue Retained Actions, as appropriate, in accordance with the best interests of the Liquidation Trust.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Liquidation Trustee from utilizing, pursuing, prosecuting or otherwise acting upon all or any of its Retained Actions and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after the Confirmation Date, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against a Person, by the Liquidation Trustee shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, list of holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or Interest of the Person or such Person's predecessor in interest; or (d) entry of the Confirmation Order. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors will not pursue any and all available Causes of Action against them. The Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein**.

Notwithstanding any allowance of a Claim, the Debtors or the Liquidation Trustee reserve the right to seek, among other things, to have such Claim Disallowed if the Debtor or the Liquidation Trustee, as the case may be, at the appropriate time, determines that it has a defense under section 502(d) of the Bankruptcy Code, e.g., the Debtor or the Liquidation Trustee holds an Avoidance Action against the holder of such Claim and such holder after demand refuses to pay the amount due in respect thereto.

## C.  Setoffs

Except to the extent that any Claim is Allowed, the Debtors or the Liquidation Trustee, as applicable, may, but shall not be required to, set off against any Claims and the payments and distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Liquidation Trustee may have against such creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall

constitute a waiver or release by the Debtors or the Liquidation Trustee of any such claims or Causes of Action the Debtors or the Liquidation Trustee may have against such creditors, and all such claims and Retained Actions which are not expressly released, conveyed or compromised pursuant to the Plan or the Acquisition Agreements shall be conveyed to the Liquidation Trust.

### D. Resolution of Disputed Claims

       1.    *Objections to Claims*. Unless otherwise ordered by the Court after notice and a hearing, the Liquidation Trustee, and other parties in interest to the extent provided by section 502(a) of the Bankruptcy Code, on and after the Effective Date, shall have the right to file objections to Claims (except those specifically Allowed by this Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the applicable Claims Objection Deadline. The foregoing deadlines may be extended by order of the Court without notice. An objection to any Claim shall be deemed properly served on the holder thereof if the Liquidation Trustee effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the Proof of Claim or any attachment thereto; or (c) by first class mail postage prepaid, on any counsel that has appeared on the holder's behalf in the Chapter 11 Cases.

       2.    *Settlement of Disputed Claims*. After the Effective Date, the Liquidation Trustee, with consent of the Liquidation Trust Oversight Board (which consent shall not be unreasonably withheld), may settle or compromise any Disputed Claim without approval of the Court upon written notice to the Office of the United States Trustee; provided, that, (a) the Liquidation Trustee shall promptly file with the Court a written notice of any settlement or compromise of a Claim that results in an Allowed Claim in excess of $500,000 and (b) the Office of the United States Trustee shall be authorized to contest the proposed settlement or compromise (whether such settlement is above or below $500,000) by filing a written objection with the Court and serving such objection on the Liquidation Trustee within twenty (20) days of the service of the proposed settlement notice. If no such objection is filed, the applicable settlement or compromise shall be deemed final without further action of the Court.

       3.    *Establishment of Disputed Claims Reserve*. In connection with the Distributions required to be made under the Plan, on the Effective Date or as soon as reasonably practicable thereafter (and in accordance with the provisions of this Plan), the Liquidation Trustee shall reserve Cash allocated for distribution on account of each Disputed Claim based on the Face Amount of each such Disputed Claim, plus 10% of the Face Amount on account of interest attributable to any such General Unsecured Claim, or such lesser or greater amount as may be agreed to by the holder of the Claim and the Debtors or Liquidation Trustee (the "Disputed Claims Reserve"). All Cash or other property allocable to the relevant Class hereunder with respect to the Disputed Claims shall be allocated for records keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve. The Liquidation Trustee shall have no duty to fund, or to set aside any separate account for the Disputed Claims Reserve.

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed as soon as practicable after the Claim is Allowed (and consistent with the provisions of this Plan). Distributions shall be made only to the extent of the aggregate distributions that the holder of any Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to the amounts held in the Disputed Claims Reserve). Distributions to each holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the holder of the Disputed Claim has not received prior Distributions on account of that Claim) shall be made in accordance with the provisions of the Plan governing the Class of Claims in which the Claim is classified.

The Disputed Claims Reserve shall no longer be necessary at the earlier of (i) when all Disputed Claims have been resolved, or (ii) when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan have been made.

4.      *Cash Held in Disputed Claims Reserve*. Cash held in the Disputed Claims Reserve shall be held by the Liquidation Trustee in trust for the benefit of holders of Allowed Claims.

5.      *Interest on Disputed Claims*. Unless otherwise specifically provided for in this Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes Allowed.

6.      *Estimation of Claims*. The Debtors or the Liquidation Trustee may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Liquidation Trustee have previously objected to such Claim or whether the Court has ruled on any such objection. In the event that the Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to this Plan or (c) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidation Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

7.      *No Recourse*. Notwithstanding that the Allowed amount or estimated amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and, as a result of such reconsideration is Allowed in an amount for which there is insufficient value in the relevant fund or reserve to provide a recovery equal to that received by other holders of Allowed Claims in the relevant Class, no such Claim holder shall have recourse to the Debtors and their Estates, the Liquidation Trust or the Liquidation Trustee, or any member or manager thereof, any of the respective Professionals of any of them, the holder of any other Claim, or any of the respective property of any of the foregoing.

However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

## IX.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS

### A.    <u>Treatment of Executory Contracts and Unexpired Leases</u>

All executory contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Court on or prior to the Confirmation Date or (b) is set forth on a Schedule of Assumed Contracts and Leases filed in connection with the Acquisition Agreements.

The assumption, assumption and assignment, and rejection of executory leases and unexpired contracts under this Plan shall be governed by the terms of the Acquisition Agreements and other orders of the Court.

### B.    <u>Cure of Defaults for Assumed Contracts and Leases</u>

The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Acquisition Agreements, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be governed by the terms and conditions of the Acquisition Agreements and orders of the Court.

### C.    <u>Bar Date for Claims for Rejection Damages</u>

Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Article IX of the Plan must be filed with the Court no later than thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease (including, without limitation, the Confirmation Order). Any Claim not filed within such time period shall be forever barred. The Debtors, the Liquidation Trustee, and other parties in interest to the extent provided by section 502(a) of the Bankruptcy Code shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Article VIII.D of this Plan.

### D.    <u>Treatment of Rejection Claims</u>

The Court shall determine any objections filed in accordance with Article VIII.D hereof at a hearing to be held on a date to be determined by the Court. Subject to any statutory limitation, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class 3 Claims in accordance with Article IV of the Plan.

### E.    Employment Agreements and Benefit Programs

1.    *Employment Agreements*. Except to the extent previously rejected by an order of the Court on or before the Effective Date, all employment and severance agreements between the Debtors and their employees entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected under Article IX.A of the Plan, except for any such employment agreement that is specifically assumed under Article IX.A of the Plan. Any Claim arising out of such rejection shall be treated in accordance with Article IX.D of the Plan.

2.    *Employee Benefit Plans*. Except and to the extent previously rejected by an order of the Court on or before the Effective Date or included in the Additional Assumed Contracts Schedule, all Employee Benefit Plans entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected under Article IX.A of the Plan. Any Claim arising out of such rejection shall be treated in accordance with Article IX.D of the Plan.

### F.    Survival of Certain Indemnification Obligations.

Notwithstanding any other provision of this Plan, the obligations of the Debtors pursuant to their certificates or articles of incorporation, bylaws and other organizational documents to indemnify persons serving after the Petition Date as officers, directors, agents, or employees of the Debtors with respect to actions, suits and proceedings against the Debtors or such officers, directors, agents, or employees, based upon any act or omission for, on behalf of, or relating to the Debtors and occurring prior to or after the Petition Date, shall continue (and shall not be discharged or impaired by the confirmation of the Plan).

## X.    EFFECT OF CONFIRMATION OF THIS PLAN

### A.    Continued Corporate Existence

Each Debtor will continue to exist after the Effective Date as a separate corporate or limited liability company entity, with all of the powers of a corporation under applicable law in the jurisdiction in which it is incorporated or otherwise formed and pursuant to its certificate or articles of incorporation and by-laws or other organizational documents in effect prior to the Effective Date, without prejudice to the right of the Liquidation Trustee to dissolve (subject to its obligations under this Plan) under applicable law and file a certificate of dissolution (or its equivalent) with the secretary of state or similar official of the jurisdiction of incorporation after the Effective Date, provided that the Liquidation Trustee shall be under no obligation to dissolve any Debtor. Notwithstanding any other provision of this Plan, all Interests of the Debtors as of the Effective Date shall be cancelled and terminated along with any and all rights of voting, management, or control of the Debtors.  Upon the Effective Date, a single Interest with respect to each Debtor shall be issued to and held by the Liquidation Trustee, and each such Interest shall have all rights of control, voting, and management with respect to the affairs of each respective Debtor.  Immediately upon the Effective Date, all board members, managers, directors, officers, or any other Persons or bodies exercising control over the affairs of the Debtors shall be

29

terminated and have no further right or authority or obligation to direct the affairs of the Debtors, such authority being vested solely with the Liquidation Trustee.

**B.    Releases by the Debtors of Certain Parties**

**Effective as of the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date,  on and after the Effective Date, each Released Party shall be deemed to have been conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each and all of the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or, because of the foregoing entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise, that the Debtors or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the restructuring transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, implementation, administration, confirmation, or consummation of the Plan Support Agreement, the Disclosure Statement, the DIP Credit Facilities, the DIP Credit Documents, the Sale, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan Support Agreement, the Disclosure Statement, the DIP Credit Facilities, the DIP Credit Documents, the Sale (including, for the avoidance of doubt, the Acquisition Agreements), or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of "substantial consummation" (as defined in section 1101(2) of the Bankruptcy Code), the pursuit of the Sale, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any transaction described herein, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release described in this Article X.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the release described in this Article X.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such claims released by the release described in this Article X.B; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the release described in this Article X.B.

Nothing in this Article X.B shall release the Released Parties from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by Final Order.  The Liquidation Trustee shall be bound, to the same extent that the Debtors are bound, by the releases and discharges set forth above.

### C.   Releases by Non-Debtors

Effective as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, on and after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the restructuring transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, implementation, administration, confirmation, or consummation of the Plan Support Agreement, the Disclosure Statement, the DIP Credit Facilities, the DIP Credit Documents, the Sale, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created, modified, amended or entered into in connection with the Plan Support Agreement, the Disclosure Statement, the DIP Credit Facilities, the DIP Credit Documents,

the Sale (including, for the avoidance of doubt, the Acquisition Agreements), or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of "substantial consummation" (as defined in section 1101(2) of the Bankruptcy Code), the pursuit of the Sale, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any transaction described herein, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Nothing in this Article X.C shall release (i) any obligations of the Debtors of Liquidation Trustee arising under this Plan, or (ii) any of the Released Parties from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release described in this Article X.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the release described in this Article X.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the release described in this Article X.C; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the release described in this Article X.C.

## D.  Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting the releases described in Articles X.B and X.C, and notwithstanding anything herein to the contrary, each Released Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any action taken or omitted to be taken, whether prepetition or postpetition, in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Plan Support Agreement), the Disclosure Statement, the Sale and the Acquisition Agreements, and/or the DIP Credit Facility, or any contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the

Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided*, *however*, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Plan Support Agreement and the Plan. Each Released Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the transactions contemplated herein, including the Sale, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, this exculpation shall not release any obligation or liability of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### E.   Injunction

Except as otherwise expressly provided in this Plan, the Plan Supplement, documents executed pursuant to this Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including all Governmental Units) shall be permanently enjoined from, on account of such Claims or Interests, taking any of the following actions, either directly or indirectly, against or with respect to any Debtor, any Estate, any Released Party, the Liquidation Trust, the Liquidation Trustee, or any of their respective properties or assets: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, executing, collecting, or recovering in any manner any judgment, award, decree, or order, or attaching any property pursuant to the foregoing; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting or effecting any setoff, recoupment, or right of subrogation of any kind against any Claim or Cause of Action; (v) enjoining or invalidating any foreclosure or other conveyance of any Property of the Liquidation Trust or of the Debtors; and (vi) taking any act, in any manner, in any place whatsoever, that does not conform to, comply with, or that is inconsistent with any provision of this Plan. Any Person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. This injunction shall not enjoin or prohibit (i) the holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of this Plan or (ii) any party in interest from seeking the interpretation or enforcement of any of the obligations of the Debtors, the Liquidation Trustee, or the Liquidation Trust under this Plan. The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any Claim or Interest or cause of action against any Debtor, any Estate, any Released Party, the Liquidation Trustee, the Liquidation Trust, or any of their respective properties or assets,

based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under this Plan have been made or are not yet due.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.E of the Plan.

### F.   Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Final Distribution Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### G.   Preservation of Insurance

Except as otherwise provided herein, the Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, including its officers and current and former directors, or any other Person.

### H.   Other Documents and Actions

The Debtors or the Liquidation Trustee are authorized and directed to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan including, for the avoidance of doubt, prosecuting and defending any appeals related to the Confirmation Order and any order by the Admiralty Court approving the Sale.

### I.   Guaranties

Notwithstanding the existence of guaranties by the Debtors of obligations of any Entity or Entities, and the Debtors' joint obligations with another Entity or Entities with respect to the same obligations, all Claims against the Debtors based upon any such guaranties shall be satisfied and released in the manner provided in this Plan and the holders of Claims shall be entitled to only one distribution with respect to any given obligation of the Debtors.

### J.   Subordination Rights

Any Distributions under the Plan shall be received and retained free of and from any obligations to hold or transfer the same to any other Claim or Interest holder, and shall not be subject to levy, garnishment, attachment or other legal process by any holder by reason of claimed contractual subordination rights, which rights shall be waived and the Confirmation

Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to Property distributed under the Plan, in each case other than as provided in the Plan.

### K.   No Successor Liability

Except as otherwise expressly provided in the Plan or the Acquisition Agreements, the Liquidation Trust, the Liquidation Trustee, each of the Plan Sponsors, and each the Plan Sponsors' affiliates (i) does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or Property of the Debtors, whether arising prior to, on, or after the Effective Date; (ii) is not, and shall not be, a successor of the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character; *provided*, *however*, that the Liquidation Trustee and the Liquidation Trust shall assume the obligations specified in the Plan, the Liquidation Trust Agreement, the other Liquidation Trust Documents, and the Confirmation Order.

### L.   Free and Clear

Confirmation of this Plan and the Confirmation Order shall constitute approval of the sale of substantially all of the Debtors' assets to the Plan Sponsors, free and clear of all Claims, Interests, Liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements included with the Plan Supplement.  **The terms of this Article X.L shall be binding on and enforceable against all Persons as a permanent injunction pursuant to Article X.E hereof.**

## XI.   EFFECTIVENESS OF THIS PLAN

### A.   Conditions Precedent to Confirmation.

It shall be a condition to confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XI.C hereof:

> 1.   the Confirmation Order, in form and substance satisfactory to the Plan Proponents in their sole discretion, which shall include, among other provisions, (i) an authorization and direction for the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan, and (ii) a reservation of jurisdiction over the Sale post-Effective Date, shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

2. this Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable Plan Proponents in their sole discretion.

### B.  Conditions Precedent to the Effective Date

The Plan Proponents intend for the Plan to be effective as soon as reasonably practicable following the entry of the Confirmation Order.  It shall be a condition to the Effective Date of this Plan that the following provisions, terms and conditions are approved or waived pursuant to the provisions of Article XI.C:

1. the Confirmation Order, in form and substance acceptable to the Plan Proponents in their sole discretion, which shall include, among other provisions, (i) an authorization and direction for the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan, and (ii) a reservation of jurisdiction over the Sale post-Effective Date, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, enjoined or stayed pending appeal;

2. an order of the Admiralty Court approving the Sale to the extent required to be approved pursuant to the Covenants and Conditions, in form and substance acceptable to the Plan Sponsors, shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated enjoined or stayed pending appeal;

3. all authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained;

4. all transactions contemplated in the Acquisition Agreements shall have been consummated;

5. the Creditors' Committee shall have appointed the Liquidation Trustee, and the Liquidation Trust Agreement and the other Liquidation Trust Documents shall have been executed and delivered; and

6. no order of a court shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

### C.  Waiver of Conditions

The conditions to confirmation of this Plan and to the Effective Date set forth in Article XI.A and XI.B hereof may be waived by agreement of the Plan Proponents without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

### D.    Notice of Confirmation and Effective Date

On or before five (5) Business Days after the occurrence of the Effective Date, the Liquidation Trustee shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the applicable Bar Date, and (iv) such other matters as the Liquidation Trustee deems appropriate.

### E.    Effect of Failure of Conditions

In the event that the Effective Date does not occur: (a) the Confirmation Order shall be vacated; (b) the Plan shall be null and void in all respects;  (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Interests shall remain unchanged and nothing contained in this Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Interests in the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iii) be deemed an admission against interest by the Debtors or any other Person.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting executory contracts or unexpired leases.

### F.    Vacatur of Confirmation Order

If a Final Order denying confirmation of this Plan is entered, or if the Confirmation Order is vacated, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

### G.    Revocation, Withdrawal, or Non-Consummation

The Plan Proponents reserve the right to revoke, withdraw or delay consideration of this Plan as to any or all of the Debtors at any time prior to the Confirmation Date either entirely or as to any one or more of the Debtors, and to file subsequent plans.  If the Plan is revoked, withdrawn or delayed as to fewer than all of the Debtors, such revocation, withdrawal or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed.  If the Plan Proponents revoke or withdraw this Plan in its entirety or as to any of the Debtors, or the Confirmation Date or the Effective Date does not occur, (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Interests

in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of any Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by any Person.

## XII.    RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim; (5) to hear and determine timely objections to Claims or Interests; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan; (11) to hear and determine disputes arising in connection with the interpretation, implementation or consummation of any transaction in connection with an Acquisition Agreements; (12) to hear and determine any issue for which this Plan requires a Final Order of the Court; (13) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (14) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of Professionals for the Debtors, Creditors' Committee or Equity Committee for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date; (15) to hear and determine any Causes of Action preserved under this Plan including under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3); (16) to hear and determine any matter regarding the existence, nature and scope of any injunction issued hereunder; (17) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article X of this Plan; (18) to hear and determine any matter regarding the Liquidation Trust and Liquidation Trust Documents; (19) to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection; and (20) to enter a Final Decree closing the Chapter 11 Cases.

## XIII.    MISCELLANEOUS PROVISIONS

### A.    <u>Payment of Statutory Fees</u>

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code shall be paid by the

Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the Liquidation Trustee.

### B.    Modification of this Plan

Subject to the limitations contained in this Plan: (1) the Plan Proponents have the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Creditors' Committee may, upon order of the Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code.

### C.    Dissolution of Creditors' Committee and Equity Committee

The Creditors' Committee and Equity Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee and Equity Committee shall each be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's and Equity Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, that, the Creditors' Committee's and Equity Committee's attorneys and financial advisors shall be entitled to pursue their own Professional Fee Claims and represent the Creditors' Committee and Equity Committee in connection with the review of and the right to be heard in connection with all Professional Fee Claims.

### D.    Votes Solicited in Good Faith

The Creditors' Committee has, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.  The Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under this Plan and, therefore, are not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under the Plan.

### E.    Request for Expedited Determination of Taxes

The Debtors or Liquidation Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending on or before the Effective Date.

### F.    Governing Law

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Florida shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

### G.    Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors and the Liquidation Trustee shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### H.    Section 1146 Exemption

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, if any, or the execution, delivery or recording of an instrument of transfer under the Plan, or the revesting, transfer or sale of any real or other Property of or to the Debtors or the Liquidation Trust, shall not be taxed under any state or local law imposing a document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or fee or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which an instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.  Without limiting the foregoing, the transfer of all assets under the Acquisition Agreements to the Plan Sponsors shall be deemed made under and subject to the terms of this Plan and shall be entitled to the protections afforded under section 1146(a).

### I.    Section 1145 Exemption

To the fullest extent permitted under section 1145 of the Bankruptcy Code, the issuance of any interests in the Liquidation Trust on or around the Effective Date shall be exempt from the registration requirements of section 5 of the Securities Act of 1933, as amended, and any and all federal, state and local laws requiring the registration or licensing of an issuer, underwriter, broker or dealer in such securities.

### J.    Time

Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day. Unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

**K.   No Admissions or Waivers**

Prior to the occurrence of the Effective Date, and notwithstanding anything herein to the contrary, nothing contained in the Plan or the taking of any action by the Debtors related to the Plan shall be deemed an admission or waiver by any Person with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

**L.   Exhibits/Schedules**

All exhibits and schedules to this Plan and the Plan Supplement are incorporated into and constitute a part of this Plan as if set forth herein.

**M.   Notices**

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:

RMS Titanic, Inc.
c/o Troutman Sanders LLP
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
Attention: Harris Winsberg and Matthew Ray Brooks
Tel: (404) 885-3000, Fax: (404) 885-3900

with copies to:

Nelson Mullins Riley & Scarborough LLP
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
Attention: Daniel F. Blanks
Tel: (904) 665-3656, Fax: (904) 665-3699

Kaleo Legal
4456 Corporation Lane, Suite 135
Virginia Beach, VA 23462
Attention: Brian A. Wainger
Tel: (757) 965-6804, Fax: (757) 304-6175

To the Creditors' Committee:

Official Committee of Unsecured Creditors of RMS Titanic, Inc. and its
debtor affiliates
c/o Storch Amini PC

140 East 45th Street, 25th Floor
New York, NY 10017
Attention:  Jeffrey Chubak
Tel: (212) 497-8247, Fax: (212) 490-4208

with copies to:

Thames Markey & Heekin, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, FL 32202
Attention: Richard R. Thames and Robert A. Heekin, Jr.
Tel: (904) 358-4000, Fax: (904) 358-4001

To the Equity Committee:

Official Committee of Equity Security holders of Premier Exhibitions, Inc.

c/o Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Attention: Peter J. Gurfein
Tel: (310)-691-7374, Fax: (310) 557-0056

with copies to:

Akerman, LLP
50 N. Laura Street, Suite 3100
Jacksonville, FL 32202
Attention: Jacob A. Brown and Katherine C. Fackler
Tel: (904) 798-3700, Fax: (904) 798-3730.

To the DIP Lender:

Bay Point Capital Partners, LP
c/o Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
Attention: Garrett A. Nail and John F. Isbell
Tel: (404) 541-2900, Fax: (404) 541-2905

To Trustees of the National Maritime Museum:

Trustees of the National Maritime Museum
c/o Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention: Timothy Graulich and Jacob Weiner
Tel: (212) 450-4639, Fax: (212) 450-5573

To Board of Trustees of National Museums and Galleries of Northern Ireland:

> Cleaver Fulton Rankin
> 50 Bedford Street
> Belfast, BT2 7FW
> Attention: Nathan Campbell and Michael Black
> Tel: +44 028 9024 3141

To Running Subway:

> Running Subway Productions, LLC
> c/o Blank Rome LLP
> One Logan Square
> 130 North 18th Street
> Philadelphia, PA 19103
> Attention: Joel Charles Shapiro
> Tel: (215) 569-5746, Fax: (215) 832-5746

### N.  Further Actions; Implementations

The Debtors or the Liquidation Trustee shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of this Plan.  From and after the Confirmation Date, the Debtors or the Liquidation Trustee shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in this Plan.

### O.  Severability

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### P.  Entire Agreement

Except as otherwise indicated, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### Q.   **Binding Effect**

This Plan shall be binding on and inure to the benefit of the Debtors' Estates, the holders of Claims against and Interests in the Debtors, and each of their respective successors and assigns, including the Liquidation Trustee, and all other parties in interest in the Chapter 11 Cases.

### R.   **Substantial Consummation**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code; *provided*, *however*, that nothing herein shall prevent the Creditors' Committee, the Plan Sponsors, or any other party in interest from arguing that substantial consummation of this Plan has occurred prior to the Effective Date.

### S.   **Conflict**

The terms of this Plan shall govern in the event of any inconsistency with the summaries of this Plan set forth in the Disclosure Statement. In the event of any inconsistency or ambiguity between and among the terms of this Plan, the Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.  If a particular term of the Plan (including any exhibits, schedules or Plan Supplement hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation, settlement or other agreement shall control and shall be binding on the parties thereto.

### T.   **Closing of Chapter 11 Cases**

The Liquidation Trustee shall, promptly after the full administration of the Chapter 11 Cases, seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, including filing with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court.

Dated: August __24__ , 2018

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Thomas Braziel (Aug 24, 2018)

Name:  Thomas Braziel

Title:   Chairman

Dated: <u>28 August</u>, 2018

**THE TRUSTEES OF THE NATIONAL
MARITIME MUSEUM**

By: _____

Name: Kevin Fewster

Title:  Director

Dated: August 28, 2018    **THE BOARD OF TRUSTEES OF NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND**

By: _____

Name: _____

Title: _____

Dated: August 28, 2018       **RUNNING SUBWAY PRODUCTIONS, LLC**

By: _____

Name:  James R. Sanna

Title:   CEO

**Exhibit B**
(Plan Support Agreement)

**EXECUTION VERSION**

## PLAN SUPPORT AGREEMENT

This **PLAN SUPPORT AGREEMENT** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of June 27, 2018, is entered into by and among:

(i) the Official Committee of Unsecured Creditors appointed in the chapter 11 cases commenced by the Debtors (as defined below) (the "**Creditors' Committee**");

(ii) National Maritime Museum ("**NMM**");

(iii) National Museums Northern Ireland ("**NMNI**" and, together with NMM, the "**Museum Buyers**");

(iv) Running Subway Productions, LLC ("**Running Subway**" and, together with NMM and NMNI, the "**Buyers**"); and

(v) the undersigned holders of claims (as such term is defined in section 101(5) of the Bankruptcy Code (as defined below)) ("**Claims**") against the Debtors (such holders, the "**Consenting Creditors**" and, collectively with the Creditors' Committee, NMM, NMNI, Running Subway and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, the "**Parties**").

## RECITALS

**WHEREAS,** since 1994, RMS Titanic, Inc. ("**RMST**") has served as salvor-in-possession of the R.M.S. *Titanic* wreck site by order of the United States District Court for the Eastern District of Virginia (the "**Admiralty Court**"), in the case captioned *RMS Titanic, Inc. v. The Wrecked & Abandoned Vessel*, No. 2:93cv902 (E.D. Va.).

**WHEREAS,** in an order dated August 15, 2011, the Admiralty Court granted a salvage award to RMST in the form of title to certain artifacts recovered from the R.M.S. *Titanic* wreck site subject to the conditions set forth in the *Revised Covenants and Conditions for the Future Disposition of Objects Recovered from the R.M.S. Titanic by R.M.S. Titanic, Inc. pursuant to an in specie salvage award granted by the United States District Court for the Eastern District of Virginia*, attached as Exhibit A to the Admiralty Court's August 12, 2010 Opinion (the "**Revised Covenants and Conditions**");

**WHEREAS,** on June 14, 2016 (the "**Petition Date**"), RMST, along with Premier Exhibitions, Inc., Premier Exhibitions Management, LLC, Arts and Exhibitions International, LLC, Premier Exhibitions International, LLC, Premier Exhibitions NYC, Inc., Premier Merchandising, LLC and Dinosaurs Unearthed Corp. (each, a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "**Bankruptcy Court**");

**WHEREAS,** the period set forth in section 1121 of the Bankruptcy Code during which the Debtors had an exclusive right to file a plan expired on February 8, 2018;

WHEREAS, the Parties have agreed to support and implement a transaction (the "**Transaction**") pursuant to a chapter 11 plan (as amended or modified from time to time consistent with the terms hereof, the "**Plan**");

WHEREAS, the Transaction will, among other things, (a) provide for the sale (the "**Sale**") of substantially all of the Debtors' assets to the Buyers on the terms set forth in the agreed term sheet attached hereto as **Exhibit A** (the "**Plan Term Sheet**") and the acquisition agreements to be entered into between the Buyers and the applicable Debtor entities (such acquisition agreements, including all exhibits, schedules, supplements, modifications, amendments, appendices, annexes and attachments thereto, the "**Acquisition Agreements**") and (b) establish a liquidation trust (the "**Liquidation Trust**") to (i) prosecute those causes of action for which the Official Committee of Equity Security Holders was granted derivative standing to pursue, and additional causes of action belonging to the Debtors' estates, as appropriate, (ii) administer, monetize and/or liquidate the assets and property of the Debtors not transferred to the Buyers pursuant to the Sale, (iii) object to and resolve disputed Claims asserted against the Debtors, (iv) make distributions, and (v) prosecute and defend appeals relating to the Confirmation Order; and

WHEREAS, the Parties are entering into this Agreement to facilitate the consummation of the Transaction.

NOW, THEREFORE, in consideration of the promises, mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    Incorporation of Defined Terms

Capitalized terms used but not otherwise defined below shall have the meanings ascribed to such terms in the Plan Term Sheet.

## 2.    Agreement Effective Date

This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the earliest date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Creditors' Committee and (ii) the Buyers (the "**Support Effective Date**").

## 3.    Definitive Documents

(a)    The definitive documents (the "**Definitive Documents**") with respect to the Transaction shall include:

(i)    the Plan (including all exhibits, schedules, supplements, modifications, amendments, appendices, annexes and attachments to the Plan) and the order confirming the Plan (the "**Confirmation Order**");

(ii)    the disclosure statement for the Plan prepared and distributed in accordance with, among other things, sections 1125 and 1126(b) of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure and other applicable law, and all exhibits, schedules, supplements, modifications, amendments, appendices, annexes and attachments to such disclosure statement (the "**Disclosure Statement**");

(iii)    the order of the Bankruptcy Court approving the Disclosure Statement and the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(iv)    the Acquisition Agreements;

(v)    any documents or agreements in connection with the creation or governance of the Liquidation Trust;

(vi)    the order of the Admiralty Court approving the Sale pursuant to the terms of the Revised Covenants and Conditions (the "**Admiralty Sale Order**"); and

(vii)    any other documents, papers, orders, instruments, schedules or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing or otherwise necessary or desirable to consummate the Transaction.

(b)    The Creditors' Committee and each Buyer agrees to promptly negotiate, in good faith, the Definitive Documents. Each Definitive Document (including with respect to any amendments, modifications or changes thereto) shall (i) contain terms and conditions consistent in all material respects with this Agreement and (ii) otherwise be in form and substance reasonably acceptable in all respects to the Creditors' Committee and the Buyers.

(c)    Each Party agrees to provide draft copies of any material documents, including any Definitive Document and any moving or opposition papers, that such Party intends to file with the Bankruptcy Court or the Admiralty Court to the Buyers and the Creditors' Committee at least three (3) business days prior to the date when such Party intends to file any such document. If delivery of such motions, orders or materials at least three (3) business days in advance is not reasonably practicable, such document shall be delivered as soon as reasonably practicable prior to filing, and such Party shall consult in good faith with the Buyers and the Creditors' Committee regarding the form and substance of any such proposed filing, as applicable.

**4.**    **[Reserved]**

**5.**    **Agreements of the Buyers**

Except as otherwise provided herein, each Buyer agrees that, for the period commencing on the Support Effective Date and ending on the earlier of (x) the date on which this Agreement is terminated in full with respect to all parties in accordance with Section 8 hereof and (y) the effective date of the Plan (the "**Support Period**"), such Buyer (acting severally and not jointly with the other Buyers) shall:

#90986720v15

(a)      support and take all commercially reasonable steps necessary to effectuate the Transaction in accordance with this Agreement, the Acquisition Agreements, and the Definitive Documents, including by seeking to be designated by the Admiralty Court as a Qualified Institution (as such term in defined in the Revised Covenants and Conditions) and by taking all actions, including, to the extent permitted, filing pleadings in the Admiralty Court, reasonably necessary to obtain entry of the Admiralty Sale Order, in each case, to the extent required under the Revised Covenants and Conditions;

(b)      execute and deliver the Acquisition Agreements and any other agreement required to (i) effectuate and consummate the Transaction and (ii) be executed and delivered by such Buyer;

(c)      not, directly or indirectly, and shall not encourage any other person or entity to, directly or indirectly, (i) object to, delay, impede or take any other action or inaction to interfere with acceptance, approval, implementation or consummation of the Plan, (ii) solicit, encourage, propose, file, support, participate in the formulation of or vote for any restructuring, sale of assets, merger, workout, plan of reorganization, plan of liquidation or arrangement of restructuring for the Debtors other than the Transaction pursuant to the Plan (such alternative transaction, an "**Alternative Transaction**"), (iii) otherwise take any action that would interfere with, or delay the consummation of, the Transaction, or (iv) exercise any right or remedy for the enforcement, collection or recovery of any Claim against the Debtors except in accordance with this Agreement, the Acquisition Agreements, the Plan and the Transaction;

(d)      pay the purchase price as set forth in the Acquisition Agreements at the closing of the Transaction and any other amounts under the Acquisition Agreements, in each case, when due and payable; provided that the purchase price shall be paid solely by the Museum Buyers;

(e)      not directly or indirectly seek to amend or modify, or file a document or paper seeking authority to amend or modify, any Definitive Document or any other document related to the Transaction in a manner inconsistent with this Agreement;

(f)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction, negotiate in good faith to address any such impediments; and

(g)      not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Transaction.

6.      **Agreements of the Creditors' Committee**

(a)      <u>Support</u>.  The Creditors' Committee agrees that, for the duration of the Support Period, the Creditors' Committee shall:

(i)      support and take all steps reasonably necessary to support the Transaction, including by (A) seeking approval of the Disclosure Statement, and confirmation and consummation of the Plan (including the release and exculpation provisions therein), (B) timely filing objections or oppositions to any motion filed with the Bankruptcy Court seeking relief that (1) is inconsistent with this Agreement in any respect or (2) would, or

#90986720v15

would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Transaction or any part thereof;

(ii)    timely solicit and tabulate votes on the Plan in accordance with the Disclosure Statement Order;

(iii)    not, directly or indirectly, and shall not encourage any other person or entity to, directly or indirectly, (A) object to, delay, impede or take any other action or inaction to interfere with acceptance, approval, implementation or consummation of this Agreement, the Acquisition Agreements or the Plan, (B) solicit, encourage, propose, file, support, participate in the formulation of any Alternative Transaction or (C) otherwise take any action that would interfere with, or delay the approval of the Disclosure Statement, entry of the Confirmation Order, entry of the Admiralty Sale Order or the consummation of the Transaction;

(iv)    not directly or indirectly seek to amend or modify, or file a document or paper seeking authority to amend or modify, any Definitive Documents or any other document related to the Transaction in a manner inconsistent with this Agreement;

(v)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction, negotiate in good faith to address any such impediments;

(vi)    not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Transaction; and

(vii)    timely object to any Alternative Transaction.

(b)    <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit the Creditors' Committee from taking any action, or from refraining from taking any action, to the extent each member thereof (save TSX Operating Co., LLC) determines in good faith, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

## 7.    **Agreements of the Consenting Creditors**

(a)    <u>Voting; Support</u>.  Each Consenting Creditor agrees that, for the duration of the Support Period, such Consenting Creditor (acting severally and not jointly with the other Consenting Creditors) shall:

(i)    subject to receipt of the Disclosure Statement and other solicitation materials approved by the Bankruptcy Court pursuant to the Disclosure Statement Order (A) timely vote or cause to be voted all of its Claims and, to the extent entitled to vote, interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn) so long as the Plan is not amended or modified other than in

accordance with this Agreement; <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Creditors' Committee and the Buyers, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period or upon valid termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

   (ii) timely vote (or cause to be voted) all of its Claims and, to the extent entitled to vote, interests against any Alternative Transaction;

   (iii) not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), (A) object to, delay, impede or take any other action or inaction to interfere with acceptance, approval, implementation or consummation of this Agreement, the Acquisition Agreements or the Plan, (B) solicit, encourage, propose, file, support, participate in the formulation of any Alternative Transaction or (C) otherwise take any action that would interfere with, or delay the approval of the Disclosure Statement, entry of the Confirmation Order, entry of the Admiralty Sale Order or the consummation of the Transaction;

   (iv) support and take all actions necessary or reasonably requested by the Creditors' Committee to facilitate approval of the Disclosure Statement, confirmation and consummation of the Plan, entry of the Admiralty Sale Order and the Transactions; and

   (v) not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Transaction.

 (b) <u>Rights of Consenting Creditors Unaffected</u>.  Nothing contained herein shall limit the rights of any Consenting Creditor (i) under any applicable agreement, instrument, or document that gives rise to such Consenting Creditor's Claims against the Debtors, to the extent not inconsistent with this Agreement; (ii) under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Debtors' chapter 11 cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Creditor's obligations hereunder; (iii) to consult with any other Parties or entities; (iv) to enforce any right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents. Nothing contained in this Agreement shall amend, waive, or modify any agreement, instrument or document that gives rise to any Consenting Creditor's Claims, or constitute the amendment or waiver of any Party's rights and remedies thereunder.

 (c) <u>Transfers</u>.  Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other Claims against or interests in the Debtors (including grant any proxy or deposit any Claims against or interests in the Debtors into a voting trust or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor

or (B) prior to such Transfer, agrees in writing to become an Additional Consenting Creditor (including with respect to any and all Claims or interests it already may hold against or in the Debtors prior to such Transfer) in accordance with Section 7(e) hereof, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Creditor agrees that any Transfer of any Claim or interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Creditors' Committee and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(d)    <u>Additional Claims or Interests</u>.  Nothing in this Agreement shall be construed to preclude a Consenting Creditor from (i) holding or acquiring any other Claims against the Debtors, whether or not entitled to vote on the Plan, (ii) holding or acquiring any interests in the Debtors, whether or not entitled to vote on the Plan or (iii) Transferring any Claims or interests; <u>provided</u>, that, in each case, each such Consenting Creditor shall promptly notify counsel to the Creditors' Committee and the Buyers in accordance with the notice provisions of <u>Section 25</u>, and each such Consenting Creditor agrees that such other Claims or interests shall be subject to this Agreement, and that, for so long as this Agreement has not been terminated pursuant to the terms hereof with respect to such Consenting Creditor, it shall vote (or cause to be voted) any such other Claims or interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 7(a)(i)</u> hereof.

(e)    <u>Additional Consenting Creditors</u>.  Any holder of a Claim against the Debtors may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting Creditor (an "**Additional Consenting Creditor**") by (i) executing a joinder agreement substantially in the form attached hereto as **<u>Exhibit B</u>**, pursuant to which such Additional Consenting Creditor shall be bound by the terms of this Agreement as a Consenting Creditor hereunder and (ii) delivering an executed copy thereof, in accordance with the notice provisions of <u>Section 25</u>, within two (2) business days of such execution, to counsel to (A) the Creditors' Committee, (B) NMM and (C) Running Subway.

8.    **<u>Termination of Agreement</u>**

(a)    This Agreement shall terminate two (2) business days following the delivery of notice to the Parties hereto, delivered in accordance with <u>Section 25</u> hereof from (i) a Consenting Creditor on or after November 1, 2018, with respect to the Consenting Creditor providing such notice, (ii) the Creditors' Committee at any time after the occurrence, and during the continuance, of a Creditors' Committee Termination Event (as defined below), with respect to all Parties or (iii) from any Buyer at any time after the occurrence, and during the continuance, of a Buyer Termination Event, with respect to all Parties.  Notwithstanding any provision to the contrary in this <u>Section 8</u>, neither the Creditors' Committee nor any Buyer may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Creditors' Committee

Termination Event or Buyer Termination Event.  This Agreement shall terminate automatically on the effective date of the Plan.

(b)  A "**Creditors' Committee Termination Event**" shall mean any of the following:

(i)  the Creditors' Committee reasonably determines in accordance with Section 6(b) that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided that the Creditors' Committee provides five (5) business days' notice of such determination to the Consenting Creditors and the Buyers in accordance with Section 25 hereof;

(ii)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Transaction, and either such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)  the Bankruptcy Court enters an order (A) converting any of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or (B) dismissing any of the Debtors' chapter 11 cases; or

(iv)  an Alternative Transaction is consummated.

(c)  A "**Buyer Termination Event**" shall mean any of the following:

(i)  the breach by (A) the Creditors' Committee or (B) any other Buyer of any of such Party's undertakings, representations, warranties or covenants set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Section 8(a);

(ii)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Transactions, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Creditors' Committee, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)  the Creditors' Committee or any other Buyer files any motion, paper, or document with the Bankruptcy Court or Admiralty Court, or withdraws any motion, paper, or document, and such filing or withdrawal, as applicable, is not consistent with this Agreement or the Plan and such motion, paper, or document has not been withdrawn or re-filed, as applicable, prior to the earlier of (A) two (2) business days after the Creditors' Committee or such Buyer, as appropriate, receives written notice from the terminating Buyer (in accordance with Section 25 hereof) that such motion, paper, or document is inconsistent with this Agreement or the Plan and (B) entry of a final, non-appealable order of the Bankruptcy Court or Admiralty Court, as applicable, approving such motion, paper, or document;

(iv)    the Creditors' Committee or any other Buyer files any motion for the (A) conversion of one or more of the Debtors' chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or (B) dismissal of one or more of the Debtors' chapter 11 cases;

(v)    the Bankruptcy Court enters an order (A) converting any of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or (B) dismissing any of the Debtors' chapter 11 cases;

(vi)    on or after the date hereof, the Debtors consummate in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the Sale;

(vii)    the Bankruptcy Court or Admiralty Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Transaction unless such order is stayed, reversed or vacated within fifteen (15) business days after the date of such issuance; provided that such Buyer may not terminate unless it seeks a stay of such relief within five (5) business days after the date of such issuance;

(viii)    the Creditors' Committee files, propounds or otherwise supports any chapter 11 plan other than the Plan;

(ix)    (A) the Creditors' Committee determining in accordance with Section 6(b) that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law and (B) all Buyers agree to terminate as a result of such determination;

(x)    entry of a final, non-appealable order by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan;

(xi)    the termination of any Acquisition Agreement by any party thereto; or

(xii)    an Alternative Transaction is consummated.

(d)    Mutual Termination.  This Agreement may be terminated by mutual agreement of the Creditors' Committee and the Buyers upon the receipt of written notice delivered in accordance with Section 25 hereof.

(e)    Effect of Termination.  Subject to the proviso contained in Section 8(a) hereof, upon the termination of this Agreement in accordance with this Section 8, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and

9

remedies available to it under applicable law; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon a termination of this Agreement, each Consenting Creditor may, upon written notice to the Creditors' Committee and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Transaction and this Agreement. If this Agreement has been terminated as to any Consenting Creditor in accordance with Section 8 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdrawal) of its vote to accept the Plan, the Creditors' Committee shall not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Creditors' Committee at law, equity, or otherwise, including those remedies set forth in Section 14 hereof.

(f)     If the Transaction is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 9.    **Definitive Documents; Good Faith Cooperation; Further Assurances**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Transaction, as well as the negotiation, drafting, execution and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

## 10.   **Representations and Warranties**

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or in the case of an Additional Consenting Creditor, as of the date such Additional Consenting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

10

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)     Each Consenting Creditor severally (and not jointly) represents and warrants that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the amount of each Claim set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Additional Consenting Creditor), and/or (ii) has, with respect to the beneficial owners of such Claims, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Claims or to exchange, assign and transfer such Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

## 11.     Publicity

Each Party shall submit drafts to the Creditors' Committee and the Buyers of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure.

## 12.     Amendments and Waivers

(a)     Other than as set forth in Section 12(b), this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Creditors' Committee and the Buyers.

(b)     Notwithstanding Section 12(a):

(i)     any waiver, modification, amendment or supplement to this Section 12 shall require the written consent of all of the Parties; and

(ii)     any change, modification or amendment to this Agreement or the Plan Term Sheet that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Debtors and the recoveries contemplated by the Plan Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor.

## 13.    GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of Florida, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement shall be brought in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of said court with regard to any proceeding arising out of or relating to this Agreement or the Transaction.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 14.    Specific Performance/Remedies

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.  Specific performance and injunctive or other equitable relief shall be the sole and exclusive remedy for any breach of this Agreement by any Party.

## 15.    Survival

Notwithstanding the termination of this Agreement pursuant to Section 8 hereof, the agreements and obligations of the Parties in this Section 15, and Sections 8(e), 13, 14, 17, 18, 19, 20, 22, 23, 25, and 26 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

#90986720v15

16.   **Headings**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.   **Successors and Assigns**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of Claims other than in accordance with the express terms of this Agreement.

18.   **Severability**

If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.   Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

19.   **Several Obligations**

The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.   Any breach of this Agreement by a Party shall not result in liability for any other non-breaching Party.

20.   **No Third-Party Beneficiaries**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

21.   **Schedules and Exhibits Incorporated by Reference**

Each of the schedules and exhibits attached hereto, including the Plan Term Sheet, is expressly incorporated herein and made a part of this Agreement.   In the event of any inconsistencies between the terms of this Agreement and the Plan Term Sheet, the terms of the Plan Term Sheet shall govern.   When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a section, exhibit or schedule, as applicable, of or attached to this Agreement unless otherwise indicated.

#90986720v15

22. **Prior Negotiations; Entire Agreement**

This Agreement, including the exhibits and schedules hereto (including the Plan Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof.

23. **No Strict Construction**

This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto. Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

24. **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

25. **Notices**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

> If to the Creditors' Committee, to:
>
> > Storch Amini PC
> > 140 East 45th Street, 25th Floor
> > New York, NY 10017
> > Attention: Jeffrey Chubak (jchubak@storchamini.com)
>
> If to National Maritime Museum, to:
>
> > Davis Polk & Wardwell LLP
> > 450 Lexington Avenue
> > New York, NY 10028
> > Attention: Timothy Graulich (timothy.graulich@davispolk.com) and
> > Jacob Weiner (jacob.weiner@davispolk.com)
>
> > Davis Polk & Wardwell LLP
> > 5 Aldermanbury Square
> > London EC2V 7HR
> > Attention: Sarah E. Levin (sarah.levin@davispolk.com)

If to National Museum of Northern Ireland, to:

> Cleaver Fulton Rankin
> 50 Bedford Street
> Belfast, BT2 7FW
> Attention: Nathan Campbell (n.campbell@cfrlaw.co.uk) and Michael
> Black (m.black@cfrlaw.co.uk)

If to Running Subway Productions, LLC, to:

> Blank Rome LLP
> One Logan Square
> 130 North 18th Street
> Philadelphia, PA 19103
> Attention: Joel Charles Shapiro (shapiro-jc@blankrome.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**26.    No Solicitation; Representation by Counsel**

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Debtors' chapter 11 cases from the Creditors.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Creditors' Committee and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

#90986720v15

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: *Thomas Braziel*
N      Thomas Braziel
Title:    Chairman of the Unsecured Creditors Committee

**NATIONAL MARITIME MUSEUM**

By:_____
    Name:
    Title:

**NATIONAL MUSEUMS NORTHERN IRELAND**

By:_____
    Name:
    Title:

**RUNNING SUBWAY PRODUCTIONS, LLC**

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:_____
    Name:
    Title:

**NATIONAL MARITIME MUSEUM**

By:_____
    Name: KEVIN FEWSTER
    Title: DIRECTOR

**NATIONAL MUSEUMS NORTHERN IRELAND**

By:_____
    Name:
    Title:

**RUNNING SUBWAY PRODUCTIONS, LLC**

By:_____
    Name:
    Title:

*[Signature Page to Plan Support Agreement]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:_____
    Name:
    Title:

**NATIONAL MARITIME MUSEUM**

By:_____
    Name:
    Title:

**NATIONAL MUSEUMS NORTHERN IRELAND**

By:_____
    Name: KATHRYN THOMSON
    Title: CHIEF EXECUTIVE

**RUNNING SUBWAY PRODUCTIONS, LLC**

By:_____
    Name:
    Title:

*[Signature Page to Plan Support Agreement]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:_____
    Name:
    Title:

**NATIONAL MARITIME MUSEUM**

By:_____
    Name:
    Title:

**NATIONAL MUSEUMS NORTHERN IRELAND**

By:_____
    Name:
    Title:

**RUNNING SUBWAY PRODUCTIONS, LLC**

By:_____
    Name:    James R Sanna
    Title:    CEO

*[Signature Page to Plan Support Agreement]*

**EXHIBIT A**
(Plan Term Sheet)

## CHAPTER 11 PLAN TERM SHEET
## FOR PREMIER EXHIBITIONS, INC. AND DEBTOR AFFILIATES

This term sheet (this "**Term Sheet**") describes certain material terms and provisions of a contemplated chapter 11 plan (the "**Plan**") for Premier Exhibitions, Inc. ("**PRXI**"), RMS Titanic, Inc. ("**RMST**"), and certain of their affiliates (collectively, the "**Debtors**"), which are debtors and debtors in possession in the jointly administered cases captioned *In re: RMS Titanic, Inc.,* et al., No. 3:16-bk-02230-PMG pending in the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**").[1]

**THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH SOLICITATION WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE PLAN AND THE RELATED DEFINITIVE DOCUMENTS GOVERNING THE TRANSACTION THAT IS THE SUBJECT OF THE PLAN SUPPORT AGREEMENT. SUCH DEFINITIVE DOCUMENTS, ALL MOTIONS, AND RELATED ORDERS SHALL SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE AND RULES, AND COMPORT WITH THE PLAN SUPPORT AGREEMENT AND THIS TERM SHEET.**

**THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE SUBJECT TRANSACTION. THE STATEMENTS CONTAINED HEREIN ARE PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE LENDERS AND THE DEBTORS.**

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan Support Agreement.

| Treatment of Unclassified Claims | |
| --- | --- |
| **Administrative Claims** | Except with respect to Administrative Claims that are professional fee claims, on the later of the Plan effective date (**"Effective Date"**) or the date on which an Administrative Claim becomes allowed, each holder of an allowed Administrative Claim shall receive, in full and final satisfaction of such claim, payment in full in cash or such other less favorable treatment as agreed to by such holder and the trustee of the Liquidation Trust (the "**Liquidating Trustee**"). |
| **DIP Financing Claim** | On the Effective Date, the DIP lender shall receive cash in an amount equal to the allowed DIP claim as of such date. |
| **Priority Tax Claims** | Each holder of an allowed Priority Tax Claim shall receive treatment consistent with Bankruptcy Code section 1129(a)(9)(C) or such other less favorable treatment as agreed to by such holder and the Liquidating Trustee. |
| Treatment of Classified Claims | |
| **Class 1 – Other Priority Claims** | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment, each holder of such claim shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter. |
| **Class 3 –Secured Claims** | Each holder of an allowed Secured Claim shall, at the option of the Liquidating Trustee, (a) be paid in full in Cash, including payment of any interest or fees required by Bankruptcy Code section 506(b); (b) receive the property securing any such claim; or (c) be treated in any other manner such that the allowed Secured Claim shall be rendered unimpaired. |
| **Class 3 – General Unsecured Claims** | Except to the extent that a holder of an allowed General Unsecured Claim agrees to less favorable treatment, on the later of the Effective Date and the date on which such claim becomes allowed, each holder of an allowed General Unsecured Claim shall receive its pro rata share of unencumbered cash from the Liquidation Trust (less amounts maintained for an administrative and disputed claims reserve) (**"Available Cash"**), plus postpetition interest at the Federal judgment rate in the event there exists Available Cash in an amount sufficient to pay the same.<br><br>Each holder of an allowed General Unsecured Claim may elect to be treated as a Convenience Claim holder by electing to reduce the amount of its allowed General Unsecured Claim to the convenience claim threshold, in full and final satisfaction of such claim.  Any such election must be made on the ballot, and shall be considered |

| | irrevocable. |
| --- | --- |
| | The convenience claim threshold shall be $5,000. |
| **Class 4 – Convenience Claims** | Except to the extent that a holder of an allowed Convenience Claim agrees to less favorable treatment, each holder of such claim shall be paid 100% of the amount of its allowed Convenience Claim. |
| **Class 5 – Intercompany Claims** | All Intercompany Claims shall be canceled in full, and holders of Intercompany Claims shall receive no distribution and retain no property on account of such Claims. |
| **Class 6 – PRXI Interests** | All PRXI Interests shall be discharged, cancelled, released, and extinguished and holders of PRXI Interests shall receive no distribution and retain no property on account of such Interests. |
| **Sale Transaction** | |
| **Buyers** | NMM, NMNI (together with NMM, the "**Museum Buyers**") and Running Subway (collectively, the "**Buyers**"). |
| **Purchase Price** | $19.2 million |
| **Transaction Structure** | The Museum Buyers shall acquire (i) the Debtors' rights as salvor in possession of the R.M.S. *Titanic* wreck, (ii) all of the Debtors' legal and beneficial interests in the artifacts collected therefrom, including in the 1987, 1993, 1994, 1996, 1998, 2000 and 2004 expeditions (collectively, the "**Artifact Collection**") and (iii) all of the Debtors' right, title and interest in and to photographs, video footage, recreations of the ship, maps and data related to the R.M.S. *Titanic* vessel, wreck site and debris field and the Artifact Collection, and all intellectual property related to the foregoing (each of the assets set forth in clauses (i), (ii) and (iii), collectively, the "**Museum Purchased Assets**"). |
| | Running Subway shall acquire substantially all of the assets of the Debtors that are not Museum Purchased Assets. |
| **Section 365 Executory Contracts** | Each Buyer (with the consent of the other Buyers, which consent shall not be unreasonably withheld) shall have the right to designate the executory contracts and unexpired leases of non-residential real property that will be assumed and assigned to such Buyer at any time through and including the date which is two (2) days prior to the hearing to confirm the Plan.  Such Buyer (i) shall be responsible for curing all defaults required to be cured in order to have the assumption and assignment approved by the Bankruptcy Court, and (ii) agrees that, if so required, it will provide any counterparty to a contract to be assumed and assigned with evidence of adequate assurance of future |

| | |
|---|---|
| | performance. |
| **Sale Approval and Consummation** | Confirmation of the Plan and entry of the Confirmation Order shall:<br><br>• constitute approval of the sale of substantially all of the Debtors' assets to the Buyers, free and clear of all Claims, interests, liens, contractually imposed restrictions, charges, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, pursuant to the Acquisition Agreements,<br><br>• authorize and direct the Debtors to consummate the Sale without any further order of the Bankruptcy Court and to take any and all actions necessary to consummate the Sale, and<br><br>• authorize and direct the Debtors to execute the Acquisition Agreements and the other Definitive Documents. |
| **Conditions to Closing** | The Plan shall include customary conditions to closing, including:<br><br>• the Admiralty Court entering an order approving the Sale pursuant to the terms of the Revised Covenants and Conditions;<br><br>• the Buyers completing customary commercial, legal, financial, operational and tax due diligence; and<br><br>• the Buyers obtaining any and all necessary internal, regulatory and court approvals. |
| **Liquidation Trust** | |
| **Creation of the Liquidation Trust; Vesting of Property** | The Plan will provide for the establishment of a Liquidation Trust for the purpose of, among other things, (a) prosecuting those causes of action for which the Official Committee of Equity Security Holders (the "**Equity Committee**") was granted derivative standing to pursue, and additional causes of action belonging to the Debtors' estates, as appropriate, (b) administering, monetizing, and liquidating the assets and property of the Debtors not transferred to the Buyers pursuant to the Sale, (c) objecting to and resolving all disputed Claims asserted against the Debtors, (d) making distributions and (e) prosecuting and defending all appeals relating to the Confirmation Order.<br><br>All property comprising the estates of the Debtors not conveyed to the Buyers under the Acquisition Agreements shall automatically vest in the Liquidation Trust on the Effective Date of the Plan.  The Liquidation Trustee shall be deemed to be substituted as the party in lieu of the Debtors and the Equity Committee in all pending matters. |

| **Other Relevant Provisions** | |
|---|---|
| **Substantive Consolidation** | The Plan shall provide for the substantive consolidation of the Debtors' estates. |
| **Conditions to Confirmation** | The Plan shall provide for conditions to confirmation, if any, in form and substance to be agreed upon by the Buyers and Creditors' Committee. |
| **Conditions to the Effective Date** | The Plan shall contain customary conditions to effectiveness in form and substance to be agreed upon by the Buyers and Creditors' Committee. |
| **Released Parties** | The Plan shall provide for the release and exculpation of, in each case solely in its capacity as such, (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Buyers, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |
| **Releasing Parties** | The releasing parties shall include: (a) the Debtors, (b) the Consenting Creditors, (c) the Creditors' Committee and Equity Committee and the members thereof, (d) the Buyers, and (e) with respect to each of the foregoing identified in clauses (b) through (d), each and all of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, trustees, officers, direct and indirect equity holders, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |
| **Third-Party Releases** | In addition to customary releases from the Releasing Parties, the Plan shall include customary third-party releases from (a) all holders of Claims voting in favor of the Plan, and (b) all holders of Claims that do not affirmatively opt out of the release provisions in their ballots in |

| | form and substance reasonably satisfactory to the Creditor's Committee and the Buyers. The third-party releases will cover, at a minimum, releases from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part, the Sale and any other restructuring transaction, contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan Support Agreement, the Disclosure Statement, the Definitive Documents, or the Plan. |
|---|---|
| **Exculpation** | The Plan shall include a customary exculpation provision in form and substance reasonably satisfactory to the Creditors' Committee and the Buyers. The exculpation provision, at a minimum, exculpate the Released Parties from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever based on or relating to, or in any manner arising from, in whole or in part, the Sale and any other restructuring transaction, contract, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with the Plan Support Agreement, the Disclosure Statement, the Definitive Documents, or the Plan. |
| **Injunction** | The Plan shall include a customary injunction provision in form and substance reasonably satisfactory to the Creditors' Committee and the Buyers. |

<u>**EXHIBIT B**</u>

**FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Plan Support Agreement, dated as of June 27, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), by and among the Creditors' Committee, the Buyers, and certain holders of Claims of the Debtors (together with their respective successors and permitted assigns, the "**Consenting Creditors**" and each, a "**Consenting Creditor**") is executed and delivered by _____ (the "**Joining Party**") as of [●], 2018.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>Representations and Warranties</u>.  With respect to the aggregate amount of Claims, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:

Principal Amount of Claims:  $_____

<u>Notice Address</u>
[●]


Fax: [●]
Attention: [●]
Email: [●]

#90986720v15

**<u>Exhibit C</u>**
(Recovery Analysis)

| Recovery Analysis | Plan | Stalking Horse Bid |
|---|---|---|
| Sale Proceeds | $ 19,200,000 | $ 17,500,000 |
| | | |
| DIP Loan | (5,112,000) | (5,112,000) |
| Secured Lender Claim | (4,000,000) | (1,000,000) |
| Administrative Expenses | (3,500,000) | (3,500,000) |
| Priority Claims | (252,698) | (252,698) |
| D&O Tail | - | (380,000) |
| | (12,864,698) | (10,244,698) |
| | | |
| Estimated Distribution to Unsecured Creditors | $ 6,335,302 | $ 7,255,302 |
| | | |
| Unsecured Claim Pool Low Estimate | 8,867,171 | 12,062,521 |
| Recovery Percentage: | 71% | 60% |
| | | |
| Unsecured Claim Pool High Estimate | 10,680,723 | 13,876,073 |
| Recovery Percentage: | 59% | 52% |

**<u>Exhibit D</u>**
(PRXI Corporate Organizational Chart)



## Exhibit E
(Covenants and Conditions)

# Exhibit A

# Revised Covenants and Conditions

## COVENANTS AND CONDITIONS
## FOR THE FUTURE DISPOSITION OF OBJECTS
## RECOVERED FROM THE *RMS TITANIC* BY RMS TITANIC, INC.
## PURSUANT TO AN *IN SPECIE* SALVAGE AWARD
## GRANTED BY THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### I. RECITALS OF PURPOSE

A. WHEREFORE, These covenants are entered into by R.M.S. Titanic, Inc., d/b/a/ Premier Exhibitions, Inc. (hereinafter "RMST") as a condition precedent for receiving an *in specie* salvage award from the U.S. District Court for the Eastern District of Virginia ("the Court") in relation to RMST's Motion for an Interim Salvage Award (dated November 30, 2007) in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902) ("the pending admiralty action");

B. WHEREFORE, RMST has, by order of the Court (since June 1994) served as salvor-in-possession of The RMS TITANIC wreck site, and (since 1993) as substitute custodian of the artifacts recovered therefrom;

C. WHEREFORE, RMST has conducted six dive expeditions to The TITANIC wreck site, logging 360 day-equivalents on the site, and has devoted thousands of hours to the recovery, stabilization, conservation, curation and exhibition of artifacts salvaged from The TITANIC;

D. WHEREFORE, These Covenants and Conditions shall apply to the present and future disposition, care, conservation, and management of the Subject TITANIC Artifact Collection;

E. WHEREFORE, It is the intent to grant RMST an *in specie* salvage award in the form of title to the artifacts that RMST has recovered and which are within the Court's jurisdiction in the pending admiralty action, such *in specie* salvage award shall be a trust for the benefit of and

1

subject to the beneficial interest of the public in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, and the Covenants and Conditions herein expressed;

F.  WHEREFORE, These Covenants and Conditions shall be perpetual in duration, and are intended to govern the disposition, care, conservation, and management of the Subject TITANIC Artifact Collection within the scope of its terms, forever, and irrespective of whether such artifacts continue to be possessed by RMST, and shall be applied to all subsequent owners or possessors of TITANIC artifacts within the scope of its terms;  {Court 4/15/2008 Order, at 5}

G.  WHEREFORE, These Covenants and Conditions are intended to ensure that TITANIC artifacts within the scope of its terms are, for the benefit of the public interest, kept together and intact and are available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7; Court 4/15/2008 Order, at 3 & 4}

## II.  DEFINITIONS OF OPERATIVE TERMS

For the purposes of these Covenants and Conditions:

A.  "RMS TITANIC" means the shipwrecked vessel Royal Mail Ship *Titanic*, sunk in the North Atlantic on April 15, 1912, and includes the wreck site and debris field of the shipwrecked vessel.  {Titanic Memorial Act 3(c); NOAA Guidelines Scope (f); International Agreement art. 1(a)}

B.  "TITANIC Artifacts" means the cargo, tackle, appurtenances and hull of RMS TITANIC, and other contents, including those associated objects (or portions thereof) that are scattered in its vicinity on the ocean floor within the wreck site and debris field, and all such property recovered from the wreck site since September 1, 1985, and any human remains of those aboard the vessel who perished. {NOAA Guidelines Scope (a); International Agreement art. 1(b); Proposed Legislation § 3(d)-sub(e)}

C.  "RMST" means R.M.S. Titanic, Inc., d/b/a/ Premier Exhibitions, Inc., its heirs, successors, and assigns, in exercise of its rights and obligations under these Covenants and Conditions. {Proposed Legislation § 17(h)}

D.  "The Court" means the U.S. District Court for the Eastern District of Virginia exercising its jurisdiction in the case styled *R.M.S. TITANIC, INC., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a*

2

*point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

E. "The Pending Admiralty Action" means the case styled *R.M.S. Titanic, Inc., Successor in interest to Titanic Ventures, limited partnership, Plaintiff v. The Wrecked and Abandoned Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within one (1) nautical mile of a point located at 41° 43' 32" North Latitude and 49° 56' 49" West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant* (Civil Action No. 2:93cv902).

F. "The French TITANIC Artifact Collection" means the entirety of artifacts that were recovered by RMST's predecessor entity in the 1987 dive expedition on The TITANIC, and which were the subject of an *in specie* salvage award granted in favor of RMST's predecessor entity in a Procès-Verbal issued October 20, 1993, by the French Maritime Tribunal, exercising appropriate jurisdiction over those artifacts. {Proposed Legislation §§ 3(c)-sub (a)(3) & 6(d)}

G. "The Subject TITANIC Artifact Collection" means all objects recovered from the RMS TITANIC wreck site and debris field by RMST that are within the jurisdiction of the Court, namely all those objects and artifacts recovered by RMST during the course of its dive expeditions (conducted in 1993, 1994, 1996, 1998, 2000 and 2004) on the site after the initiation of the pending admiralty action in 1992. For the purposes of this operative definition, the Subject TITANIC Artifact Collection does not include (1) lumps of coal recovered from The RMS TITANIC wreck site; (2) extraneous objects removed from the site that, according to the best scientific and historic evidence, were not associated with the RMS TITANIC at the time of its sinking; or (3) objects that are determined to be human remains. {NOAA Guidelines Comment (17); Proposed Legislation § 3(c)-sub (a) & 6(d)}

H. "The TITANIC Collections" refers to the total assemblage of the French TITANIC Artifact Collection and the Subject TITANIC Artifact Collection. {Court 4/15/2008 Order, at 4-5; U.S. Amicus Br. 11 & n.7}

I. "Qualified Institution" means any entity (whether governmental, not-for-profit, corporate, or otherwise in form or character) that has demonstrated the willingness and capacity (by virtue of facilities, financial resources, personnel, accreditation and/or otherwise) to conserve, curate, manage, and generally care for the Subject TITANIC Artifact Collection, and to ensure that such is available to posterity for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. Considerations for any evaluation of whether an entity is a qualified institution are included as Annex A to these Covenants and Conditions. For the purposes of entering into these Covenants and Conditions, RMST is, as of the effective date of these Covenants and Conditions, a qualified institution. {NOAA Guidelines Scope (g); 36 C.F.R. § 79.9}

J. "The Trustee" means any qualified institution which shall have the responsibility and authority to conserve, curate, manage, and generally care for the TITANIC Collections for the

3

public interest. For the purposes of the Covenants and Conditions, RMST shall be the first Trustee of the Subject TITANIC Artifact Collection.

K. "National Oceanic and Atmospheric Administration (NOAA)" refers to the federal agency that represents the public interest in TITANIC Collections and exercises oversight functions in relation to these Covenants and Conditions. NOAA's authority to represent the public interest in this matter is consistent with NOAA's authority under the RMS TITANIC Maritime Memorial Act of 1986 and NOAA's 2001 implementing Guidelines. Such authority shall be carried out consistent with the 1986 Act, other applicable law, and orders of the Court, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions. NOAA shall, however, be an intended beneficiary of these Covenants and Conditions, with the authority to enforce their terms as appropriate on behalf of the public interest. References to NOAA in the context of court proceedings shall, as appropriate, be interpreted to refer to actions by NOAA acting through its counsel the United States Department of Justice.

L. "Conservation" means, in relation to The TITANIC Collections, the handling, cleaning, stabilizing, restoration and conserving of objects in such a manner to preserve them for posterity. {36 C.F.R. § 79.4(b)(6)}

M. "Curation" means managing and preserving The TITANIC Collections for posterity, including, but not limited to: (1) inventorying, accessioning, labeling and cataloging objects; (2) identifying, evaluating and documenting objects; (3) storing and maintaining objects using appropriate methods and containers, and under appropriate environmental conditions and physically secure controls; (4) periodically inspecting objects and taking such actions as may be necessary to preserve them; (5) providing access and facilities for study and research. {Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44737; 36 C.F.R. § 79.4(b)}

N. "Performance guarantee" means the reserve account established under Section V.D. hereof in order to fund an endowment the income of which is sufficient to cover the annual costs to conserve and curate the Subject TITANIC Artifact Collection. It may also include such additional financial undertakings or guarantees as the Court may order under these Covenants and Conditions.

O. "Reserve Account" means that fund set aside by the Trustee and irrevocably pledged for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Artifact Collections for the public interest, as provided by Section V.D. herein;.

III. ENSURING THE UNITY AND INTEGRITY OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 11-12; Court 4/15/2008 Order, at 4-5}

A. The Subject TITANIC Artifact Collection shall be kept together and intact forever, pursuant to the terms of these Covenants and Conditions. Individual objects or artifacts, or groups of objects or artifacts, as well as all supporting documentation, shall not be dispersed through sale or other disposition (including pledge, collateralization, or similar treatment), except as through a process of deaccessioning, as provided under these Covenants and Conditions. The Subject TITANIC Artifact Collection shall, to the maximum extent possible and consistent with reasonable collections management practices, be conserved and curated together with the French TITANIC Artifact Collection as an integral whole by the Trustee. {NOAA Comment (5) & Guideline 28; & International Agreement art. 3}

B. The TITANIC Collections shall be available to present and future generations for public display and exhibition, historical review, scientific and scholarly research, and educational purposes. {International Agreement pmbl. ¶ 7 & Rule 28}

1. *Public Display and Exhibition.* Popular presentation and public display and exhibition of the TITANIC Collections may, at the Trustee's discretion, be at a fixed venue or location, or through one or more traveling exhibitions, and such displays or exhibitions may be permanent, continuous, intermittent, or occasional in character. Public display and exhibition of the TITANIC Collections may include temporary loans of objects to qualified institutions under terms no less exacting than those contained in these Covenants and Conditions. {NOAA Guideline 31; International Agreement Rule 31; 36 C.F.R. § 79.10(e)}

2. Historical Review, Scientific and Scholarly Research.

a. *Research in the Ordinary Course.* Individual objects or artifacts, or groups of objects or artifacts, within the TITANIC Collections shall be made available by the Trustee, in its discretion and consistent with professional standards, to qualified scholars, researchers, and scientists for viewing and study on appropriate terms and conditions, depending on the character of the object being studied, and the nature of the study being conducted, and consistent with best collections management practices. The Trustee may condition access to objects within the TITANIC Collections to reasonable restrictions, in order to ensure fair access, conservation of the Trustee's resources, and preservation of its rights of exhibition and media in such objects (including any relevant intellectual property rights). The Trustee shall (where appropriate) promote the public dissemination of researches and studies in relation to the TITANIC Collections. {NOAA Guideline 27; International Agreement Rule 27; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44734 (std . IV); 36 C.F.R. § 79.10(b)}

b. *Destructive or Invasive Research.* The Trustee may, in its discretion based on best scientific and research practices, permit the destructive or invasive testing or analysis of selected objects within the TITANIC Collections by highly qualified investigators,

using established protocols or techniques of investigation, who are pursuing studies for which no other alternative means of investigation is possible, provided that all efforts are taken to ensure that objects that are truly of an irreplaceable or historically significant nature will not be harmed. An example of legitimate destructive or invasive research within the contemplation of this provision would be metallurgical and forensic analysis of portions of The TITANIC hull, in order to determine the true causes of the vessel's sinking. The Trustee may allow access to objects within the TITANIC Collections for destructive or invasive testing or analysis, subject to the payment of a user fee to the Trustee for the conduct of such research, and the Trustee may insist that the results of such destructive or invasive research be made publicly available. Research that involves potential harm or destruction of artifacts may only be conducted under a research plan approved by the Court. {NOAA Guideline 3; International Agreement Rule 3; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44734 (stds. II & IV); 36 C.F.R. § 79.10(d)(5); 36 C.F.R. § 79.9(b)(5)(iii))}

3. *Education.* The Trustee shall make all reasonable and appropriate efforts to develop and promote public educational uses and applications of the TITANIC Collections, including curricular materials and items in a variety of mediums. Without derogating its intellectual property rights in such educational materials, the Trustee shall make such materials available on preferential terms to educational institutions at all appropriate levels of instruction. {NOAA Guideline 31}

C. Deaccessioning of Objects within the Subject TITANIC Artifact Collection (STAC).

1. *General Principle.* Deaccessioning of objects in the Subject TITANIC Artifact Collection (STAC) may occur only under extraordinary circumstances and only after a rigorous process of evaluation by the Trustee, which process has demonstrated that a particular artifact or object, or group of artifacts or objects, within the Subject TITANIC Artifact Collection no longer hold historical, cultural or archaeological significance or that such items can no longer be properly conserved or curated, based on then-current best collections management practices. {NOAA Guidelines Comment (6); U.S. Amicus Br. 12 n.8}

2. *Considerations for Deaccessioning.* Considerations that may be relevant to the Trustee in any rigorous process of evaluation for deaccessioning from the STAC, include: (a) whether an object has sufficient intrinsic or historical value or aesthetic merit as an item for further study, research or exhibition; (b) whether an object is redundant or duplicative and has no value as part of a series; (c) whether the physical condition of the object is so poor as to render stabilization, conservation or restoration impossible; (d) whether the physical condition of the object is so poor that it no longer has value for exhibition, research, study or teaching purposes. Any evaluative report made by the Trustee to deaccession an object must fully document its conclusions based on then-current best collections management practices. {AAMD Practices; ICOM Professional Ethics Code 2.13 & 2.15}

6

3. *Modalities of Disposition by Deaccessioning.* Once an object within the STAC is deaccessioned it may be disposed of in a variety of ways by the Trustee without violating the principle that objects or artifacts, within the Subject TITANIC Artifact Collection, shall not be dispersed through sale or other disposition. {NOAA Guidelines Comment (6)}

a. Disposition of a deaccessioned object from the STAC may be accomplished by (i) sale to a designated buyer, or by public auction, or by other means in an appropriate arms-length transaction; (ii) sale, exchange or gift to a museum or educational institution in an appropriate arms-length transaction; or (iii) destruction (in the case of an object that is too badly damaged or deteriorated to be properly conserved or restored). {ICOM Professional Ethics Code 2.13 & 2.15}

b. Before disposition, an object shall be fully and permanently documented by the Trustee, including analysis and imaging, so that future researchers may consult some record of the object. {ICOM Professional Ethics Code 2.13 & 2.15}

c. Any moneys received from the disposition of a deaccessioned object from the STAC shall be applied solely for the benefit of the TITANIC Collections. {ICOM Professional Ethics Code 2.16}

4. Any decision made concerning the deaccessioning of an object from the STAC, and the modalities of such disposition, shall be made upon the initiative of the Trustee. Such shall be based upon an evaluative analysis prepared by the Trustee and directed to the Court. After the filing of such a request and analysis, NOAA may submit information and/or a report and recommendation to the Court regarding the proposed deaccessioning of an object and the modalities of such disposition. The Trustee may make a timely response to any NOAA submission. No deaccession or disposition of an object from the STAC shall occur or be valid except with the approval of the Court. {U.S. Amicus Br. 12 n.8}

IV. ENSURING THE PROPER MANAGEMENT OF THE TITANIC COLLECTIONS {U.S. Amicus Br. 12-13; Court 4/15/2008 Order, at 4-5}

A. The TITANIC Collections shall be maintained in accordance with current internationally recognized museum standards and practices for collections management. {Proposed Legislation § 17(i)}

B. Specifically, the TITANIC Collections shall be maintained in accordance with the following rules:

1. Conservation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the conservation project is to be

7

undertaken. {International Agreement Rule 24; NOAA Guideline 24}

2. Curation of objects in the TITANIC Collections shall be carried out in accordance with professional standards current at the time the curation project is to be undertaken. {International Agreement Rule 30; NOAA Guideline 30}

3. Transport, exhibition, and security of objects in the TITANIC Collections, to the extent that such are not otherwise subsumed within standards for curation, shall be carried out in accordance with best practices current at the time a particular activity is to be undertaken. {International Agreement Rule 23; NOAA Guideline 23}

4. Documentation of objects in the TITANIC Collections shall be carried out in accordance with reasonably prudent archaeological standards current at the time the documentation project is to be undertaken, and shall include, where relevant, the systematic and complete recording of the provenance of objects in the TITANIC Collections in order to preserve historical, cultural and archaeological information, and the preservation of field notes, plans, sections, photographs, and imaging/recording of the objects. {International Agreement Rules 5, 21-22; NOAA Guidelines 5, 21-22; Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44735-37; 36 C.F.R. § 79.9(b)(6)}

C. The Trustee shall ensure that all conservation, curation, documentation and related projects for the TITANIC Collections shall be undertaken only under the guidance of, and in the presence of, qualified technical and/professional experts with the knowledge, experience and demonstrated competence appropriate to the projects undertaken, and that all persons associated with a project should be (1) qualified and have demonstrated experience appropriate to their project roles; and (2) fully briefed and understand the work required. {International Agreement Rules 17 & 18; NOAA Guidelines 17 & 18; 36 C.F.R. § 79.4(h); Interior Archeology Standards & Guidelines, 48 Fed. Reg. 44739-40}

D. The Trustee shall take all necessary measures to protect the physical security of the TITANIC Collections and shall insure it against casualty or loss. {36 C.F.R. § 79.9(b)(3)}

V. *OVERSIGHT OF COMPLIANCE WITH THE COVENANTS AND CONDITIONS* {U.S. Amicus Br. 13-14; Court 4/15/2008 Order, at 5}

A. NOAA has the authority to gather information and to submit information and/or make reports and recommendations to the Court regarding the compliance of the Trustee with these Covenants and Conditions, subject to the availability of resources, appropriations, and other authorized funds. NOAA is not a formal party to these Covenants and Conditions, and does not possess mandatory legal obligations pursuant to the Covenants and Conditions.

B. NOAA's authority shall be exercised within the terms of these Covenants and Conditions.

C. In order to make reports and recommendations to the Court, NOAA shall have the authority under these Covenants and Conditions:

1. To periodically inspect the TITANIC Collections and the Trustee's operations for the conservation, curation, documentation, and other activities in relation to the STAC. For these purposes, NOAA shall have full access to the TITANIC Collections, the Trustee's facilities and personnel, and any documentation NOAA determines is reasonably necessary to evaluate the condition of the STAC.   {36 C.F.R. § 79.11}

2. To consult with, and seek advice from, any entity or individual who may be of assistance to evaluate the condition of the TITANIC Collections, including other federal governmental departments and agencies, and those entities or individuals who have such relevant or appropriate professional or academic credentials.  Any written reports and views of such entities and individuals consulted shall be timely shared with the Trustee, which shall have the opportunity to timely respond.   {16 U.S.C. § 450rr-3; 66 Fed. Reg. 18911}

3. To make recommendations to the Trustee about measures to be adopted to improve the condition of the STAC.  The Trustee shall have the opportunity to respond to such recommendations, and shall subsequently report to the Court how it has implemented, or why it has not implemented, such recommendations.

4. To make recommendations as to the deaccessioning of objects from the STAC, pursuant to the procedures detailed in Covenant and Condition III.C.4, *supra.*

5. To make recommendations relating to the performance guarantee detailed in Covenant and Condition V.D, *infra.*

6. To make recommendations as to whether the Trustee is in significant default of an essential Covenant and Condition, pursuant to the procedures detailed in Covenant and Condition V.E, *infra.*

7. To make recommendations as to the designation of a Subsequent Trustee, pursuant to the procedures detailed in Covenant and Condition VI.E, *infra.*

8. To make recommendations in the event of a Trustee's bankruptcy, pursuant to the procedures detailed in Covenant and Condition VII.D, *infra.*

9. To make recommendations that the Court should appoint experts to offer opinions regarding the compliance of the Trustee with these Covenants and Conditions and/or any other matter relevant to the STAC.

9

10. To make periodic reports to the Court as to the Trustee's compliance with these Covenants and Conditions.

11. Subject to the availability of resources, appropriations, and other authorized funds, to perform any other functions requested by the Court regarding oversight of the STAC.

12. If NOAA determines it will no longer participate in these Covenants and Conditions, it will provide timely notice to the Court and the Trustee.

D. Performance Guarantees: Trust and Reserve Account.

1. An incumbent Trustee hereby covenants that it will set aside and pay a designated sum of monies into a reserve account (as specified below) separate and segregated from other accounts, which may not be used for general operating or other routine expenses of the Trustee.

2. The payments shall be made out of the money which it may now or later have on hand and available for such purposes commencing with the fiscal quarter in which these Covenants and Conditions are executed and the *in specie* salvage award is granted, and quarterly thereafter in equal amounts of US $25,000 per quarter, as a performance guarantee. The payments shall be adequate so that within twenty-five (25) years from the date hereof, and based upon reasonably anticipated rates of return, there shall be an endowment, the annual income of which (based on reasonable rates of return) would be sufficient to cover the estimated annual costs and expenses of conserving and curating the TITANIC Collections for that year. For these purposes the amount of an adequate endowment will be deemed equal to 5 million dollars (US $5,000,000), which may be adjusted from time to time to address changes in circumstances and inflation. Interest that may accrue on said reserve fund shall be retained in the reserve account until such time as the fund shall accumulate 5 million dollars (US $5,000,000), as that amount may be adjusted from time-to-time as hereinabove provided.

3. Said reserve account shall be and is hereby irrevocably pledged to and held in trust by Trustee for the purpose of providing a performance guarantee for the maintenance and preservation of the TITANIC Collections for the public interest.

4. All monies in the reserve account may be kept in cash or invested in direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States Government, obligations of agencies of the United States Government or certificates of deposit secured by such obligations. In all other respects, investment decisions related to the reserve fund are committed to the sound business discretion of the Trustee. Interest on such investments and/or any profits realized from the sale thereof shall be deposited in and become a part of the reserve account until the aggregate amount equals 5 million dollars (US $5,000,000), as from time-to-time may be adjusted.

10

5. No funds from the reserve account may be withdrawn except upon the prior written request of the Trustee with sufficient explanation as to its need and use, and with the approval of the Court. If a deficiency is created in the Reserve Account by reason of a withdrawal either for purposes of maintaining or preserving the TITANIC Collections or any item thereof, then said deficiency in the reserve account shall be made up from the money first available to the Trustee after covering current expenses of maintaining and preserving the TITANIC Collections.

6. In making any determination related to performance guarantees, the Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing.

7. NOAA may submit information and/or prepare a report and recommendation for the Court, as to any issue related to performance guarantees, and the Trustee may make a timely response to such a submission. The Court may consider any information and/or report and recommendation submitted by NOAA.

E. Trustee's Material Default.

1. A "Material Default" is defined to include that conduct or omission by the Trustee, or such conditions in relation to the TITANIC Collections, that seriously compromise and jeopardize the TITANIC Collections and the objective of ensuring that it is available to posterity. Any violation of Covenants and Conditions III.A, III.C, IV.B, and IV.D will normally be assumed to be a material default.

2. Procedures to be Followed in the Event of a Material Default.

a. NOAA may, in a notice directed to the Trustee (or in a report to the Court in the event of extraordinary circumstances) indicate that a material default has occurred, or will imminently occur, and may recommend a means of response or remediation of such default. The Trustee shall have thirty (30) days to respond to such a notice or report, indicating (i) whether its conduct, or the condition of the Titanic Collections, is such as to merit characterization as a significant default, and (ii) what response or remediation efforts have, in any event, been implemented. If NOAA is satisfied with the Trustee's response that shall end the matter, but if not, NOAA may request a further set of responses from the Trustee, or shall direct a report to the Court indicating that a material default has occurred, or will imminently occur, and recommending a means of response or remediation of such default

b. The Court may request information from the Trustee and/or may convene and conduct an evidentiary hearing in order to ascertain whether a material default has occurred, and what steps the Trustee must undertake to respond or remediate;

11

          c. At the conclusion of any evidentiary hearing NOAA may submit additional information and/or prepare a report and recommendation for the Court, as to whether there has been a material default, and whether the Trustee is unwilling or unable to satisfactorily respond or remediate. The Trustee may make a timely response to such submissions;

          d. The Court may consider any information and/or report and recommendation submitted by NOAA and the Trustee;

          e. The Court may enter an Order as to whether there has been a material default, and, if so, any such action as the Trustee must make, within a specified period of time, to respond or remediate,

          f. If the Court finds that there has been a material default of an essential Covenant and Condition, and the Trustee is unable or unwilling to comply with the Court's order for response or remediation, the Court may order (i) the Trustee to make other reasonable undertakings in order to respond to or remediate the material default; (ii) the Trustee to post additional performance guarantee(s); or (iii) the use of the reserve account in a manner subject to the Court's determination to best protect and preserve the TITANIC Collections.

     F. The Continuing Jurisdiction of the Court.

          1. The Court shall be deemed to have continuing jurisdiction over the Subject TITANIC Artifact Collection as part of the pending admiralty action.

          2. Any Trustee designated under these Covenants and Conditions shall submit itself *in personam* to the jurisdiction of the Court, for the purpose of oversight of compliance with these Covenants and Conditions.

     G. Funding of Oversight

          1. The Trustee shall, as part of its obligations under these Covenants and Conditions, pay reasonable expenses of court-appointed experts. Such experts may be appointed where necessary and appropriate to assist with any issue or determination arising under these Covenants and Conditions.

          2. NOAA may recommend appointment of an expert, or the Trustee may make such recommendation, or the Court may do so *sua sponte*.

VI. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF ITS SALE {U.S. Amicus Br. 14-15; Court 4/15/2008 Order, at 5 & 6 n.12}

A. The Subject TITANIC Artifact Collection (STAC) may not be sold, transferred, assigned, or otherwise be the subject of a commercial transaction, except as approved by the Court. Such transfer or assignment will be subject to orders of the Court including the provisions of these Covenants and Conditions. {U.S. Amicus Br. 15}

B. These Covenants and Conditions for the STAC shall run in perpetuity and shall be applied to all subsequent Trustees within the scope of their terms. {Court 4/15/2008 Order, at 5}

C. Subsequent purchasers, assignees, transferees, or otherwise of the Subject TITANIC Artifact Collection (henceforth "subsequent Trustees") shall be deemed to be on notice of the restrictions contained in these Covenants and Conditions as constituting an equitable servitude and trust imposed for the public interest and that NOAA may represent the public interest in the STAC and exercise oversight functions in relation to these Covenants and Conditions. NOAA may file or cause to be published such public notice of these Covenants and Conditions as it deems in its discretion to be necessary or convenient to protect the public interest. The Trustee shall execute such documents as may be reasonably appropriate to provide such notice.

D. Any subsequent Trustee must be a qualified institution, as defined in provision II.I, *supra*, and in light of the considerations contained in Annex A, *infra*.

E. Procedure for Designating a Subsequent Trustee.

1. The Trustee may propose to the Court a transaction for the sale, transfer, assignment or otherwise of the Subject TITANIC Artifact Collection. The proposal should include all details of the transaction, shall identify the proposed Subsequent Trustee, and indicate how the candidate Subsequent Trustee is, or will become, a qualified institution, and shall include a signed acknowledgement by the proposed Subsequent Trustee to be bound by these Covenants and Conditions. The procedures outlined in this section (Section VI) of the Covenants and Conditions do not apply, however, in situations where the corporate identity of the Trustee is changed or altered by sale, purchase, merger, acquisition, or similar transaction, the form and purpose of which does not effectuate a change in the management, conservation and curation of the STAC.

2. The Court may appoint experts to conduct and complete due diligence investigations of the candidate Subsequent Trustee, to no less an extent as permitted in regards to the operations of the Trustee. Such experts may, by communication to the Court, Trustee, and NOAA, offer opinions whether (a) the candidate Subsequent Trustee is a qualified institution; and (b) whether the transaction may proceed under the terms and conditions proposed, or whether such must be modified in order that the transaction be in conformance with these Covenants and Conditions.

13

3. The Court may request information from the Trustee on this matter, and/or may convene and conduct a hearing, in order to ascertain whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed.

4. The Court may consider any information and/or report and recommendation submitted by NOAA as to whether the candidate Subsequent Trustee is a qualified institution and whether the transaction may proceed. The incumbent Trustee may timely respond to such NOAA submissions.

5. The Court may enter an Order indicating whether the transaction may proceed, and (if appropriate) designating the candidate proposed as the next Trustee of the Subject TITANIC Artifact Collection. As part of its Order, the Court may confirm that, in the transfer of the STAC, the disposition of any funds having accumulated in the reserve account established in Covenant and Condition V.D. remains with the former Trustee, provided that the subsequent Trustee immediately replaces any such funds, thereby irrevocably pledging those funds for the purpose of providing for the maintenance and preservation of the TITANIC Collections for the public interest, and undertakes its continuing accretion at not less than its then-current levels, such funds being pledged for the conservation and curation of the TITANIC Collection for the public interest.

F. Special Provisions in the Event of a Transaction with an Overseas Entity.

1. Nothing in these Covenants and Conditions precludes the sale, transfer, assignment or other transaction of the Subject TITANIC Artifact Collection to a qualified institution located or constituted outside the United States ("an overseas entity").

2. An Overseas Entity must make, as a condition of the transaction, the declaration contained in provision V.F.2, in a form satisfactory to the Court.

3. As ordered by the Court, an Overseas Entity may be required to post an additional performance guarantee as a condition for being confirmed as the Subsequent Trustee, unless:

a. The overseas entity is located or constituted in a State Party to the International Agreement Concerning the Shipwrecked Vessel RMS Titanic, done at London, November 6, 2003, or in a country mentioned in 16 U.S.C. § 450rr-3(a); or

b. The transaction approved pursuant to the procedures indicated at provision VI.E, *supra*, requires that the STAC be leased-back to, or otherwise effectively managed by, a United States entity that has previously served as a Trustee.

14

4. Any performance guarantee required pursuant to provision VI.F.3 of the Covenants and Conditions shall have such additional purposes and objectives as designated by the Court.

VII. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF A TRUSTEE'S BANKRUPTCY  {U.S. Amicus Br. 16; Court 4/15/2008 Order, at 5}

A. Having been declared that any Trustee's title to and possession and use of the Subject TITANIC Artifact Collection (STAC) pursuant to the *in specie* salvage award is subject to a trust to further the public interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, any Trustee of the STAC that is organized as a business association (whether for-profit, or not-for-profit), shall be required to take all appropriate measures to ensure that these Covenants and Conditions will continue to apply to the STAC for the benefit of the public interest even in the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event.

B. To the extent allowed by federal law, the beneficial interests to the STAC, including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate of the Trustee in the event of bankruptcy, insolvency, dissolution, winding up, or similar event, and all measures taken by a trustee, debtor-in-possession or similar agent of the Trustee shall be subject to review by the United States District Court for the Eastern District of Virginia to protect the unity and integrity of the STAC under these Covenants and Conditions; provided, however, nothing in this subparagraph shall be construed to deprive the Trustee of any economic benefits relating to the *in specie* salvage award and its title to the STAC consistent with these Covenants and Conditions.

C. Deleted.

D. Procedures in the Event of a Trustee's Bankruptcy.

1. In the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event, the Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions;

2. The Court may request information from the Trustee and/or may convene and conduct a hearing in order to ascertain whether the Trustee's insolvency bond should be forfeited and recommend the modalities under which the funds will be applied to protect the TITANIC Collections;

3. Deleted.

4. Deleted.

5. NOAA shall have the right to make submissions in the foregoing proceedings and represent the public interest.

6. As set forth in V.F.1, jurisdiction over this matter shall remain in the United States District Court for the Eastern District of Virginia. If, however, another bankruptcy court attempts to exercise jurisdiction over the STAC artifacts, the district court in which the bankruptcy case is pending may have the reference withdrawn under 28 U.S.C. § 157, or transfer venue to this Court under 28 U.S.C. § 1412.

## VIII. OTHER PROVISIONS

A. These Covenants and Conditions constitute the entirety of a Trustee's obligations in regards to the TITANIC Collections.

B. Any controversy or claim arising out of or relating to these Covenants and Conditions shall be within the primary competence of the Court exercising jurisdiction in the pending admiralty action.

C. If any provision of these Covenants and Conditions is found to be unconstitutional or unenforceable by a court or tribunal of competent jurisdiction, such provision shall be severed from the whole and the remaining provisions shall be given full force and effect.

D. These Covenants and Conditions shall be interpreted in accordance with federal law.

16

## ANNEX A

### Considerations for any Evaluation of Whether an Entity is a Qualified Institution

The following considerations are relevant to a determination whether an entity is a qualified institution within the meaning of the Covenants and Conditions. An entity will be deemed to have the capability to provide adequate long-term conservation and curatorial services when the entity is able to:

(a) Accession, label, catalog, store, maintain, inventory and conserve the TITANIC Collections on a long-term basis using reasonable museum and archival practices; and

(b) Comply with the following, as appropriate to the nature and content of the collection;

    (1) Maintain complete and accurate records of the TITANIC Collections, including:

        (i) Records on acquisitions;

        (ii) Catalog and artifact inventory lists;

        (iii) Descriptive information, including field notes, site forms and reports;

        (iv) Photographs, negatives and slides;

        (v) Locational information, including maps;

        (vi) Information on the condition of the TITANIC Collections, including any completed conservation treatments;

        (vii) Approved loans and other uses;

        (viii) Inventory and inspection records, including any environmental monitoring records;

        (ix) Records on lost, deteriorated, or damaged objects within the Subject TITANIC Artifact Collection (STAC); and

        (x) Records on any deaccessions and subsequent transfers, repatriations or discards of objects within the STAC;

    (2) Dedicate the requisite facilities, equipment and space in the physical plant to properly store, study and conserve the collection. Space used for storage, study, conservation and, if

17

exhibited, any exhibition must not be used for non-curatorial purposes that would endanger or damage the collection;

(3) Keep the TITANIC Collections under physically secure conditions within storage, laboratory, study and any exhibition areas by:

(i) Having the physical plant meet local electrical, fire, building, health and safety codes;

(ii) Having an appropriate and operational fire detection and suppression system;

(iii) Having an appropriate and operational intrusion detection and deterrent system;

(iv) Having an adequate emergency management plan that establishes procedures for responding to fires, floods, natural disasters, civil unrest, acts of violence, structural failures and failures of mechanical systems within the physical plant;

(v) Providing fragile or valuable items in a collection with additional security such as locking the items in a safe, vault or museum specimen cabinet, as appropriate;

(vi) Limiting and controlling access to keys, the collection and the physical plant; and

(vii) Inspecting the physical plant for possible security weaknesses and environmental control problems, and taking necessary actions to maintain the integrity of the collection;

(4) Require staff and any consultants who are responsible for managing and preserving the STAC to be qualified professionals;

(5) Handle, store, clean, conserve and, if exhibited, exhibit the TITANIC Collections in a manner that:

(i) Is appropriate to the nature of the material remains and associated records;

(ii) Protects them from breakage and possible deterioration from adverse temperature and relative humidity, visible light, ultraviolet radiation, dust, soot, gases, mold, fungus, insects, rodents and general neglect; and

(iii) Preserves data that may be studied in future laboratory analyses. When material remains in a collection are to be treated with chemical solutions or preservatives that will permanently alter the remains, when possible, retain untreated representative samples of

each affected artifact type, environmental specimen or other category of material remains to be treated. Untreated samples should not be stabilized or conserved beyond dry brushing;

(6) Store site forms, field notes, artifacts inventory lists, computer disks and tapes, catalog forms and a copy of the final report in a manner that will protect them from theft and fire such as:

(i) Storing the records in an appropriate insulated, fire resistant, locking cabinet, safe, vault or other container, or in a location with a fire suppression system;

(ii) Storing a duplicate set of records in a separate location;

(7) Inspect the collection for possible deterioration and damage, and perform only those actions as are absolutely necessary to stabilize the collection and rid it of any agents of deterioration;

(8) Conduct inventories to verify the location of the material remains, associated records and any other Federal personal property that is furnished to the repository; and

(9) Provide access to the collection by the public and researchers.

{36 CFR § 79.9}